UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE CITY OF HIALEAH EMPLOYEES' RETIREMENT SYSTEM and LABORERS PENSION TRUST FUNDS FOR NORTHERN CALIFORNIA, On Behalf of Themselves and All Others Similarly Situated, | ) ) ) ) ) | Civ. Action No. 07-1513<br><br>CLASS ACTION<br><br>AMENDED COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934 |
|                 Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| TOLL BROTHERS, INC., BRUCE E. TOLL, ROBERT I. TOLL, ZVI BARZILAY, ROBERT S. BLANK, JOEL H. RASSMAN, RICHARD BRAEMER, PAUL E. SHAPIRO, CARL B. MARBACH and JOSEPH R. SICREE, | ) ) ) ) ) ) ) ) | |
|                 Defendants. | ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

Page

SUMMARY ...................................................................................................................1

BACKGROUND TO THE CLASS PERIOD AND OVERVIEW OF DEFENDANTS'
    CLASS PERIOD MISCONDUCT .......................................................................5

PARTIES .....................................................................................................................24

JURISDICTION AND VENUE ...................................................................................34

DEFENDANTS' CLASS PERIOD MISREPRESENTATIONS ..................................35

DEFENDANTS' NOVEMBER 8, 2005 DISCLOSURES ABOUT TRAFFIC, ACTIVE
    SELLING COMMUNITIES, DEMAND AND EXPECTED PROFITABILITY ...........80

SCIENTER AND SCHEME ALLEGATIONS ............................................................84

    Defendants' Knowledge of Facts Rendering Their Class Period Statements False ..........84

    Defendants' Insider Trading ...............................................................................88

LOSS CAUSATION/ECONOMIC LOSS ...................................................................95

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE MARKET
    DOCTRINE ......................................................................................................98

NO SAFE HARBOR ...................................................................................................99

CLASS ACTION ALLEGATIONS ..........................................................................109

COUNT I
Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder
    Against All Defendants....................................................................................110

COUNT II
Violation of §20(a) of the 1934 Act Against All Defendants.........................................112

COUNT III
Violation of §20A of the 1934 Act Against Defendants Robert Toll,
    Bruce Toll and Sicree....................................................................................113

PRAYER....................................................................................................................115

JURY DEMAND .......................................................................................................115

## SUMMARY

1.      This is a securities fraud class action brought on behalf of all purchasers of the common stock of Toll Brothers, Inc. (the "Company" or "Toll Brothers") between 12/9/04 and 11/8/05 (the "Class Period").  Toll Brothers is a publicly owned homebuilder specializing in large, luxury homes sold primarily to middle-income and upper-income buyers.  Its stock trades on the New York Stock Exchange ("NYSE").  The defendants are Toll Brothers and several of its top insiders: Robert Toll (Chief Executive Officer), Bruce Toll (Vice Chairman), Zvi Barzilay ("Barzilay") (President/Chief Operating Officer), Joel Rassman ("Rassman") (Chief Financial Officer), Joseph Sicree ("Sicree") (Chief Accounting Officer), Robert Blank ("Blank") (Director), Paul Shapiro ("Shapiro") (Director), Richard Braemer ("Braemer") (Director) and Carl Marbach ("Marbach") (Director) (collectively the "Insider Defendants").

2.      Plaintiffs allege that throughout the Class Period, defendants misrepresented Toll Brothers' ability to open new active selling communities at the rate necessary to support its financial projections, "traffic" in its existing selling communities, demand for Toll Brothers homes, and the Company's ability to continue its historically strong earnings growth beyond its fiscal 2005 ("F05").[1]  In addition, throughout the Class Period, defendants falsely and adamantly maintained that Toll Brothers' business model of focusing on expensive homes for a niche market of high-end buyers was immune from the adverse impact of rising interest rates and other negative macro-economic factors that were overtaking the home building industry during 2004 and 2005.  They repeatedly assured investors that Toll Brothers' unique business model, combined with the fact that the Company controlled a steadily increasing number of active selling communities, would enable it to achieve "*at least*" 20% earnings growth in fiscal 2006 ("F06") over F05, and 20% growth again in

---

[1]      Toll Brothers' fiscal year ends on October 31, so that its F04 was 11/1/03-10/31/04, and its F05 was 11/1/04-10/31/05.

fiscal 2007 ("F07") over F06.  These forecasts were phenomenal, as Toll Brothers' F05 net income grew 97% over fiscal 2004 ("F04").  Defendants' positive statements drove Toll Brothers' stock price from $28.50 per share on 12/19/04 to a Class Period high of $58.67 per share in July 2005, an upward price move that substantially outstripped that of the stocks of other publicly owned home builders during that time period.

3.    Contrary to the positive statements defendants were making publicly, however, they knew that a number of adverse developments in Toll Brothers' business during the last half of F04 and throughout F05 were negatively impacting their business and signaling much slower growth in F06 than they were leading investors to expect.  Toll Brothers was experiencing increasing difficulties opening new active selling communities in F04 and F05, a critical indicator of growth in subsequent years.  In F05 the Company opened only *half* of the new selling communities necessary to achieve 20% growth in F06.  In addition, despite defendants' public statements to the contrary, demand for Toll Brothers' homes fell during F05 and "traffic" to Toll Brothers' existing active selling communities, a key measure of the Company's future sales, slowed throughout F05 as the Federal Reserve Bank raised interest rates eleven consecutive times from 1% in June 2004 to 4% by November 2005.  Toll Brothers' new contract growth declined precipitously each quarter in F05 to a mere 1% growth by 4Q F05 as rising interest rates made Toll Brothers' homes less affordable and diminished its pricing power, even though defendants had publicly stated Toll Brothers was immune from these factors.  Nevertheless, in the midst of these foreboding developments, defendants *raised their F06 earnings projections three times* during the Class Period by a total of *28%*.

4.    As Toll Brothers' stock moved sharply higher during the Class Period in response to defendants' misrepresentations, the Insider Defendants took advantage of the artificial inflation of the stock price, collectively selling over 14 million shares of their own Toll Brothers stock– up to 93% of their holdings – *for insider trading proceeds of over $617 million*.  Robert Toll and Bruce

Toll reaped $323.4 million and $206.4 million by selling 29% and 37% of their holdings, respectively. Barzilay, the Company's Chief Operating Officer, sold 92% of his holdings for over $45.8 million. Rassman, the Chief Financial Officer, sold 68% of his holdings for over $12.1 million. Blank, Shapiro and Marbach, three Toll Brothers directors, sold 93%, 84% and 82% of their holdings, respectively, for over $26 million. These sales were highly suspicious in that the Insider Defendants all sold at the same times and their Class Period sales far surpassed their pre-Class Period sales in volume and proceeds. Several of these insiders sold no stock at all during the entire year preceding the Class Period, and the others sold pittances during that time in comparison with their Class Period sales. At the same time the Insider Defendants were selling their stakes in Toll Brothers, they falsely insisted that they were not selling due to undisclosed problems or difficulties in Toll Brothers' business, but solely for benign reasons, such as estate planning, asset diversification, or to raise cash for food and clothing. Defendants also caused Toll Brothers to spend over $120 million in corporate funds to repurchase over 2.8 million shares of Toll Brothers' common stock on the open market – also at the same time they were selling off large portions of the Toll Brothers' stock that they owned. In fact, Robert Toll told investors that Toll Brothers' stock was "*a tremendous buy*" at $47.63 per share on 6/1/05 – while on the day before and after this statement, the Insider Defendants sold 520,000 shares of their stock for over $23 million and during the next few weeks sold off 1.7 million more shares for $61 million – *while not buying a single share*. Later, in late August 2005, when the stock was trading around $50 per share, Rassman told investors, "*[W]e . . . firmly believe that the price of the stock will continue to go up*" and "*earnings will continue to grow at . . . about 20% a year for each of the next two years*."

5.      Within days after the Insider Defendants had completed the vast majority of their insider sales of Toll Brothers stock at all-time high prices, defendants shocked investors by admitting in a series of disclosures between 8/4/05 and 11/9/05 that traffic at Toll Brothers' active selling

communities had been down since November 2004; demand for Toll Brothers' homes had softened throughout the country; new order growth had slowed to a halt; and Toll Brothers had added only half the new active selling communities it needed to achieve its F06 forecasts. As a result of these developments, defendants abandoned Toll Brothers' projections for F06 and F07 net income growth. On these belated revelations, Toll Brothers' stock cratered from its Class Period high of $58.67 per share to as low as $33.13 per share on 11/10/05 – a 43% decline – as analysts and the media expressed outrage at the Insider Defendants' shocking disclosures on the heels of their own sales. In December 2005, defendants reduced their net income projection for F06 to as low as *0.5%* growth and declined to provide F07 guidance.

6. The decline in Toll Brothers' stock during the last several months of the Class Period resulted from the revelation of company-specific adverse information that had previously been misrepresented to, or withheld from, the market, and proximately caused huge damages to the investors who had earlier purchased Toll Brothers stock during the Class Period. However, Toll Brothers and the Insiders Defendants did not fare nearly so badly, having personally gained over $617 million in insider trading proceeds before the true facts were finally revealed. The following chart illustrates the performance of Toll Brothers' stock and the Insider Defendants' selling during the year before the Class Period, the inflation of the stock during the Class Period as compared to the S&P Homebuilders' Index, and the Insider Defendants' Class Period selling:



**BACKGROUND TO THE CLASS PERIOD AND OVERVIEW OF DEFENDANTS'
CLASS PERIOD MISCONDUCT**

7.    Toll Brothers specializes in building large, luxury homes in single-family detached and attached home communities mainly on land it develops and improves. Toll Brothers markets its homes primarily to middle-income and upper-income buyers and sells a large number of its homes as second or vacation homes. The Company operates in six regions designated as Northeast, Mid-Atlantic, Southeast, Midwest, Southwest and West Coast (California).

8.    During 2002, 2003 and the first half of 2004, home builders in the United States were enjoying the fruits of a multi-year housing boom fueled in large part by some of the lowest interest rates in history. Toll Brothers was a beneficiary of this boom, seeing its revenues increase from $2.2 billion in fiscal 2001 ("F01") to $2.3 billion in fiscal 2002 ("F02"), then to $2.7 billion in fiscal 2003 ("F03") and to $3.8 billion in F04, while its earnings per share ("EPS") soared from $2.76 to $2.91,

to $3.44 to $5.04 in the same periods. Because of strong demand for its houses during 2003 and the first half of 2004, Toll Brothers had obtained purchase commitments from buyers that essentially sold all the houses Toll Brothers could build through the end of its F05, *i.e.*, 10/31/05. The strong demand for its homes was especially important to Toll Brothers' profitability as it gave Toll Brothers "pricing power," *i.e.* the ability to constantly raise prices for its houses, which price increases flowed directly to the Company's "bottom line" as the costs of production of their homes was largely fixed.

9.     However, despite its strong financial results, Toll Brothers' stock traded in line with other homebuilder stocks throughout calendar 2003 and the first three quarters of calendar 2004, and was a mediocre performer during the Company's F04 (11/1/03-10/31/04). While the stock traded as high as $21.50 per share during late 2003, it still traded as low as $20.87 per share in early October 2004, still performing in line with the stocks of other publicly traded home builders. The chart below illustrates the performance of Toll Brothers' stock compared to the S&P Homebuilders Index from January 2003 through September 2004:



**Toll Brothers vs. S&P Homebuilding Index**

January 2, 2003 - September 30, 2004

10.     The performance of Toll Brothers' stock in the year prior to the Class Period, despite Toll Brothers' strong financial performance, reflected the concerns of investors and analysts that the long-running housing boom had entered a "bubble" phase and was about to lose steam due to exhaustion of demand, rising interest rates and other adverse economic factors, all of which would curb the profit growth of public home building companies.  By June 2004, the Federal Reserve began to boost interest rates, and it was widely predicted that rate increases would continue into 2005 and would dampen home buying activity, as rates typically have the largest influence of any factor driving home sales.  During July 2004, new home sales declined by 6.4% according to a Commerce Department report, a far steeper drop than analysts had anticipated.  The decline left new home sales at their lowest level since December 2003, in the midst of a challenging labor market and high fuel prices, which some industry experts believed made people wary about buying homes.  It

was reported by *The Wall Street Journal* in mid-August 2004 that homebuilders who offered financing, like Toll Brothers, had been providing financing incentives to offset the impact of increasing interest rates. By late August 2004, mortgage rates increased in anticipation of more Federal Reserve rate increases, and homebuilder stocks declined, with Toll Brothers' stock price down 11% since March 2004. Then during November 2004, housing starts, the number of housing units on which builders began work, plunged 13.1% from October 2004, the biggest monthly drop in eleven years and steeper than predicted, suggesting that the industry was cooling. In early November 2004, the Federal Reserve raised rates for the third time since June 2004. Just nine days before the Class Period begins, on 11/30/04, homebuilder stocks were among the worst performers, and Toll Brothers stock declined 3.7% that day. All of these factors kept Toll Brothers trading in line with other homebuilders and put pressure on its stock price.

11.     Also negatively impacting the performance of Toll Brothers' stock during 2004 was the fact that speculators, *i.e.*, short sellers, were taking very large short positions in Toll Brothers' stock, selling shares they did not own, hoping to buy them back later at a lower price, *i.e.*, a bet that the stock will go down. Some of these short sellers were making or circulating negative commentaries about Toll Brothers' future prospects.

12.     The performance of Toll Brothers' stock during 2003 and most of 2004, which virtually mirrored that of other publicly owned homebuilders during that time period, and the compounding impact of speculation in the stock was very frustrating to Toll Brothers' top insiders, who owned large amounts of Toll Brothers stock. These insiders also knew by late 2004 that the 2005 results of all home builders, including Toll Brothers, were "in the bag" due to committed contracts to buy houses then in production but would still take months to finish and deliver. In order to create investor enthusiasm for the stock and counter the negative impact of short selling activity, they had to convince large numbers of investors that there were factors unique about Toll Brothers'

business that would allow it to continue its strong earnings performance beyond 2005. Defendants therefore embarked on a campaign to persuade investors that Toll Brothers' business model of selling luxury homes to a niche market of upper income homebuyers would insulate it from the potentially adverse impact of negative macro-economic factors and increasing interest rates, and would thus permit it to continue to achieve at least 20% earnings growth after F05, *i.e.*, after the homes for its existing committed sales contracts were completed. The Tolls and their insider colleagues hoped that such statements, forecasts, and assurances would drive Toll Brothers' stock price higher, and that as the stock moved higher, this would put financial pressure on speculators with large short positions in Toll Brothers' stock. This would hopefully force speculators to "cover" their short positions by re-purchasing shares of Toll Brothers' stock they had sold short, which would in turn create additional buying demand for Toll Brothers stock, pushing the stock price even higher.

13. Defendants began to prime investors and analysts to expect 20% growth in 2006 several months before the Class Period began. For example, on 8/25/04, Toll Brothers issued a release reporting its results for 3Q F04, the period ended 7/31/04, which was headlined and stated:

> **Toll Brothers' Record 3rd Qtr 2004 Net Income Up 56% to $106.0 Million** . . .
>
> Robert I. Toll, chairman and chief executive officer, stated: "Buyer appetite for new luxury homes has remained tremendous throughout 2004 and we are enjoying very strong demand across all our product lines. . . .
>
> ***Based on our projections of community growth in the coming year, assuming continued strong demand, we believe that 20% revenue and net income growth should be achievable in FY 2006***."

14. On 10/5/04, Toll Brothers issued a release regarding its business, headlined and stating:

> **Toll Brothers Reiterates Continued Strong Demand For Luxury Homes** . . .
>
> Robert I. Toll, stated: . . .

"With supply constricted due to governmental regulation and no-growth politics and demand spurred by increasing numbers of affluent households and maturing baby boomers entering their peak earning years, buyer appetite for luxury homes should remain strong for the foreseeable future. . . . *Since we expect to reach approximately 235 selling communities by FYE 2005, compared to 215 at FYE 2004, we believe that 20% revenue and net income growth should be achieved in FY 2006*."

Defendants had originally projected reaching 225 selling communities by the end of F04 in December 2003.

15.     On 11/9/04, Toll Brothers issued a release preliminarily reporting its 4Q F04 and full year F04 results – the year ended 10/31/04 – headlined and stating:

**Toll Brothers' Record 4th Qtr 2004 Contracts Grow 51% vs. 2003 to $1.5 Billion** . . .

Toll Brothers, Inc., the nation's largest builder of luxury homes, today reported record fourth-quarter and fiscal-year-end results for contracts, backlog and home building revenues for the period ended October 31, 2004. . . .

\*          \*          \*

Robert I. Toll, chairman and chief executive officer, stated: "As long as the population continues to rise and affluent households continue to grow much faster than the population in general, and as long as government keeps making it difficult to entitle building lots, demand for luxury homes will continue to exceed supply.

. . . *With a record 220 communities at FYE 2004, projected to reach about 240 by FYE 2005, we believe we'll achieve at least 20% net income growth in FY 2006*."

16.     On 11/9/04, Toll Brothers conducted a telephone conference call for analysts to discuss its business and its 4Q F04 and F04 results.  During the call the following occurred:

**Robert Toll – Toll Brothers, Inc. – Chairman & CEO**

With me today are Joel Rassman, Chief Financial Officer . . .  Joe Sicree, Chief Accounting Officer . . . .

\*          \*          \*

With our record backlog, which already equals 115 percent of fiscal '04 revenues, and our increasing communities, we believe we will produce at least 30 percent net income growth in fiscal year '05, *and at least 20 percent net income growth over that in fiscal '06*. . . .

\*          \*          \*

- 10 -

We now own or control approximately 60,000 home sites, a five- to six-year supply, based on our current pace of growth.  With the growing industry imbalance between demand and supply, we believe this positions us to prosper in the coming years.

*     *     *

**Joel Rassman – Toll Brothers, Inc. – EVP, Treasurer, CFO & Director**

*     *     *

***Based on the expected community count*** and openings during 2005 and the continuation of the current economy, ***we believe we can grow earnings at approximately 20 percent in 2006, as well***.

17.     By at least one month before the Class Period, defendants had succeeded in convincing analysts that Toll Brothers' business model immunized it from any housing downturn on the horizon and would allow it to continue to achieve earnings growth of at least 20% beyond 2005. For example, on 11/9/04, Raymond James issued a report on Toll Brothers based on the recent conference call and follow-up conversations with Robert Toll and/or Rassman.  The report stated:

Management noted that demand has remained robust. ***. . . They maintained their expectation of 20% growth in FY06***. . . .

. . . Toll's industry-leading visibility gives us comfort in the company's earnings over the coming year, which should demonstrate superior growth relative to the sector. ***We continue to believe that Toll's customer is less interest-rate centric, which we believe is evident in the company's past performance***.  Specifically, during periods of rising interest rates over the past decade, Toll Brothers has exhibited significant outperformance in both earnings growth and share price performance.

On 11/9/04, Credit Suisse First Boston issued a report on Toll Brothers based on the recent conference call and follow-up conversations with Robert Toll and/or Rassman.  The report stated:

***TOL maintained its guidance of increasing net income at least . . . 20% in FY06 based primarily on its current backlog, community count growth expectations and strong underlying demand***.

18.     Over the next year, throughout the Class Period, the Federal Reserve continued its rate hikes commenced in June 2004, and increased interest rates nine more consecutive times, taking the federal funds rate from 2% in November 2004 to 4% by November 2005.  Defendants assured investors throughout the Class Period that despite an increasingly hostile interest rate environment,

- 11 -

Toll Brothers was enjoying "***continuing strong demand***" and was in fact seeing a "'***widening gap between tight supply and growing demand***.'"  They said there was "***no abatement***" in demand, that the "'***demand continues to grow***,'" that this "***imbalance between supply and demand is evident everywhere***," and the "***market is fantastic***."   As a result of these very favorable market conditions, they assured investors that Toll Brothers was enjoying "'***strong pricing power and increasing profit margins as demand for luxury homes continues to outpace supply***.'"  Importantly, Toll Brothers told investors its "'***growing portfolio of well-positioned [selling] communities'***" would enable it to grow, it would have ***240 active selling communities*** by the end of FY05 as compared to 220 at the end of FY04, and would have "265 active selling communities" by the end of FYE 2006; and, based on the "***current pace of traffic***," would deliver 10,200-10,600 new homes during FY2006.   At bottom, they said, this presented to investors a perfect situation for Toll Brothers stock, as "'[w]e've got the supply and the market has the demand, so it's a match made in heaven.'"

19.     Defendants also went to great lengths to specifically convince investors that rate hikes would have no impact on Toll Brothers' performance, assuring them that its business was unique because its luxury homebuyers were "***less impacted by interest rate hikes***" and that it was "***supply and demand***" and "***not interest rates***" that was driving Toll Brothers' business.   Robert Toll repeatedly assured investors that rising interest rates would not be a deterrent to Toll Brothers' continued growth, that Toll Brothers' customers were mostly **"*completely insulated from the rising rate environment***," thus Toll Brothers "***will prove***" to investors that it was immune to interest rate hikes.   Despite rising mortgage interest rates, defendants insisted that Toll Brothers was "***very confident***" of achieving "***approximately***" or "***at least***" 20% net income/EPS growth in F06 ***and*** F07. Defendants said there was no "***reason for us not to be able to hit 20% a year [net income growth] minimum***," as "***all signs seem to point in that direction***."

20. Importantly, Toll Brothers increased its F05 net income growth forecast three times during F05, from 40% to 60% to 70% and finally 80%, which in turn *materially increased its F06 forecast of 20% growth over F05 by 28%*. As defendants increased Toll Brothers' F05 forecasts, they maintained their F06 forecast. Analysts found this very significant. For example, Credit Suisse reported in May 2005 that "despite the higher [70%] base earnings in 2005, *management believes it can still achieve earnings growth of approximately 20% in fiscal 2006*." BB&T Capital Markets reported, "[m]anagement still expects net income to grow by 20% in FY'06, *even from the higher base in FY'05*."

21. Also during the Class Period, when any hints of problems in Toll Brothers' business surfaced, Toll Brothers assured investors there were benign explanations for these events, thus explaining them away. When defendants told investors in May 2005 that Toll Brothers had encountered a decline in orders for new homes in its important California market, where it garnered 25% of its profits, it assured investors that this was "'*not due to a lack of demand*'" but was because of "'*a lack of supply*'" as Toll Brothers had "'*sold out*'" of some communities faster than expected. They assured investors that demand for Toll Brothers homes in California remained "*very strong*" and its supply of active selling communities in California would climb back to 1Q F05 levels in early F06, thus resulting in a total of about 265 active selling communities in F06 and the sale of 10,200-10,600 new homes during F06. Even when parts of the Southern United States were hit by serious hurricanes in August 2005, defendants told investors the hurricanes had not impacted Toll Brothers' business "*at all*."

22. Defendants' efforts to convince sufficient analysts and investors to believe Toll Brothers' business model was unique and would allow the Company to continue to report strong (20%+) earnings growth in F06 and F07 were successful. Toll Brothers' stock skyrocketed during

the Class Period due to the foregoing positive statements, assurances and forecasts, materially outperforming the stocks of other publicly owned home builders:



**Toll Brothers vs. S&P Home Building Index**
January 2, 2003 - July 25, 2005

23.     As Toll Brothers stock rapidly rose to its all-time high of $58.67 in July 2005, trading at artificially inflated prices due to these very positive assurances and forecasts, the Insider Defendants sold off almost 14.1 million shares of their own Toll Brothers stock *for over $617 million in insider trading proceeds*.  Their trading began immediately after the commencement of the Class Period on 12/9/04, with seven of the Insider Defendants reaping $124.6 million from sales of their own Toll Brothers stock in just five trading days between 12/10/04 and 12//15/04.  Their trading continued throughout the Class Period, as these insiders each sold *between 29% and 93%* of their Toll Brothers' holdings.  In particular, Barzilay, the Chief Operating Officer, sold 92% of his holdings for $45.8 million in proceeds; Sicree, the Chief Accounting Officer, sold 74% of his shares

for over $2.1 million; Rassman, the Chief Financial Officer, sold 68% of his holdings for over $12.1 million; Bruce Toll, the Vice Chairman, sold 37% of his holdings for over $206.4 million; and Robert Toll, the Chief Executive Officer, sold 29% of his holdings for $323.4 million. The four director defendants each sold between 52% and 93% of their Toll Brothers holdings for almost $28 million in proceeds.

24.     When members of the financial media highlighted and/or questioned the large sales of Toll Brothers stock by the insiders during 2005 as a possible indication of future business problems, defendants assured investors the sales were for "'***ordinary***'" asset "'***diversification'***" and "***estate planning***" purposes, and because they had "'***to buy food and clothing***.'" Rassman said their selling "***had nothing to do***" with adverse conditions inside Toll Brothers' business or its markets. In fact, on 6/1/05 when Toll Brothers stock hit its then all time high $47.64, in answer to the question "would you be a buyer of this stock at these levels," Robert Toll stated "***[y]es, I would . . . its just fabulous . . . a tremendous buy***." However, in the few days surrounding 6/1/05, the Insider Defendants collectively sold off over 2.2 million shares of their Toll Brothers stock for $61 million in insider trading proceeds – not buying a single share. Later, Rassman assured investors, "***[W]e . . . firmly believe that the price of the stock will continue to go up***" as "***earnings will continue to grow at . . . about 20% a year for each of the next two years***."

25.     Robert Toll was forced to admit his early Class Period sales between 12/10/04 and 2/25/05, for proceeds of over $189 million, were not "kosher" during a 5/26/05 CNBC interview with James Cramer on "Mad Money":

> JIM CRAMER, CNBC ANCHOR: Toll Brothers, 52-week high, up monstrous today. . . . All right. Let's get right to it. Last quarter you had a great quarter, you came on, you said you were going to beat up the shorts, and then you blew out the stock. ***Was that kosher?***
>
> TOLL: . . . ***Although, if it doesn't look kosher, and it doesn't smell kosher, I guess maybe it should be regarded as not and I'm sorry that I did it***.

After making this statement, Robert Toll sold an additional $134 million of his own Toll Brothers stock during a one month period between 6/21/05 and 7/25/05.

26.     Contrary to what defendants were telling investors throughout the Class Period, Toll Brothers was in fact experiencing declining demand and pricing power and increasing difficulty adding new selling communities, and was being negatively impacted by rising interest rates and pricing pressure. As a result, Toll Brothers' actual outlook for F06 and F07 was not anywhere near the 20% net income growth defendants were publicly projecting at any time during the Class Period. It was for this reason – not to diversify or buy food and clothing – that the Insider Defendants were selling their own Toll Brothers stock in record amounts at record-high stock prices. In particular, the following facts were known to defendants throughout the Class Period but concealed in furtherance of their scheme:

(a)     During F04 and continuing throughout the Class Period, Toll Brothers was encountering increasing difficulties in opening enough new active selling communities to achieve 20% net income growth beyond F05. The addition of new active selling communities in F05 was one of the most important factors to the Company's F06 profitability outlook, as delays in opening such communities beyond 10/31/05 would also delay income from such communities beyond F06, since it would take about one year or more for homes in new communities to be delivered to buyers. Toll Brothers only succeeded in adding twenty new selling communities in F04 when it had planned to add twenty-five, and was then able to add *only ten* new active selling communities during F05, while it needed *twenty* to achieve F06 forecasted growth levels. Developing new active selling communities is a lengthy and very involved process requiring a vast amount of planning and multiple regulatory approvals for any given community. Defendants knew at least four to six months in advance whether a selling community would open on schedule. Defendants therefore knew during the Class Period that they would be unable to open twenty new active selling

communities by the end of F05, which would render it impossible to achieve the levels of net income growth being forecast for F06 and F07.

(b)    Demand for Toll Brothers' homes was softening, resulting in impaired pricing power for Toll Brothers, which would adversely impact its profitability in F06 and F07.

(c)    The "traffic" in Toll Brothers' existing active selling communities was declining throughout F05 because of softening consumer demand for Toll Brothers homes due to rising interest rates and the prices of the homes, which were making them increasingly less affordable for buyers.  Robert Toll finally admitted in November 2005 that traffic had been declining since November 2004.  Traffic at active selling communities was one of the clearest indicators of future new home sales by Toll Brothers.  "Traffic" refers to prospective homebuyers who visit Toll Brothers' model homes and sales offices in its selling communities, which, as defendants admitted in the Company's F04 10-K, "play an important role in our marketing."  Toll Brothers had a sales office in each of its 220 active selling communities, and traffic was tracked meticulously by each sales office.  Every person who visited a sales office was required to complete a card with their name and other information, which cards were used to calculate site-specific traffic and were turned into the corporate office every weekend.  The fact that traffic declined in F05 was material to defendants' F06 net income, since traffic in F05 was an important indication of home deliveries and revenues that would be collected in F06: home sales to potential buyers reflected in F05 traffic would not generate revenues for at least 12 more months, or during Toll Brothers' F06.  The decline in traffic throughout F05 was thus a material negative development that indicated to defendants that Toll Brothers would not be able to achieve F06 and F07 net income growth at the levels being forecast.

(d)    The number of contracts Toll Brothers was actually signing for future sales/delivery of its homes was slowing throughout the Class Period due to the decline in traffic in its active selling communities and softening demand for its homes over 1Q F04.  By 4Q F05, growth in

new contracts for Toll Brothers homes had declined from 44% growth in 1Q F05 over 1Q 04 to 1% growth in 4Q F05 over 4Q F04.

(e)     Through the use of incentives, Toll Brothers accelerated the delivery of 200 homes at the end of F05 that would have been delivered in F06, thereby materially reducing F06 earnings projections, as Toll Brothers recognizes revenue from a sale when the home is delivered.

(f)     Because of Toll Brothers' aggressive price increase activity when it held pricing power, increasing interest rates were making its now even more expensive homes increasingly less affordable, even to high-end buyers, as evidenced by the decreasing traffic into its selling communities and declining demand for its new homes throughout the Class Period.[2]  Thus, defendants knew that Toll Brothers' business model, *i.e.* selling very expensive homes to a "niche" market of high-end buyers, did ***not*** make it immune from the adverse impact of rising interest rates or other adverse macroeconomic factors negatively impacting home building/home buying activity by late 2004, contrary to their public statements.

(g)     As a result of all of the foregoing, Toll Brothers did not have visibility into F06 that was consistent with the forecasts of 20% net income growth during that year.  In fact, the visibility that existed was inconsistent with and contradicted such forecasts based on facts defendants knew.  There was therefore no reasonable basis for the forecasts of "approximately" or "at least" 20% net income growth for Toll Brothers during either F06 or F07 – forecasts defendants nevertheless continued to raise as much as 28% throughout the Class Period when they raised F05 forecasts from 40% to 80% without a corresponding reduction in the F06 forecast.

---

[2]     The Federal Reserve Bank raised interest rates eleven consecutive times from June 2004 through November 2005, taking the federal funds rate, which directly impacts mortgage rates, from 1% to 4%.

27.     Defendants began to gradually reveal the above facts and the truth about Toll Brothers' outlook for years following F05 in early August 2005 – just ten days after the Insider Defendants had completed the vast majority ($590 million) of their Class Period sales.  However, their piecemeal negative revelations were coupled with continuing false reassurances.  Toll Brothers insiders admitted on 8/4/05 that there was some "***cooling in some local markets***," but assured investors that "***this is good***," ***sales had not "slowed down at all***" and "***demand is still there [–] on the West Coast (i.e., California)***" where it was "***very strong***."  About three weeks later, on 8/25/05, Toll Brothers disclosed that traffic was down "***from last year***" "***by 10 to 20%***" on a "***per community [basis]***," but said that this was due to so many Toll Brothers' communities having waiting lists and essentially being "closed" to traffic.  On 10/3/05, Robert Toll told *USA Today* that Toll Brothers was suffering from a "***general slowdown in most of the markets***" and he was expecting a "***10%*** ***decline***" in building activity as "***you have a slowdown in orders***."  Nevertheless, Robert Toll insisted Toll Brothers would still achieve "***20%***" net income growth in F06 and F07.

28.     Then, on 11/8/05, defendants finally admitted their prior representations, assurances and forecasts had been false with the shocking revelation that Toll Brothers was seeing "***softening of demand***" which was "***pretty much across the board***" – "***[a] decrease in overall demand***."  In addition to this drop in demand, Toll Brothers also admitted it was going to have "***fewer selling communities***" – not the 240 (and then 237) forecasted, but only 230 active selling communities at the end of F05.  The Company had added only ten more active selling communities since the end of F04, a sharp slowdown from its addition of twenty new selling communities during F04.  Defendants also shockingly admitted that "***[t]raffic has been down for about a year***" (since early November 2004), new contract growth had slowed to only 1% in 4Q F05, and California, responsible for about 25% of Toll Brothers' revenues, was its weakest market with a decline in contracts, orders, and backlog.

29.     On each of defendants' partial revelations of previously misrepresented or concealed information between 8/4/05 and 11/8/05, some artificial inflation came out of the price of Toll Brothers stock.  While the stock price fell sharply on each revelation, it continued to trade at artificially inflated prices due to defendants' continuing misrepresentations and false assurances until defendants' full disclosure about Toll Brothers' F06 outlook on 11/8/05.  During those final three months of the Class Period, Toll Brothers' stock plummeted from $56.12 on 8/3/05 to $33.71 on 11/8/05 and to $33.13 over the next few days, all company-specific stock declines that damaged prior Class Period purchasers.

30.     On 11/8/05, Robert Toll was interviewed on CNBC:

CARUSO-CABRERA: Twice now in October you spoke to Ron Insana when he did his piece for "USA Today," and there was a cover story in "The New York Times Magazine" where you said earnings growth next year of 20 percent, earnings growth a year after that of 20 percent and 15 percent the year after that.  Can you still stand by those numbers?

TOLL: *No, I can't*. . . .

CARUSO-CABRERA: *How far below 20 percent do you think*?

TOLL: *I don't know*.

CARUSO-CABRERA: You don't know?  Mr. Toll . . . [i]t's been a tough day for you as well. . . .

TOLL: *[D]on't cry for me.  It's not that tough*.

CARUSO-CABRERA: *That's right.  You've also sold a lot recently.  We know that* . . . .

31.     Investors, analysts, and members of the financial media were furious at the Insider Defendants' deception of the market and insider trading over the prior year.  For instance, the following comments were reported after the 11/8/05 revelations:

*   11/9/05: *USA Today*:

**Toll Bros. insiders sold stock in July; company has cut building forecast**.

- 20 -

Toll Bros. shareholders might feel as if a roof collapsed on them Tuesday, ***but company insiders were able to avoid some of the financial house of pain with well-timed selling***.

***The company stunned Wall Street with news it wouldn't build as many homes as expected in 2006, sending the stock down $5.50, or 14%, to $33.91, which wiped out $856 million in shareholder value***.

- The 11/9/05 *Dallas Morning News* reported:

**Follow the housing insiders' money**

At 5:07 a.m. Tuesday, toxic words crossed the wires: "softening demand."

The two words were nestled in Toll Brothers' fiscal fourth-quarter earnings release . . . .

\*  \*  \*

[D]ragging the stock down 14 percent. At $33.91, Toll closed 42 percent off its 52-week high of $58.67 on July 20.

\*  \*  \*

***With all this money disappearing, it's a good thing the people running the homebuilding companies got out when they did***.

So far this year, insiders at Toll have sold $588 million worth of the company's stock – representing nearly 10 percent of the current market capitalization.

- A 11/9/05 report of Susquehanna Financial Group stated:

The market's reaction to Toll's Orders and Revenue release speaks volumes. ***The disappointing outlook was quite a surprise*** . . . .

Investors shocked by TOL's disappearing Order growth. ***1% unit Order growth was completely unexpected***. The ***primary culprit was lack of community growth, which caught the Street off guard***. We are very disappointed in how it transpired as well. By the company's own admission, management will typically know four to six months in advance whether a community will likely open on time. That takes us back to early summer.

32.     Then, on 12/8/05, defendants slashed Toll Brothers' previously forecasted 2006 net income growth from 20% ***to 0.5%-10%***. Rassman admitted that the reduced projection was partly due to "the accelerated growth we achieved in fiscal year '04 and '05" – admitting that Toll

- 21 -

Brothers' strong performance during those years had rendered 20% growth in future years unlikely if not impossible.

33.     During the Class Period, Toll Brothers stock materially outperformed the stock of other publicly owned homebuilders, trading at artificially inflated levels until a series of company-specific negative disclosures of previously misrepresented and/or concealed information caused the artificially inflation to come out of the stock, damaging Class Period purchasers.



34.     The chart below sets forth the events surrounding and during the Class Period, including the artificial inflation of Toll Brothers' stock price as a result of defendants' Class Period misrepresentations, and the Insider Defendants' sales of Toll Brothers' stock.

# Toll Brothers
## June 17, 2004 - June 29, 2006

June 17, 2004 = 100



35.     Even after the Class Period, Toll Brothers continued to suffer setbacks.  In *The Philadelphia Inquirer* on August 23, 2006, Robert Toll admitted that the Company had been forced to enter into "'a substantial cutback mode.'"  Indeed, the Company had reduced the number of lots it controlled, cancelled land-purchase options as an increased number of buyers initiated contract cancellations, and experienced dramatic decreases in both contracts for new homes and total contracts.

36.     In the fiscal year after the Class Period, Toll Brothers' net income declined 15% and the Company was forced to take write-downs of $92.7 million.  By 4Q F06, profits had fallen 19%, sales had dropped by 48%, and shares in Toll Brothers had lost 57% of their value since July 2005.  During that quarter alone, orders plummeted by 58%, as more than one-third of customer contracts were cancelled.  By year-end F06, the number of contracts held by Toll Brothers had plunged 41% and the backlog of new orders was down 27% compared to F05.

37.     In 1Q F07, Toll Brothers reported a 67% drop in profits, a decline in net profit of almost $110 million, a 19% decline in revenue, and a 34% drop in net signed contracts.  In the same quarter, Toll Brothers was forced to write-down $96.9 million in costs related to land and houses the company no longer could sell at a profit.  In August 2007, *The Wall Street Journal* reported that 43% of Toll's buyers used "Alt-A" loans, a category between prime and sub-prime, and that its cancellation rates had risen to 23.8% along with severely tighter lending standards on Alt-A loans.

## PARTIES

38.     (a)     Lead Plaintiff The City of Hialeah Employees' Retirement System purchased the common stock of Toll Brothers at artificially inflated prices during the Class Period and was damaged as a result of defendants' Class Period misrepresentations, which caused Toll Brothers' stock price to be artificially inflated, and their later disclosure of the truth about Toll Brothers' business and outlook for F06 and F07, which caused the Company's stock price to decline.

(b)    Lead Plaintiff Laborers Pension Trust Fund for Northern California purchased the common stock of Toll Brothers at artificially inflated prices during the Class Period and was damaged as a result of defendants' Class Period misrepresentations, which caused Toll Brothers' stock price to be artificially inflated, and their later disclosure of the truth about Toll Brothers' business and outlook for F06 and F07, which caused the Company's stock price to decline.

39.    Defendant Toll Brothers is a public corporation with its executive offices in Horsham, Pennsylvania. Toll Brothers builds and sells high-end luxury homes. During the Class Period, Toll Brothers stock traded on the NYSE, a highly efficient market.

40.    (a)    Defendant Robert I. Toll is Chief Executive Officer and Chairman of Toll Brothers. During the Class Period, Robert Toll sold 7,477,400 shares of his Toll Brothers common stock (29% of the shares he owned) for over $323.3 million in proceeds. These sales were unusual in timing and amount and inconsistent with Robert Toll's pre-Class Period Toll Brothers stock sales in 2004, as the following chart shows.



(b)     Defendant Bruce E. Toll is Vice Chairman of Toll Brothers.  During the Class Period, Bruce Toll sold almost 4,707,000 shares of Toll Brothers stock (37% of the shares he owned) for over $206.4 million in proceeds.  Bruce Toll's stock sales were unusual in timing and amount and out of line with his pre-Class Period Toll Brothers stock sales in 2004, as the chart below shows.



(c)    Defendant Zvi Barzilay was the President and Chief Operating Officer of the Company.  During the Class Period, Barzilay sold 1,020,800 shares of his Toll Brothers common stock in 2004, 92% of his holdings, for almost $46 million in proceeds.  These sales were unusual in timing and amount and out of line with Barzilay's pre-Class Period sales of Toll Brothers stock in 2004, as shown by the following graph.



(d)      Defendant Joel H. Rassman served as Executive Vice President and Chief
Financial Officer of the Company.  During the Class Period, Rassman sold 281,200 shares of his
Toll Brothers common stock, 68% of the stock he owned, for over $12.1 million in proceeds.  These
sales were unusual in timing and amount and out of line with Rassman's pre-Class Period sales of
Toll Brothers stock in 2004, as shown by the following graph.



(e)      Defendant Robert Blank is a Director of Toll Brothers.  During the Class Period, Blank sold 160,000 shares of his Toll Brothers common stock, 93% of the stock he owned, for over $7.6 million in proceeds.  These sales were unusual in timing and amount and out of line with Blank's pre-Class Period sales of Toll Brothers stock in 2004, as shown by the following graph.



(f)      Defendant Paul Shapiro is a Director of Toll Brothers.  During the Class Period, Shapiro sold 220,000 shares of his Toll Brothers common stock, 84% of the stock he owned, for over $10.1 million in proceeds.  These sales were unusual in timing and amount and out of line with Shapiro's pre-Class Period sales of Toll Brothers stock in 2004, as shown by the following graph.



(g)     Defendant Joseph Sicree is the Chief Accounting Officer of Toll Brothers. During the Class Period, Sicree sold 47,312 shares of his Toll Brothers common stock, 74% of the stock he owned, for over $2.1 million in proceeds.  These sales were unusual in timing and amount and out of line with Sicree's pre-Class Period sales of Toll Brothers stock in 2004, as shown by the following graph.



(h)     Defendant Richard Braemer is a Director of Toll Brothers.  During the Class Period, Braemer sold 70,000 shares of his Toll Brothers common stock, 52% of the stock he owned, for over $2.6 million in proceeds.  These sales were unusual in timing and amount and out of line with Braemer's pre-Class Period sales of Toll Brothers stock in 2004, as shown by the following graph.



      (i)     Defendant Carl Marbach is a Director of Toll Brothers.  During the Class Period, Marbach sold 150,000 shares of his Toll Brothers common stock, 82% of the stock he owned, for over $7.3 million in proceeds.  These sales were unusual in timing and amount and out of line with Marbach's pre-Class Period sales of Toll Brothers stock in 2004, as shown by the following graph.



## JURISDICTION AND VENUE

41.    The claims asserted in this complaint arise under and pursuant to §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934 ("1934 Act") [15 U.S.C. §§78j(b), 78t(a) and 78t-1] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1337 and §27 of the 1934 Act.

42.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C.

§1391(b).  Many of the acts alleged herein, including the preparation and dissemination of materially

false and misleading information, occurred in substantial part in this District, Toll Brothers'

headquarters are located in this district, and Toll Brothers conducts business in this District.

### DEFENDANTS' CLASS PERIOD MISREPRESENTATIONS

43.     On 12/9/04, Toll Brothers issued a release officially reporting its 4Q F04 and F04

results, stating:

> Toll Brothers, Inc., the nation's leading builder of luxury homes, today reported
> record fourth-quarter and fiscal-year-end results for earnings, revenues, contracts and
> backlog for the period ended October 31, 2004.
>
> *      *      *
>
> Robert I. Toll, chairman and chief executive officer, stated: ". . . With more
> communities and more product lines than ever before, we produced record results
> across the board while enjoying strong pricing power in the lot-constrained, affluent
> markets where we operate.
>
> With our record backlog and the current strength of demand, we enter Fiscal
> 2005 with great optimism.  Based on projected home building revenues of between
> $5.0 billion and $5.35 billion, we believe net income will grow at least 40% in Fiscal
> 2005.
>
> With demand outpacing supply in most of our affluent markets, we believe
> the 60,000 lots we now control represent a five- to six-year pipeline for continued
> growth.  ***Since we plan to continue increasing our selling communities over the
> coming years, we believe we are positioned to produce net income and revenue
> growth of at least 20% in Fiscal 2006 and subsequent years***.

44.     Later in the day on 12/9/04, Toll Brothers held a telephone conference call for

analysts to discuss its business and its 4Q F04 and F04 results.  During the call, Robert Toll told

analysts that demand remained "tremendous" for Toll Brothers homes and that the Company would

add twenty new active selling communities during F05:

> **Robert Toll – Toll Brothers – Chairman, CEO**
>
> . . .  Demand for our luxury homes remained tremendous in fiscal 2004 and has
> continued to this day.

*     *     *

*[W]e already have strong visibility . . . into the first quarter of '06*.

*     *     *

Our community count at fiscal year end '04 was a record 220, *and we project it to reach about 240 communities by fiscal year end 2005*.

In answer to a question, Robert Toll stated:

I think our Company has the ability to double itself without entering any markets just by increasing its production in the various markets that we are in . . . . And I would guess that we could do that certainly within a three-year period. ***I don't see any reason for us not to be able to hit 20 percent a year minimum; at least all signs seem to point in that direction***.

45.     Analysts and the media reiterated Robert Toll's positive statements about Toll Brothers' anticipated continued strong performance in 2006 over the next few days. For example, on 12/9/04, the *Dow Jones Newswire* reported:

**Toll Brothers Sees Net Up 40% In 2005, 20% In 2006**

Luxury home builder Toll Brothers Inc. posted record-breaking results in its fiscal 2004 fourth quarter, as revenue increased 62% and earnings climbed 93%. And Chairman and Chief Executive Robert Toll said the run is far from over.

*He's predicting . . . at least 20% growth in fiscal 2006*.

*     *     *

"Mechanically and technically, we have such confidence because we're already sold into the first quarter of 2006," said Toll, noting that home orders taken in the latest period won't be delivered until the company's first fiscal quarter of 2006, which begins Nov. 1, 2005. "The plum is already in the pudding. We've already put that in the oven."

*     *     *

*Toll based his bullish post-2005 predictions on the company's performance in previous periods when interest rates rose* . . . .

"During those periods, we continued to blast and rock and roll," he said.

46.     On 12/9/04, Wachovia Securities issued a report on Toll Brothers based on the recent conference call and follow-up comments with Robert Toll and with Rassman. The report stated:

**Conference Call Caller**

> *[T]OL reaffirmed its guidance of 20% net income growth in FY 2006.* Toll's guidance is done on a bottom-up basis. Projections are done at the local level and rolled up into corporate projections. Corporate then analyzes each community's projections based on local managements ability to deliver, local product, and local labor, instilling greater confidence in the company's ability to meet and more often exceed its external targets.

TOL continues to see strong demand in all of its markets.

47.    On 12/9/04, JP Morgan issued a report on Toll Brothers based on the recent conference call and follow-up conversations with Robert Toll and with Rassman. The report stated: "[T]he company . . . *reiterated 2006 guidance of 20%+ NI growth*."

48.    On 12/10/04, BB&T Capital Markets issued a report on Toll Brothers based on the recent conference call and follow-up conversations with Robert Toll and with Rassman. The report stated:

> *Management continues to expect net income growth of at least 20% for 2006 and subsequent years.*

> \*       \*       \*

> *Management stated that demand was strong . . . . For the periods beyond 2005, management continues to expect to post net income growth of at least 20%.*

49.    On 12/10/04, Credit Suisse First Boston issued a report on Toll Brothers based on the recent conference call and follow-up conversations with Robert Toll and with Rassman. The report stated:

> **TOL . . . maintained its 20% growth outlook for FY06**. . . .

> We believe TOL is *one of the best-positioned companies to manage profitability in a rising rate environment given its focus on high-end buyers that are less dependent on affordability, its above average geographic profit diversification, and its less direct competition with other large, public builders*.

50.    On 12/10/04, Raymond James issued a report on Toll Brothers based on the recent conference call and follow up conversations with Robert Toll and/or Rassman. The report stated:

"*Management continues to expect 20% growth in revenues and earnings in FY06 and subsequent years*."

51.     In response to defendants' positive 12/9/05 statements, the price of Toll Brothers stock jumped from $26.96 on 12/8/04 to $30.53 on 12/9/04 and $32.89 on 12/10/04 – a 22% increase in two trading sessions – on huge volume of over 10.5 million shares each day.  Robert Toll took note of the strong reaction of the stock.  During a 12/9/04 interview with Bloomberg, he stated he was "very happy at this kind of performance" and "[g]enerally stock trades [sic] off a quarter or a half no matter what we say, . . . *apparently it's working our way this time*.  *And we're ecstatic*." According to the 12/9/04 *Dow Jones Newswire*, Robert Toll also stated:

> The market isn't arguing this time, as the stock jumped 10% Thursday.
>
> In the past, many of the publicly traded home builders have been consistently posting 20% to 30% increases across the board "*and then watched their stocks sell off a quarter point*," Toll said.  "*It's been so frustrating*."
>
> Each time his company and other public builders would post robust results, naysayers would predict the group had peaked.
>
> "(They'd write) the end is near, Repent.  *The world cometh to an end next week, and then the stock would get kicked around*," he said.

52.     As Toll Brothers' stock price soared higher on defendants' positive 12/9-10/04 statements, the Insider Defendants immediately took enormous advantage of the artificial inflation in the stock.  In a matter of five days between 12/10/04 and 12/15/04, seven of the Insider Defendants sold over 3.9 million shares of their Toll Brothers stock at prices between $31.48 and $32.37 *for some $125 million in proceeds*.  Robert Toll sold over 2,477,400 shares of his holding in a three-day period between 12/10/04 and 12/13/04 *for over $79 million in proceeds*.  Bruce Toll sold 1 million shares of his own holdings on 12/13/04 for proceeds of *over $31.5 million*.  Barzilay sold 200,000 of his shares on 12/10/04 for proceeds of over $6.4 million.  Rassman sold 121,200 shares of his stock in a two-day period on 12/10/04 and 12/15/04 for almost $4 million in proceeds.  Defendants

Braemer, Shapiro, and Sicree collectively sold almost 112,000 of their own shares on 12/10/04 and 12/15/04 for proceeds of over $3.6 million.

      53.     In late December 2004, Toll Brothers issued its F04 Annual Report for the year ended 10/31/04. The report contained a letter signed by Robert Toll, Bruce Toll, and Barzilay which stated:

> An Extraordinary Year With More To Come
>
>      Demand for luxury homes remained tremendous in Fiscal Year (FY) 2004 and has continued through the early part of our FY 2005. . . . Our revenues, contracts, and backlog increased in every region of the country. ***Investors took notice, as our stock price rose 74% from $36.84 per share at Fiscal Year End (FYE) 2003 to $64.00 per share as of this writing***.
>
>      And the beat goes on! . . . Our community count, which hit a record 220 at FYE 2004, should reach about 240 by FYE 2005. ***With that expansion ahead, we think that in FY 2006 we will achieve net income growth of at least 20%***.
>
> Fundamentals Drive Demand
>
>               *      *      *
>
>      For at least the past five or six years, it has been argued that a housing "bubble" has been created which is about to pop. ***We strongly disagree: we believe demand is being driven by fundamental demographics and home prices are rising due to the imbalance between supply and demand***.
>
>               *      *      *
>
> Expanding The Brand By Staying Focused On Luxury
>
>      ***Our luxury brand continues to get stronger as demand accelerates***.
>
>               *      *      *
>
> During tough economic times, affluent buyers are less impacted by a struggling economy, as our strong performance through the recent recession and stock market crash attests. ***And they are less affected by rising mortgage rates***. . . . ***We believe it should be a long time before rates make a difference to our luxury home buyers***.

      54.     The Toll Brothers F04 Annual Report further stated:

>      In anticipation of this growth in demand and shortage of land supply, we have positioned ourselves accordingly. We now control more then 60,000 home sites, a five- to six-year supply based on our current pace of growth . . . ***Our financial strength and land approval expertise enable us to take home sites through multi-***

*year approval processes, whereas smaller private builders, who lack our skills and funds, cannot*.

55.     The positive statements, assurances, and forecasts made between 12/9/04 and the issuance of Toll Brothers F04 Annual Report, as pleaded in ¶¶43-54, were materially false and misleading when made because of the following undisclosed material facts, which were known to or recklessly disregarded by the defendants:

(a)     Toll Brothers was encountering increasing difficulties in bringing new active selling communities online at the rate necessary to achieve its forecasted growth rates for F06. While Toll Brothers had originally planned to add twenty-five new selling communities during F04, it had only succeeded in adding twenty due in part to regulatory approval delays.  The number of active selling communities at the end of F05 was one of the most important determinants of Toll Brothers' net income growth in F06.  In order to achieve forecasted growth levels in 2006, Toll Brothers had to add another twenty active selling communities in F05.  Defendants knew that Toll Brothers' difficulties in bringing new active selling communities online would continue in F05, as they could determine four to six months in advance whether a selling community would open on schedule and knew that openings were still being delayed in early F05.  They therefore knew that the projection of 20 new active selling communities was made without reasonable basis, and consequently, that their projection of 20% net income growth for F06 was also made without reasonable basis.

(b)     Demand for Toll Brothers' new homes was softening, resulting in impaired pricing power for Toll Brothers, which would adversely impact its profitability in F06 and F07.

(c)     The "traffic" in Toll Brothers' existing active selling communities had declined during the 1Q F05 (November 2004-January 2005), because of softening consumer demand for Toll Brothers homes due to rising interest rates and the prices of the homes, which were making them increasingly less affordable for buyers.  Robert Toll admitted in November 2005 that traffic

had been declining since November 2004.  Traffic at active selling communities was one of the clearest indicators of future new home sales by Toll Brothers.  Toll Brothers had a sales office in each of its 220 active selling communities, and traffic was tracked meticulously by each sales office in order to project future home sales.  Every person who visited a sales office was required to complete a card with their name and other information, which cards were used to calculate site-specific traffic and were turned into the corporate office every weekend.  The fact that traffic had declined in 1Q F05 was material to defendants' F06 net income, since traffic in F05 was an important indication of home deliveries and revenues that would be collected in F06: home sales to potential buyers reflected in the traffic in 1Q F05 would not generate revenues until the first part of Toll Brothers' F06.  The decline in traffic was thus a material negative development that indicated to defendants that Toll Brothers would not be able to achieve F06 and F07 net income growth at the levels being forecast.  Defendants failed to disclose the decline in traffic to investors.

(d)     Toll Brothers could reliably project future results based on its backlog no more than one year ahead of time since homes in backlog were likely to be delivered (the point at which Toll Brothers recognized revenue from the sale) over the next nine to twelve months.  Consequently, as of December 2004, defendants only had some visibility into the first quarter of 2006, at best, based on Toll Brothers' backlog, and results beyond that time could not be reasonably or reliably projected, particularly in light of Toll Brothers' difficulty in opening new active selling communities, slower traffic, and uncertainties that surfaced in the housing market during 2004, such as steadily rising interest rates.

(e)     As a result of all of the foregoing, there was no reasonable basis in fact for the forecasts of "approximately" or "at least" 20% net income growth for Toll Brothers during either F06 or F07.  Toll Brothers did not have visibility into F06 that was consistent with the forecasts of 20% net income growth during that year.  In fact, based upon information then available to them,

defendants actually knew that their forecasts were false and misleading when made as there was no reasonable probability that the forecasted levels of growth would in fact be achieved.

56.    On 2/8/05, Toll Brothers preliminarily reported results for 1Q F05, the period ending 1/31/05, and held a conference call for analysts to discuss its 1Q F05 results and future prospects, during which Bruce Toll made the following representations:

> With me today are Joel Rassman, Chief Financial Officer, Joe Sicree, Chief Accounting Officer . . . .
>
> *        *        *
>
> [D]emand for our luxury homes remains very strong. . . . . Therefore, we are very optimistic about a great start to fiscal 2006.
>
> In addition, we project our community count which now stands at a record 225, will reach about 240 by fiscal year end 2005. We have over 60,000 home sites under our control.  This is a 5 to 6-year supply based on our historical pace of growth.  We see a continuing and growing imbalance between increasing demand from growing numbers of affluent households, and a constrained supply of building lots due to antigrowth politics which slows the approval process.  Therefore, we believe our land holdings position us for further growth and market share gains in the coming years.

57.    On 2/8/05, Rassman was interviewed on Bloomberg and made the following representations:

> MONICA: There have been a lot of nay sayers about the housing market over the last year, almost two years about this could not last.  But, your backlog of homes under contract and sales really say otherwise.  What is the, what you're seeing in terms of the backlog suggest about what the housing market may do this year?
>
> JOEL: Well, we see, we have a very strong backlog, a record backlog, a billion dollars.  Uh, *we think that assures this year and the beginning of next year with a very strong start*.  And based on the continued contracts we saw and which was up 60% also in terms of revenues or potential revenues, *that shows that we have a very strong year, we believe starting next year as well.  And that demand remains very robust*.

58.    On Toll Brothers' 2/8/05 announcements, the Company's stock price rose from a low of $40.62 on 2/7/05 to as high as $43.05 on 2/8/05.  Defendant Barzilay, the Company's Chief Operating Officer, sold 41,200 shares of his Toll Brothers stock for prices as high as $43.16 per

share on 2/9/05 for over $1.75 million.  Defendant Shapiro, a director, sold 60,000 of his shares at $42.85 per share for over $2.57 million.

59.     On 2/9/05 Raymond James issued a report on Toll Brothers which stated in part: "The company **continues to see strong traffic** and deposits across most of its communities . . . .  Toll continues to experience **superior demand trends relative to its peers**, which we believe to be due to the fact that Toll's customer base is less affordability oriented."

60.     On 2/23/05, Toll Brothers reported its 1Q F05 results via a release headlined and stating:

> **Toll Brothers' Record 1st Qtr Net Income Rises 120% to $110.2 Million** . . .
>
> Toll Brothers, Inc., the nation's leading builder of luxury homes, today reported record results for earnings, revenues, contracts and backlog for its first quarter ended January 31, 2005. . . .
>
> Robert I. Toll, chairman and chief executive officer, stated: "**We are enjoying strong pricing power and increasing profit margins as demand for luxury homes continues to outpace supply**."
>
> *          *          *
>
> Robert Toll continued: "**Continuing strong demand . . . and our growing portfolio of well-positioned communities in upscale markets all bode well for our future prospects.  Based on these factors, as we have previously discussed, we believe fiscal 2006 will be another record year**.
>
> . . . In response to the widening gap between tight supply and growing demand, we continue to expand our pipeline of land under development.  We now control over 63,000 home sites – a five-to-six year supply based on our historic pace of expansion. With this land, attractive demographics, our diversity of products and our highly respected brand name in the luxury market, **we believe we are well-positioned for continued growth in the years ahead**."

In the same release, Rassman reported that Toll Brothers was raising its F05 net income forecast from 40% growth to 60% growth over F04.  Toll Brothers' increase of its F05 net income forecast was very significant to investors, because it created a higher base for 20% F06 net income growth and **effectively raised that forecast by 14.3%**.

- 43 -

61.     Also on 2/23/05, Toll Brothers held a conference call for analysts to discuss its

business and its 1Q F05 results, during which Robert Toll said the following:

**Robert Toll – Chairman/CEO**

With me today are Joel Rassman, Chief Financial Officer, . . . Joe Sicree, Chief
Accounting Officer . . . .

\*          \*          \*

With this backlog, which already contains most of fiscal year '05 deliveries, **we are
increasing our guidance for revenues and earnings . . . .  We are enjoying strong
pricing power and increasing profit margins as demand for luxury homes
continues to outpace supply.  Due to this demand . . . we believe fiscal 2006 will be
another record year**. . . .

\*          \*          \*

           **[W]e believe we're well positioned for continued growth in the years ahead**.

Robert Toll also reaffirmed Toll Brothers' forecast of 20% growth for 2006 in response to one

analyst's question:

Lorraine Maikis – Merrill Lynch – Analyst

           I just wanted to talk for a minute about 2006.  I didn't see anything in the
press release about reaffirming the 20 percent EPS growth.  Is that still the case?

Robert Toll – Toll Brothers – Chairman, CEO

**. . .  My best guess currently is we will do somewhere between 18 and 22, so
approximately 20, but in the last press release, I said at least 20, so I'm not as
certain that I will do at least 20, but I believe it will do approximately 20**.

62.     On 2/23/05, *Dow Jones Newswire* reported:

**Toll CEO Sees Net Growth of 60% In '05, 20% In '06**

**Toll Brothers Inc. is on track to see earnings rise 60% in fiscal 2005 and about
20% in 2006, Chairman and Chief Executive Robert Toll said during a conference
call Wednesday**.

**. . . He affirmed guidance of 20% earnings growth in 2006, which is tweaked
slightly from previous projections of "at least 20%" growth**.

           "We are enjoying strong pricing power and increasing profit margins as
demand for luxury homes continues to outpace supply," said Toll.

- 44 -

The stellar demand, recovering economy and strong land supply in affluent markets should "**make 2006 another record year**."

\*　　\*　　\*

Toll said demand has far outpaced the number of lots coming onto the market. "As you expand your entitled lots, you expand your business," he said.

\*　　\*　　\*

Toll Brothers controls more than 63,000 home sites, which represents a five-to six-year supply. "With this land, demographics, our diversity of products and highly respected brand name in the luxury market, we believe we are well-positioned for growth in the years ahead," he said.

63.　　On 2/23/05, Robert Toll appeared on *Fox: Your World* with Neil Cavuto to discuss

Toll Brothers' business. The following occurred:

**Toll Brothers – Chmn. & CEO Interview**

STUART VARNEY, GUEST HOST: Is it any wonder there's been so much talk of a housing bubble? Look at the top luxury homebuilder, ***Toll Brothers***. The company reporting a whopping 120 percent jump in profits in its latest quarter, ***boosted by higher demand for its high-end homes, and says things are looking even better going forward***.

Joining us from its headquarters, Robert Toll. He's the chairman and chief executive of ***Toll Brothers***.

Robert, profits have spiked for your company. Your stock's doubled since October. Real estate residential prices going through the roof. Looks like a bubble to a lot of people. What do you say?

\*　　\*　　\*

TOLL: We've been hearing about the bubble for at least four years now. If this were bubblegum, I think it would cover all of the southeast and perhaps a little of Texas.

VARNEY: All right. Let's call it a very strong upswing for the housing industry. And right now, we've got 30-year fixed rate mortgages averaging nationally about 5.6 percent. Do you think that if those 30-year fixed rate mortgages went to say, 6.5, 7 percent, would that really damp down on this housing boom?

TOLL: ***I don't think so, because we've been through it. We were there in '95. Rates went to 8.5. In '97, 8.25, in 2000, 8.5. If you go back and look at the records of the homebuilding industry and the major public homebuilders, I think you'll see we prospered in that time***.

*I don't think a point or a point-and-a-half, even two points, will be a determinant of whether we have the continued strong market we're in now.  The demographics are too powerful*.

64.     On 2/23/05, Robert Toll appeared on CNBC to discuss Toll Brothers' business.  The following occurred:

Toll Brothers – CEO Interview

BRAD GOODE, CNBC ANCHOR: Demand for luxury homes appears strong as **Toll Brothers** . . . is also raising its outlook for the full year, but at least one analyst doesn't see such a rosy picture, of course, they've been saying that about the housing industry.

Look at shares trading this morning up more than 3 percent on **Toll Brothers** up to $2.43 to $83.47.  Joining us now is Robert Toll, **Toll Brothers** Chairman and CEO.

\*        \*        \*

GOODE: A good day for you again I see. . . .  What continues to fuel this red-hot luxury home market?

TOLL: It's the lack of supply more than it is the growth in demand, *although the growth in demand is pretty strong because of the demographics*.

\*        \*        \*

GOODE: *But at the same time Mr. Toll are you saying then that your customer is completely insulated* from the rising rate environment?

TOLL: *Why would I say it's completely insulated*?

GOODE: *It sounds like you are saying that for the most part*.

TOLL: *For the most part it is true.  Interest rates went to 8.5 in '95, they went to 8.5 again in 2000, and these are 30-year fixed rates that I'm quoting and we blew through those periods*.

\*        \*        \*

GOODE: Now you've heard all the chatter and naysayers calling for the housing bubble to burst yet your company is raising outlook for '05.  Is this based on projected new orders, or a backlog of orders to fill?

TOLL: This is based on the backlog of orders that we already have.  The earnings pretty much for '05 are in the bag.  We've already sold the homes, we've got substantial deposits.  All we have to do is build them and go to the settlement table, so the prediction for '05 is not really a prognostication, its just mathematics.

- 46 -

GOODE: . . . *Your stock is up 97 percent year-over-year, 19 percent of the float is shorted.  Just how much more upside do you think is reasonable with your stock*?

TOLL: *The shorts are going to get crushed.  You ain't seen nothing yet*.

                    *        *        *

GOODE: What is the red-hot market for you right now if you had to put your finger on it?  What region, what area?

TOLL: Phoenix is hot as a pistol.  Las Vegas is back, and growing.  San Francisco went through the tech implosion, is all the way back to a top.  Southern California is hot for us, New Jersey, New York, Pennsylvania.

65.    On 2/23/05, Robert Toll was interviewed by Bloomberg.  The following occurred:

SUZY: So . . .  you crushed the first quarter of 2005 estimates.  Obviously, also raising '05 guidance as well. . . . *[Y]ou're also in the rare position to have visibility well into 2006, what do you see that far out*?

ROBERT: *Uh, we don't see any abatement.  The market appears to be so strong, again because of the demographics that I just outlined, that it would appear to us that even if mortgage rates were to go up a full 2 points, I don't think we would see a slowdown in our business*.  We've had that experience in '95, '97 and 2000 when mortgage rates went up to 8.5 and it didn't bother us.  I don't expect it will now. . . .

SUSY: *And you see no signs of growth moderating*?

ROBERT: *No., I don't.  As a matter-of-fact, I see it increasing. . . .  So, I see nothing but good times for us*.

66.    On 2/24/05, BB&T Capital Markets issued a report which stated in part that Toll Brothers' management "reiterated growth of about 20% for FY06."

67.    Toll Brothers stock soared higher on the 2/23/05 announcements, comments, and statements by defendants, rising from as low as $40.27 on 2/22/05, to as high as $44.11 on 2/24/05, $44.96 on 2/25/05 and $45.15 on 2/28/05 on the highest trading volumes the stock had seen since 12/10/04 (over 9.2 million shares and 8.34 million shares on 2/23/05 and 2/24/05).  The Insider Defendants again took enormous and immediate advantage of the artificial inflation in the price of Toll Brothers stock, selling off almost 3.8 million shares of their stock for *$166.7 million* in proceeds in a two-week time period between 2/24/05 and 3/7/05.  *Robert Toll sold 2.5 million shares in two consecutive days on 2/24/05 and 2/25/05 for over $110 million in proceeds, and*

- 47 -

***Bruce Toll sold 1 million shares in two consecutive days on 2/28/05 and 3/1/05 for proceeds of over $44.38 million***.  Barzilay, who had sold 141,200 shares in January and early February 2005 for proceeds of over $5.4 million, ***sold another 200,000 shares on 2/25/05 for proceeds of almost $8.9 million***.  Defendants Blank, Marbach, Rassman and Sicree collectively sold 75,000 of their shares for proceeds of over $5.5 million.

68.     The positive statements, assurances and forecasts made between 2/8/05 and 3/14/05, as pleaded in ¶¶56-66 were false and misleading when made because of the following undisclosed material facts, which were known to or recklessly disregarded by defendants.

(a)     Toll Brothers continued to encounter difficulties through 2Q F05 in bringing new active selling communities online at the rate necessary to achieve its forecasted growth rates for 2006.  The number of active selling communities added during F05 was one of the single most important determinants of F06 net income growth for Toll Brothers.  In order to achieve forecasted growth levels in F06, Toll Brothers had to add another twenty active selling communities in F05.  Defendants knew that Toll Brothers' continued difficulties in bringing new active selling communities online diminished its ability to add twenty by the end of F05 and that their forecasted net income growth for F06 and F07 was thus without reasonable basis, because they could determine four to six months ahead of time whether a new community would open on schedule.

(b)     Demand for Toll Brothers homes was softening, resulting in impaired pricing power for Toll Brothers, which would adversely impact Toll Brothers' profitability in F06 and F07.

(c)     The "traffic" in Toll Brothers' existing active selling communities had continued to decline through the first half of 2Q F05 (2/1/05-4/30/05), because of softening consumer demand for Toll Brothers homes due to rising interest rates and the prices of the homes, which were making them increasingly less affordable for buyers.  Robert Toll admitted in November 2005 that traffic had been declining since November 2004.  The fact that traffic had declined in the

first two quarters of F05 was material to defendants' F06 net income, since traffic in F05 was an important indication of home deliveries and revenues that would be collected in F06: home sales to potential buyers reflected in the traffic in 2Q F05 would not generate revenues until Toll Brothers' F06.  Because traffic at Toll Brothers' active selling communities was one of the clearest indicators of future new home sales by Toll Brothers, the decline in traffic was a material negative development which indicated to defendants that Toll Brothers would not be able to achieve F06 and F07 net income growth at the levels being forecast.  Defendants failed to disclose the decline in traffic to investors.

(d)     The number of contracts Toll Brothers was actually signing for future sales/delivery of its homes was slowing due to the decline in traffic in its active selling communities and softening demand for its homes, which was also a serious negative indicator that Toll Brothers would not be able to achieve the levels of net income growth being forecast for F06 and F07.

(e)     Toll Brothers could reliably project future results based on its backlog no more than one year ahead of time since homes in backlog were likely to be delivered (the point at which Toll Brothers recognized revenue from the sale) over the next nine to twelve months. Consequently, as of March 2005, defendants only had some visibility through the first quarter of 2006, at best, based on Toll Brothers' backlog, and results beyond that time could not be reasonably or reliably projected.  Toll Brothers' increased forecast of 60% net income growth in F05 over F04 also increased its F06 forecast of 20% growth by 14.3%, making that projection even more unlikely and unreliable.  The increase would require Toll Brothers to achieve $131 million more in net income in F06 than in F05 (a 60% increase over F04 would bring F05 net income to $654.56 million, and 20% of that number is $131 million).  As of February and March 2005, defendants had no reasonable basis to project that they would increase revenues by that amount that far into the future, particularly in light of Toll Brothers' difficulties in adding new selling communities, slower

traffic and growing uncertainties in the housing market and the economy in general, such as steadily rising interest rates.

(f)     As a result of all of the foregoing, there was no reasonable basis in fact for the forecasts of "approximately" or "at least" 20% net income growth for Toll Brothers during either F06 or F07 as of February and March 2005, especially after having raised its F05 net income forecast to 60% growth.  Toll Brothers did not have visibility into F06 that was consistent with the forecasts of 20% net income growth during that year.  In fact, based upon information then available to them, defendants actually knew that those forecasts were false and misleading when made as there was no reasonable probability that the forecasted levels of growth would in fact be achieved.

69.     The upsurge of insider selling by Toll Brothers insiders since late 2004 did not go unnoticed.  On 3/21/05, the *New York Sun* published an article raising questions about the Robert and Bruce Toll's large selling of their Toll Brothers stock.  The article was headlined and stated:

**What Does Robert Toll Know that the Rest of Us Don't?**

Though executives at high-flying luxury home builder ***Toll Brothers*** Incorporated insist the so-called housing bubble is not ready to burst, the recent actions of company co-founder and chief executive Robert Toll could be interpreted to indicate otherwise.  ***He and his brother, Bruce, sold $241 million worth of Toll Brothers stock when the shares hit an all-time high last month.  The company's chief financial officer insisted to The New York Sun that the shares sold were part of Robert Toll's estate planning and portfolio diversification plans*** . . . .

Many investors, who argue that senior corporate executives use their superior company knowledge to make profitable stock purchases and sales, closely watch these trades.  This scrutiny often becomes acute when a company's stock price has a yearlong run like Toll Brothers, as the stock went to over $91 from $36.

*                *                *

However, as the Federal Reserve continues to hike interest rates and housing prices continue to rise, ***short-sellers – who borrow stock and sell it, on the view that they can make money buying the stock back at a lower price – have been betting aggressively that Toll Brothers' customers are going to get squeezed, hurting company sales.  An unusually large amount of money has been bet by short-sellers, with nearly 15% of the company's available stock sold short, according to Yahoo! Finance***.

Mr. Toll dismissed the short-sellers, declaring in a February 21 CNBC interview, *"They will get crushed," just days before his stock was sold*.

70.     On 5/10/05, Toll Brothers issued a release reporting its results for 2Q F05, ending 4/30/05, and discussing the state of its business, which was headlined and stated:

> *Toll Brothers' Record FY 2005 2nd Qtr Contracts Grow 38% to $2.2 Billion vs. FY 2004 . . .*
>
> *Toll Brothers*, Inc., the nation's leading builder of luxury homes, today reported record second-quarter and six-month results for contracts, backlog and home building revenues for the period ended April 30, 2005.
>
> \*     \*     \*
>
> Robert I. Toll, chairman and chief executive officer, stated: "*Demand for luxury homes remains strong, and we continue to enjoy solid pricing power*. Based on the pace of current demand and our record backlog, which now includes many deliveries stretching into the second quarter of FY 2006, we remain on track for what we believe will be approximately 60% net income growth in FY 2005 *and approximately 20% net income growth in FY 2006*.
>
> . . . We believe this strong demand, coupled with our record backlog and the increase in our community count – from 205 a year ago to 227 this second quarter-end – will contribute to our growth in FY 2006.
>
> \*     \*     \*
>
> Our contracts rose in every region but the West Coast (California). *The decline in California was not due to a lack of demand*, but rather to a lack of supply as we've sold out of several communities at a faster pace than we have been able to open up new ones. *We have a number of new sites in the approval pipeline that should increase our California community count in the coming year*.
>
> We currently control approximately 68,000 lots, compared to 58,000 one year ago, and continue to see attractive land buying opportunities in most markets. *We believe this lot position in affluent markets, which represents a five-to six year supply based on our historic pace of growth, positions us well for future growth*."

71.     On 5/10/05, Toll Brothers held a conference call for analysts to discuss its 2Q F05 results, during which Robert Toll made the following representations:

**Robert Toll – Chairman/CEO**

With me is Joel Rassman Chief Financial Officer . . . .

\*     \*     \*

- 51 -

*Demand for luxury homes remains strong, and we continued to enjoy strong pricing power. Based on the pace of current demand and our all-time record backlog, which now includes many deliveries stretching into the second quarter of fiscal year '06, we remain on track for . . . approximately 20% net income growth in fiscal year '06.*

   *     *     *

The growth in our community count amplifies the strength in same-store deposits. We ended the quarter with 227 communities compared to 205 one year ago. *These factors, coupled with our record backlog, will contribute to our growth in fiscal year '06.*

   *     *     *

*Our backlog now extends about 11 months on average providing revenue visibility into the second quarter of fiscal year '06.*

   *     *     *

[O]ur contracts rose in every region but the West Coast, California. *The decline in California was not due to a lack of demand, but rather to a lack of supply, as we sold out of several communities at a much faster pace than we have been able to gain entitlements to open up the new ones.*

*We have a number of new sites in the approval pipeline that should increase our California community count in the coming year.* It will get back to equal to the first quarter '05 by late fiscal '06.

We currently control approximately 68,000 lots compared to 58,000 one year ago, and continue to see attractive land buying opportunities in most markets. We believe that this lot position in the flow of markets, which represents a 5 to 6 year supply based on our historic pace of growth positions us well for future growth.

*The housing market has remained strong through 8 consecutive interest rate hikes from the Federal Reserve. . . .*

I will take the opportunity to point out that we've seen this movie before. We had to prove ourselves in 1995, 1997 and 2000 when mortgage rates rose. In those years, our revenues rose 28% 95, 28% 97 and 23% in 2000 even as national single-family housing starts decline.

*So, we will prove it once again . . . .*

*We believe Toll Brothers marches to a different beat in the housing market, in general, due to our luxury market rates and the land we control in some of the most desired locations.*

*We believe luxury buyers are less impacted by interest rate hikes than less affluent buyers are affected. . . .*

- 52 -

\*       \*       \*

*So it appears that the fundamentals of supply and demand driven by the demographics are driving our business in general, not interest rates and not a speculative investor*.

72.     On 5/10/05, JP Morgan issued a report on Toll Brothers based on the recent conference call and follow-up conversations with Robert Toll and/or Rassman.  The report stated: "*[M]anagement reaffirmed its . . . FY06 net income guidance of . . . and 20%* . . . .  ORDERS STRONG DESPITE CA COMMUNITY SELL-OUTS – Order gr. was strong across all 6 regions . . . .*"*

73.     On 5/11/05, Credit Suisse First Boston  issued a report on Toll Brothers based on the recent conference call and follow-up conversations with Robert Toll and/or Rassman.  The report stated:

Despite a 51% decline in unit orders in the West, TOL reported double-digit increases in its other regions . . . .  *Management noted that the declines in California resulted from a lack of supply (entitlement delays), as TOL is selling through communities faster than it can open them.  Management indicated that it is deliberately slowing order growth in several markets so as not to lock in pricing too early, although it expects to continue to increase community count*.

\*       \*       \*

*TOL maintained its guidance of increasing net income at least . . . 20% in FY06 based primarily on its current backlog, community count growth expectations and strong underlying demand*.

74.     On 5/11/05, BB&T Capital Markets  issued a report on Toll Brothers based on the recent conference call and follow-up conversations with Robert Toll and/or Rassman.  The report stated:

The number of contracts increased 22% from the prior-year period to 3,181 homes, rising in every region except the West Coast (California), which saw a decline of 51%.  *Management emphasized that this was not due to a shortage of demand, but a lack of supply, as the company sold out of communities at a faster pace than it could replace them.  The entitlement process for new communities has been slow, but management expects the community count in California to be where it was in Q1'05 by the beginning of fiscal 2006.  Management said it is also controlling releases to keep the backlog on a projected 12-month delivery time*.

- 53 -

* * *

*With the positive demand management sees for its luxury homes . . . and the current pace of backlog, management reiterated its guidance for net income growth [of] . . . "approximately 20%" for FY'06.*

75.     Also on 5/11/05, Citigroup issued a report on Toll Brothers reiterating that the Company "intentionally reduced its 2Q05 order pace to allow its construction cycle to catch up with its backlog."

76.     On 5/24/05, Rassman was interviewed on Bloomberg and the following occurred:

ERIN: Recently you said profits could grow about 60% this year, 20% next year. First, talk to me a little bit about what explains the slowdown in that growth rate that you expect to see.

JOEL: Uh, I don't think it's a slowdown. It's based on our increased acquisition of land that we uh implemented about two years ago and we expected that to pay off in increased deliveries, which it has. And now we're growing at what has been our traditional pace of growth, about 20% plus a year.

77.     On 5/26/05, Toll Brothers issued a release reporting its results for 2Q F05, the period ended 4/30/05, and further increasing its estimated F05 net income to 70% growth over F04, which again materially raised its prior F06 projection of 20% growth over F05 by 6.2%. Defendants had *now increased their F06 projection by a total of $147.3 million, or 21.4%*, since the beginning of the Class Period. The 5/26/05 release was headlined and stated:

Toll Brothers Inc., the nation's leading builder of luxury homes, today reported record second-quarter and six-month results for earnings, contracts, revenues and backlog for the period ended April 30, 2005. The value of the company's second-quarter contracts and backlog were the highest for any quarter in its history.

* * *

[Robert I. Toll, chairman and chief executive officer, stated:] "With increasing numbers of communities in lot-constrained markets, our growing brand name and our broadening diversity of luxury new home product lines, we continue to produce record results.

*We expect to end fiscal 2005 with approximately 240 selling communities compared to 220 at FYE 2004. We believe our expertise in securing land and opening communities in high-regulated, upscale markets gives us a competitive advantage, both today and in the future.* We now control approximately 68,000

home sites, compared to 58,000 one year ago.  These sites, which are in communities currently open for sale or wending their way through the approval process, represent a five-to-six year supply based on our historic pace of growth."

Joel H. Rassman, chief financial officer, stated: "Our record earnings, contracts and backlog reflect the strong demand and accompanying pricing power we have enjoyed over the past twelve months.  Based on these results . . . we are increasing our earnings expectations for FY 2005.  We now believe net income will grow approximately 70% in FY 2005 compared to FY 2004.  ***Based on our backlog and expected community growth, even with this increased projection, we still believe net income will rise approximately 20% in FY 2006 over FY 2005***."

78.     On 5/26/05 Toll Brothers held a conference call for analysts to discuss its business and its 2Q F05 results, during which Robert Toll represented:

With me today are Joel Rassman, Chief Financial Officer, . . . Joe Sicree, Chief Accounting Officer . . . .

\*          \*          \*

We expect to end fiscal '05 with approximately 240 selling communities, compared to 220 at fiscal year end 2004.

***We believe our expertise in securing land and opening communities in the highly regulated upscale markets gives us a competitive advantage, both today and in the future.***  We now control approximately 68,000 home sites, compared to 58,000 one year ago.  . . .  These sites, which are in communities currently open for sale, or wending their way through the approval process, represent a 5 to 6 year supply based on our historic pace of growth.

Rassman also said during the call:

We believe that based upon our record backlogs and current estimates for the remainder of the year, that ***even with our increase in guidance for fiscal 2005, we can achieve approximately 20%, which we define as between 17 and 23% growth in net income in 2006***.

79.     On 5/26/05, Rassman appeared on CNBC to discuss Toll Brothers' business.  The following occurred:

CLAMAN: Phenomenal quarter, but, you know, for a company where you make a lot of your money in the high-end home building sector, ***how is that market doing right now***?

\*          \*          \*

RASSMAN: ***Home building looks terrific and the demographics seem to point to continued strength in our area***.

- 55 -

80.     On 5/26/05, Credit Suisse First Boston issued a report on Toll Brothers which reiterated that the Company's management "maintained its 20% growth expectation in 2006."

81.     On 5/26/05, Wachovia Capital Markets LLC issued a report on Toll Brothers which stated in part: "GUIDANCE RAISED.  TOL increased FY2005 net income to +70% yr/yr (up from 60%) and reiterated its FY 2006 net income growth of +20% over FY2005 (*effectively raising its FY 2006 guidance by 6%*)."

82.     On 5/27/05, BB&T Capital Markets issued a report on Toll Brothers based on the recent conference call and follow-up conversations with Robert Toll and/or Rassman.  The report stated:

> Demand trends remain strong, as evinced by . . . management's comments . . . .  Moreover, the company appears well positioned by virtue of its robust pipeline and plans for new community openings to continue to take advantage of this strength.

83.     On 5/27/05, Credit Suisse First Boston issued a report on Toll Brothers which stated in part: "Although the company does not provide specific earnings per share guidance, it did raise its fiscal 2005 outlook to approximately 70% net income growth versus its prior guidance of at least 60% growth.  Additionally, *despite the higher base earnings in 2005*, *management believes it can still achieve earnings growth of approximately 20% in fiscal 2006*."

84.     On 5/27/05, BB&T Capital Markets issued a report on Toll Brothers which stated in part: "Management still expects net income to grow by 20% in FY'06, *even from the higher base in FY'05*."

85.     Toll Brothers' stock price soared higher from $42.77 on 5/25/05 to $45.83 on 5/26/05 to $46.40 on 5/27/05 and $47.64 on 6/1/05 – all new all-time high prices.

86.     On 6/1/05, Robert Toll appeared on *Nightly Business Report*.

> GHARIB: Joining us now to talk about the outlook, Robert Toll, chairman and CEO and co-founder of Toll Brothers . . . .

A Fed official today hinted that there's one more rate hike at the Fed.  Now, if that is the case, if that's true, what would that mean for your company and for the housing industry?

TOLL: *I don't think much*. . . .

*       *       *

GHARIB: [W]hen housing prices do come down and at some point I guess they will, at least in some of the markets you're talking about, what does that mean for your company's earnings performance and sales performance?

TOLL: *I don't think much*. . . .

*       *       *

GHARIB: *As I mentioned just a few moments ago, Toll Brothers stock hit a new all-time high today.  I want to get your thoughts on that and would you be a buyer of your stock at these levels*?

TOLL: *Yes, I would and I think it's just fabulous . . . a tremendous buy*.

Following this statement, Robert Toll sold over $34.3 million worth of his own Toll Brothers shares between 6/21/05 and 6/30/05.

87.     On 6/9/05, Toll Brothers issued a release announcing a 2 for 1 stock split which stated: "*[T]he Company expects net income to increase . . . approximately 20% in FY 2006 over FY 2005*."

88.     On 6/14/05, Robert Toll appeared on CNBC's *Kudlow & Co.* to discuss Toll Brothers' business and represented the following:

LARRY KUDLOW, host: So are the housing bubbleheads right or wrong?  Here we go again.  Joining me now is Mr. Bob Toll, chairman and CEO of Toll Brothers.

*       *       *

KUDLOW: [S]peaking of demands, are they still as strong as they were, let's say, six months ago?

Mr. TOLL: *There is no abatement as of this meeting between us*.

KUDLOW: Still good? Still strong?

Mr. TOLL: *As strong as it's ever been*.

- 57 -

KUDLOW: All right.  The bears are wrong again.

89.	On 6/16/05, Rassman was quoted in the *Chicago Tribune*: "'We've sold out into the second quarter of next year.'"

90.	Due to these positive statements, assurances, and forecasts, Toll Brothers' stock price increased from $46.38 on 6/9/05 to $53.73 on 6/17/05.  The stock continued to soar higher during July 2005 and reached $58.67 on 7/20/05, its all-time and Class Period high.

91.	The Insider Defendants took advantage of the artificial inflation of Toll Brothers stock created by the above May and June 2005 statements, selling off 5,572,000 shares of their stock at prices as high as $58.34 per share for over ***$289 million in illegal insider trading proceeds*** during 5/10/05-7/25/05—as the Federal Reserve raised rates three more times in March, May and July for eight consecutive rate increases since June 2004.  Between 6/21/05 and 7/25/05, Robert Toll sold 2.5 million of his Toll Brothers stock ***for over $134 million in proceeds***.  Between 5/31/05 and 7/25/05, ***Bruce Toll sold 2,087,000 shares of his Toll Brothers stock for over $104.3 million in proceeds***.  Between 6/20/05 and 7/20/05, Barzilay sold almost 480,000 of his shares ***for over $25 million*** in proceeds.  Between 6/22/05 and 7/12/05, Rassman sold 150,000 of his shares for over $7.7 million in proceeds.  Between 5/31/05 and 7/20/05, defendants Blank, Braemer, Marbach, Shapiro, and Sicree collectively sold 355,400 of their shares for over $18.3 million in proceeds.

92.	The positive statements, assurances and forecasts made between 5/10/05 – 6/14/05, as pleaded in ¶¶70-89, were false and misleading when made because of the following undisclosed material facts, which were known to or recklessly disregarded by the defendants.

(a)	Toll Brothers continued to encounter difficulties through 3Q F05 (5/1/05-7/31/05) in adding new active selling communities at the rate necessary to achieve its forecasted growth rates for F06.  By the end of 2Q F05, at 227 communities, Toll Brothers had only added seven communities since the end of F04, less than half of what was required to achieve the

projection of 240 communities by the end of F05.  The number of active selling communities by the end of F05 was one of the single most important determinants of F06 net income growth for Toll Brothers.  In order to achieve forecasted growth levels in F06, Toll Brothers had to add another twenty active selling communities in F05.  By the beginning of 3Q F05 (May 2005), defendants knew that Toll Brothers would only add ten new active selling communities by the end of F05 because defendants could determine four to six months in advance whether a selling community would open on schedule.  Defendants knew that Toll Brothers' failure to add twenty new active selling communities by the end of F05 would result in a decline in its number of homes sold in F06, and that their forecasts of 20% of net income growth for F06 and F07 were thus without reasonable basis.

(b)     Demand for Toll Brothers new homes was softening, resulting in impaired pricing power for Toll Brothers, which would adversely impact Toll Brothers' profitability in F06 and F07.

(c)     The "traffic" in Toll Brothers' active selling communities had continued to decline in 3Q F05 because of softening consumer demand for Toll Brothers homes due to rising interest rates and the prices of the homes, which were making them increasingly less affordable for buyers.  Robert Toll admitted in November 2005 that traffic had been declining since November 2004.  The fact that traffic had declined in the first three quarters of F05 was material to defendants' F06 net income, since traffic in F05 was an important indication of home deliveries and revenues that would be collected in F06.  Because traffic at Toll Brothers' active selling communities was one of the clearest indicators of future new home sales by Toll Brothers, the decline in traffic was a material negative development which indicated to defendants that Toll Brothers would not be able to achieve F06 and F07 net income growth at the levels being forecast.  Defendants failed to disclose the decline in traffic to investors.

(d)     The number of binding contracts Toll Brothers was actually signing for future sales/delivery of its homes was slowing due to the decline in traffic in its active selling communities, its inability to add new active selling communities and softening demand for its homes – not due to defendants' deliberate slowing of sales, as they represented.  This was also a serious negative indicator that Toll Brothers would not be able to achieve the levels of net income growth being forecast for F06 and F07.

(e)     Toll Brothers could reasonably project future results based on its backlog about one year ahead of time since homes in backlog were likely to be delivered (the point at which Toll Brothers recognized revenue from the sale) over the next nine to twelve months.  As of mid-2005, defendants' visibility through F06 indicated it was unlikely that Toll Brothers would achieve 20% net income growth during that year based on its inability to add new active selling communities, slower order growth and still steadily rising interest rates.  Toll Brothers' increased forecast of 70% net income growth in F05 over F04 made its F06 forecast of 20% growth even more unlikely and unreasonable, as it would require Toll Brothers to achieve $139 million more in net income in F06 than in F05 (a 70% increase over F04 would bring F05 net income to $695.5 million, and 20% of that number is $139 million).  As of May and June 2005, defendants had no reasonable basis to project that Toll Brothers would increase revenues by that amount that far into the future, particularly in light of increasing difficulties in opening new selling communities, slow traffic and contract growth and continuing uncertainties in the housing market and the economy in general such as steadily rising interest rates.

(f)     As a result of all of the foregoing, there was no reasonable basis in fact for the forecasts of "approximately" or "at least" 20% net income growth for Toll Brothers during either F06 or F07 as of May 2005, especially after having raised its F05 net income forecast to 70% growth.  Toll Brothers did not have visibility into F06 that was consistent with the forecasts of 20%

net income growth during that year.  In fact, based upon information then available to them, defendants actually knew that those forecasts were false and misleading when made as there was no reasonable probability that the forecasted levels of growth would in fact be achieved.

93.     On 7/27/05, Rassman appeared on *CNBC* to discuss Toll Brothers' business.  The following occurred:

> TED DAVID, CNBC ANCHOR: Well, new home sales rose 4 percent in June, indicating no sign of a real estate cool off.  That is good news for homebuilders like Toll Brothers.  Toll Brothers stock has been riding high, moving up nearly to $60 . . . Joining me now is the chief financial officer of Toll Brothers, Joel Rassman.
>
> *     *     *
>
> DAVID: Look, the bottom line is this can't go on forever.  When do things slow down do you think and what slows them down?
>
> RASSMAN: . . . *[W]e don't currently see any indications on a national basis that that's happening, either slowdown in regulation or a change in the balance between supply and demand*.

94.     On 7/28/05, Rassman was interviewed on Bloomberg and the following occurred:

> CAROL: Joel . . . what are the prospects for your business going forward?  You've had tremendous profit growth for many years.  It doubled in the last quarter, stock hit a record on that news.  Can you continue that kind of growth going forward?
>
> JOEL: We believe we can uh, we try to achieve at least 15% growth in earnings each year.  And we have done much better than that whether you look at us 1, 3, 5, 7, 10, what, since we've been public, 19 years.  We've significantly surpassed 15% in each of those categories, way in excess of 20 in most of those categories.  And, uh, we think we can continue similar types of growth into the future. . . . *[W]e don't see any let-up in terms of demand or our ability to produce profits*.

95.     On 8/4/05, Toll Brothers reported preliminary results for 3Q F05, the period ending 7/31/05, and reaffirmed its 70% projection for 2005 net income growth via a release headlined and stating:

> ***Toll Brothers' Record FY 2005 3rd Qtr Home Bldg Revenues Rise 55% to $1.54 Billion*** . . .
>
> Toll Brothers, Inc. . . . today reported record third-quarter and nine-month results for home building revenues, backlog and contracts for the period ended July 31, 2005.

The value of the Company's third-quarter backlog and revenues were the highest for any quarter in its history.

* * *

Robert I. Toll, chairman and chief executive offer, stated: "[W]e remain on track with our previous projection of approximately 70% net income growth in FY 2005. ***With more than 60% of FY 2006's projected deliveries already in our backlog, we continue to believe that net income in FY 2006 should be approximately 20% higher than in FY 2005***.

We ended this quarter with 230 selling communities and expect to end fiscal 2005 with approximately 237 compared to 220 at FYE 2004. ***We project we'll reach about 265 selling communities by FYE 2006: Assuming continued healthy demand, we believe this should put us on track for approximately 20% net income growth in FY 2007 over FY 2006***.

***Demand for our luxury homes remains strong***. . . .

With buyer appetite so healthy, approximately one-third of our communities now have backlogs stretching out twelve months. Therefore, in a number of our communities, ***we've chosen to hold off taking new home sale contracts*** rather than lock in sales prices today for deliveries more than a year away. Instead of selling out communities too quickly, ***we've chosen to ration our supply*** to maximize profit."

96.     On 8/4/05, Toll Brothers held a conference call for analysts to discuss its 3Q F05 results. During the call, Toll Brothers for the first time mentioned a "cooling" in "some local markets." Robert Toll made the following representations:

Bob Toll – Toll Brothers, Inc. – Chairman & CEO

With me today by phone are Joel Rassman, Chief Financial Officer; Fred Cooper, Senior Vice President of Finance and Investor Relations; Joe Sicree, Chief Accounting Officer; and Kira McCarron, Chief Marketing Officer.

* * *

We ended this quarter with 230 selling communities and expect to end fiscal '05 with approximately 237 selling communities compared to 220 at fiscal year end '04. We project to reach about 265 selling communities by fiscal year end '06 – assuming continued healthy demand. This should put us on track to increase net income approximately 20% in fiscal year '07 over fiscal year '06.

Demand for our luxury homes remains strong.

* * *

- 62 -

*We do see cooling in some local markets that were overheated just a few months ago, but we think this is good*. . . .

\* \* \*

Margaret Whelan – UBS – Analyst: Has the sales pace slowed down at all?

Bob Toll: *No, I don't think so*.  Joel?

Joel Rassman: *No*. . . .

\* \* \*

Bob Toll: *[D]emand is still there on the West Coast – very strong*.

\* \* \*

Lorraine Maikis – Merrill Lynch – Analyst: Can you just talk about the few markets that you're seeing where pricing is cooling down and what operational or selling changes you're making to your business there?

Bob Toll: Vegas, ever so slightly.  . . .  It's still hotter than a normal market *but not as hot as it was*.  Some areas around Washington, D.C. have cooled a little bit also to a healthy situation . . . .  Any other markets you guys can think of that I've missed?

Joel Rassman: No.

97.    On 8/4/05, *Reuters* reported:

*Some of the hottest U.S. upscale home markets may be cooling off*, the head of luxury home builder Toll Brothers said on Thursday.

    "*We do see cooling in some local markets that were red hot a few months ago*," Robert Toll, chairman and chief executive of Toll Brothers, said during a conference call with analysts.

\* \* \*

    "*It's still hotter than a normal market, but not as hot as it was*," Toll said.

\* \* \*

    "Yet, markets, such as Phoenix, Arizona, are still searing," Toll said.

98.    On 8/4/05, JP Morgan issued a report on Toll Brothers based on the recent conference call and follow-up conversations with Robert Toll and with Rassman.  The report stated: "*Also, critically, TOL reaffirmed its FY05 and FY06 net income guidance of 70% and 20%, respectively*."

- 63 -

99.     On 8/5/05, the Susquehanna Group issued a report on Toll Brothers based on the
recent conference call and follow-up conversations with Robert Toll and with Rassman.  The report
stated:

> *Our post conference call view actually brightens a bit despite some conservative
> posturing by management.  Given the trends in place, we believe 30% earnings
> growth is possible for fiscal 2006*.

100.     On 8/5/05, Janney Montgomery Scott issued a report on Toll Brothers based on the
recent conference call and follow-up conversations with Robert Toll and with Rassman.  The report
stated:

> *We believe even more strongly about the positive three-year outlook for Toll
> following the call.*  The single most important factor affecting long-term growth is
> the lot pipeline.  Lots controlled by Toll in 3Q05 rose 25.7% versus a year ago.  In
> terms of the near term, momentum remains strong . . . .
>
> *       *       *
>
> *Orders were down in California due to a lower community count*.  The
> company continues to sell out of its communities in California faster than anticipated
> in its long-term plan, and new community releases await governmental approvals.
> This creates a scarcity premium and a strong pricing environment. . . .
>
> *The company plans on having 265 active selling communities in FY 06, a
> 16% increase versus the expected average in FY 05.  This is the single, most
> important factor driving fiscal 2006 and 2007 expectations of 20% EPS growth*. . . .
>
> Houses in Las Vegas are still selling quickly but not as fast as a year ago
> during the speculative fever.  Management welcomes this change as it makes pricing
> homes easier.  New releases sold out in Las Vegas last year in a matter of hours to a
> few days; currently, it takes 1-2 weeks to sell out a new release.  New Jersey also has
> cooled somewhat from the frantic pace of a year ago *but is still stronger than
> normal*.  The rest of Toll's markets are experiencing levels of demand similar to a
> year ago.

101.     Upon defendants' first partial disclosure of previously misrepresented and/or
concealed information on 8/4/05, the artificial inflation caused by defendants' prior false statements
began to come out of the stock, damaging earlier Class Period purchasers.  Toll Brothers' stock price
fell from $56.12 on 8/3/05 to $49.51 on 8/5/05 and to $48.58 over the next few days.  However, due
to defendants' lack of full and complete disclosure, false assurances and continuing

misrepresentations, Toll Brothers stock continued to trade at artificially inflated, albeit lower, prices through the balance of the Class Period.

102.    The 8/15/05 edition of *Forbes Magazine* which appeared on or about 8/3/05 or 8/4/05 highlighted the massive recent insider trading by Toll Brothers insiders, reporting:

> Why are insiders at home building companies crowding the exit door?
>
> **Do they know what we don't – but should?**  Insiders at home building companies, those with market caps exceeding $500 million, are selling shares in unnerving numbers.  For the first half of 2005 those sales by executives totaled $671 million, compared with $189 million in the same period last year.  Makes you wonder if there's **anything to the Fed chairman's repeated mumblings about "froth" in the housing market**.
>
> Maybe it's just a matter of good market timing for the sellers.  Shares of Horsham, Pa. luxury home builder Toll Brothers have risen 184% in the last year.  Cofounders Robert, who has rarely sold stock, and sibling Bruce started unloading in November – $441 million worth through the middle of July.  The duo still own a combined $1.6 billion worth of Toll Brothers.  "**It's for ordinary diversification, safety and for spending," says Robert, who points out that his bonus is paid in shares.  "I have to buy food and clothing**."
>
> Gimme Shelter
>
> Executives at home builders have been selling out as their stocks hit new highs.

**First Six Months 2005**

| Company | Number of Insider Shares Sold ($thou) | Value of Shares ($mil) | Average |
|---|---|---|---|
| Toll Brothers | 6,626 | $304.2 | $46 |

103.    On 8/16/05, Robert Toll appeared on *CNBC* to discuss Toll Brothers' business and made the following representations:

> SUE HERERA, CNBC ANCHOR   Today's Commerce Department report on housing starts shows lower than expected data on new home products.  Figures that economists, some, are using to suggest the red hot housing market may have started to cool down.  Others disagree.  Robert Toll, Chairman and CEO of Toll Brothers . . . .
>
> *            *            *
>
> [G]ive us your perspective.  I mean the big debate – and we get e-mails from viewers about this all the time.  Some say, "Hey, where I live it's definitely a housing

- 65 -

bubble." Others say, "Would you guys quit using the word 'bubble'." So what do you see . . . ?

                    *        *        *

TOLL: We don't see a housing bubble. ***The market is fantastic. We're enjoying exactly where we are***. And we don't see the rationale or the logic for the market to go backwards. You may have cooling in some markets as you have had. And I think you'll have reheating in some markets as we now see. . . . ***The supply is just out of balance with demand***.

                    *        *        *

HERERA: What's the hottest area for you right now? Where are you seeing the most growth?

TOLL: ***Recently, it would be Washington, DC market, again, Las Vegas, West Coast Gold Coast Florida, Central Florida, Phoenix still red hot, California still excellent***. ***That's probably where we see this – the greatest strength in the market right now***.

104.    On 8/25/05, Toll Brothers issued a release reporting its results for 3Q F05, the period

ended 7/31/05, which stated:

Toll Brothers, Inc. . . . today reported record third-quarter and nine-months results for earnings, revenues, backlog and contracts for the periods ended July 31, 2005. The Company's third-quarter net income, revenues and backlog were the highest for any quarter in its history.

        Robert I. Toll, chairman and chief executive officer, stated: "We attribute these tremendous results to our team's diligence, our strong land position and the pricing power we enjoy in our affluent markets. While the supply of buildable lots seems increasingly to be constrained by governmental regulation, ***demographics-driven demand continues to grow***. These dynamics have put us on track for . . . ***approximately 20% net income growth in both FY 2006 and FY 2007***.

        In recent weeks, it appears that bubble mania and reports of a strengthening employment picture with associated interest rate fears have rattled investors. We believe strong job numbers and an improving economy are positive factors for the housing industry, in general, ***and our luxury niche in particular***. Mortgage rates remain low and the projected Fed Funds target of about 4.5% is below its peak in 1994, 1995, 1996, 1997, 1998, 1999 and 2000, which were all years of record home sales for Toll Brothers.

        ***We believe our success is determined more by our brand name and our well-located communities than by fluctuations in the mortgage market***. In the past decade, there have been several periods of mortgage rate hikes, three years in which national housing starts dropped, a recession, and a major stock market decline. None of these have stifled our ability to expand and produce record results.

We've watched some markets go from overheated to warm and back to hot. It appears to us that the basic fundamentals of wealth accumulation, constrained lot supplies and growing demand should continue to support our business model. . . ."

Joel H. Rassman, chief financial officer, stated: ". . . *We now expect net income growth of over 80% . . . in FY 2005 compared to FY 2004's record results.*

*Based on our backlog, we believe we should deliver between 10,200 and 10,600 homes in FY 2006 . . . .*"

105.    Defendants' increase in Toll Brothers' F05 net income projection to 80% growth in turn increased its F06 projection of 20% growth by another 6% from its most recent F06 projection. In total, defendants had now increased their F06 net income projection by $196.5 million, *or 28%*, since the beginning of the Class Period.

106.    On 8/25/05, Toll Brothers held a conference call for analysts to discuss its business and its 3Q F05 results. During the call the following occurred:

**Robert Toll – Toll Brothers – Chairman, CEO**

With us today by phone are Joel Rassman, Chief Financial Officer . . . and Joe Sicree, Chief Accounting Officer.

\*      \*      \*

We are very pleased . . . with our prospects for the future.

\*      \*      \*

We attribute these tremendous results to . . . the pricing power we enjoy in our affluent markets. While the supply of buildable lots seems increasingly to be constrained by governmental regulation, demographics-driven demand continues to grow. *These dynamics have put us on track for our 13th consecutive year of record earnings in fiscal year '05 and assuming continued healthy demand, we believe approximately 20% net income growth in both fiscal year '06 and '07*. We ended this quarter with 230 selling communities and *expect to end fiscal '05 with approximately 237 selling communities*, compared to 220 at fiscal year end '04. *We project to reach about 265 selling communities by fiscal year end '06*.

Few Fortune 500 companies have both provided their shareholders with such a consistent string of record earnings and can also look toward projected 20% net income growth in each of the next two years. *We believe that our size and financial strength, our consistent record of performance, our record backlog, and our continuing community growth should give confidence to investors that our results and prospects are not as cyclical as the market seems to be anticipating.* . . . *We*

- 67 -

*believe our success is determined more by our brand name and our well located communities than by fluctuations in the mortgage market*. . . .

*       *       *

**Joel Rassman – Toll Brothers – CFO, EVP, Treasurer**

*       *       *

[B]ased upon our record backlog and current pace of traffic and deposits, expected community openings and the current economic conditions, we estimate we will deliver between 10,200 and 10,600 homes in 2006 . . . .

*Even with the increased projection for 2005, based upon all our current estimates we still believe we will achieve approximately 20% net income growth in fiscal 2006*. . .  Based upon the current economic conditions and increased community count, we believe we can achieve approximately 20% in net income growth in 2007 as well.

*       *       *

**Justin Speron – Credit Suisse First Boston – Analyst**

You mentioned in the press release you said that you've watched some markets go from overheated to warm and back to hot.

**Robert Toll – Toll Brothers – Chairman, CEO**

Right.

**Justin Speron – Credit Suisse First Boston – Analyst**

Just in reference to a few weeks ago, is that being made there in regard to those markets that you mentioned cooled slightly, or is that just a general statements?

**Robert Toll – Toll Brothers – Chairman, CEO**

I would characterize, of the markets you mentioned, that that is true for the Las Vegas market, and I don't think it's going back to hot in Jersey, I think it's – I think it's just where it was.  And in D.C., I gave you in the monologue *my idea of where that market was, where it went from super-hot, or overheated to just plain hot, which is pretty terrific*.  Okay?

**Justin Speron – Credit Suisse First Boston – Analyst**

Okay.   And then your Denver, Austin, Hilton Head, you mentioned improvements.

**Robert Toll – Toll Brothers – Chairman, CEO**

Yes.

- 68 -

                   *       *       *

I'm giving you my impression from reading our weekly non-binding reservation deposits that come in as a precursor to the binding contracts that we are into.  *I noticed in the last several weeks that Austin has gotten a lot healthier, Denver's gotten a lot healthier, and Hilton Head has just been off the charts*.

                   *       *       *

**Rick Murray – Raymond James – Analyst**

Just a couple of questions.  Bob, can you talk about – I guess maybe clarify a little bit your previous comment with regard to non-binding deposits?  Can you give us a sense quantitatively to the kind of how that number has been trending the last month and a half?

**Robert Toll – Toll Brothers – Chairman, CEO**

*Yes, it's been trending up, which is really astounding*.  Every day I get the *New York Times* and the *Wall Street Journal*, and I don't think they've missed a bad article in our regard in the last two to three weeks.  *And it's amazing to me that we're doing the business that we're doing, which is tremendous, in the face of this bad press*.  I mean, if there's anybody left in the U.S. that hasn't read an article that this is the absolute peak, I'd like to meet them.  So who are all these people that are buying at the absolute peak, according to the newspaper?  They're people who want the move up home, whether it be attached, multifamily, or single, and aren't willing to play the market according to the press.  *It's really astounding to me that we've been doing the business that we've been doing*.

**Joel Rassman – Toll Brothers – CFO, EVP, Treasurer**

I think you have to look at that I know terms of the supply and demand imbalance and recognize that it appears that *there's so much more demand than there is supply*, and that's the reason we keep on selling homes. . . .

                   *       *       *

**Lorraine Markis – Merrill Lynch – Analyst**

Okay.  Then finally can you just comment on traffic levels overall or on a regional basis?

**Robert Toll – Toll Brothers – Chairman, CEO**

Sure.  I have the old traffic sheet right here.  *With respect to traffic, on a per-community basis, traffic has been down from last year*, and on average, it just – just eye-balling this, it seems to me as though *it has been down 10% to 20% per community going back for almost a quarter and a half*.  With respect to sales, however, that being non-binding reservation deposits, it pretty much looks like we're

- 69 -

setting records for the last month and a half, with a couple of weeks excepted. Maybe a little longer than that.

**Joel Rassman– Toll Brothers – CFO, EVP, Treasurer**

> *Bob, wouldn't the traffic be affected by the fact that we have a lot of communities with waiting lists?  And people don't really* –

**Robert Toll – Toll Brothers – Chairman, CEO**

I hadn't thought of that.  You're absolutely right.  I thought it was surprising compared to what we've been doing.  That's a well-taken point.  A lot of our communities are now on an invitation-only basis.  You phone us your interest, and send in a deposit, a reservation deposit, and then we call you within which – within the order that we receive the reservation deposits.  So the community is basically closed, and we'll open it up, bring in five people only by appointment, sell them, then it's closed again, so that's probably a good explanation as to the imbalance between traffic and deposits.  Thanks, Joel.

107.    On 8/25/05, *Dow Jones News Wires* reported:

Luxury homebuilder **Toll Brothers Inc. appeared to see no signs of a housing slowdown as its revenue rose 54% and earnings more than doubled in its fiscal third quarter**.

> *Chairman and Chief Executive Robert Toll is bullish about his company's outlook, as he's predicting 20% earnings growth in fiscal 2006 and 2007*.

Toll isn't deaf to the talk of a housing bubble that has been reverberating through the market - **but he emphasizes he doesn't see one**.

"In recent weeks, it appears that bubble mania and reports of a strengthening employment picture with associated interest-rate fears have rattled investors," said Toll in a statement.  However, he said strong job numbers and an improving economy will help to keep housing demand strong – **especially for luxury homes**.

"Mortgage rates remain low and the projected Fed Funds target of about 4.5% is below its peak in 1994, 1995, 1996, 1997, 1998, 1999 and 2000, which were all years of record home sales for Toll Brothers," he added.

Toll said his company has weathered through mortgage-rate hikes, declines in housing starts, a recession and stock market correction over the past decade, and "none of these have stifled our ability to expand and produce record results."

> *He said fundamentals remain healthy as demographics will keep demand healthy while limited land supply will prevent overbuilding*.

108.    On 8/25/05, *Reuters* reported:

- 70 -

*The company also said it was on track for fiscal 2007 revenue growth of 20 percent*.

109.   On 8/25/05, Rassman appeared on *Fox News, Neil Cavuto* to discuss Toll Brothers'

business and made the following representations:

> TERRY KEENAN, GUEST HOST: Well, as Hurricane Katrina expects to plow through the Florida coast, talk of homes being threatened in the area did not hurt Toll Brothers.  Its third-quarter earnings results were out today.  Quarterly profits more than doubled.
>
> Joining me now from its headquarters is Joel Rassman.  He is the chief financial officer of Toll Brothers.
>
> \*        \*        \*
>
> KEENAN: *How does business look going forward?*
>
> RASSMAN: *It looks spectacular.  We have backlogs that have visibility into our third and fourth quarter of next year.  And everything looks like we will have another record year this year and another record year next year*.
>
> *So, we are already projecting records for 2006 and an additional 20 percent growth in 2007*.
>
> KEENAN: Where are you seeing the growth from?  What parts of the country are the hottest?  *Does it continue to be Florida, California, Vegas?*
>
> RASSMAN: *I think that those markets continue to be very strong*.  The dynamics of those markets are such that you have much greater demand than you have supply.  But, in most of the metropolitan areas around this country, that same kind of balance between supply and demand exists, whether it is the Washington, D.C., suburbs around Virginia and Maryland or the Chicago suburbs or Southern California or Northern California.  *The shortage and imbalance between supply and demand is evident everywhere*.
>
> \*        \*        \*
>
> KEENAN: We have the storm Hurricane Katrina bearing down on Florida right now.  Its been a tough hurricane season.  *Do these storms affect your business at all?*
>
> RASSMAN: We would think they should, but they haven't.
>
> \*        \*        \*
>
> *We have not suffered any losses of significance from the hurricanes*.

- 71 -

110. On 8/25/05, Rassman appeared on *CNBC* to discuss Toll Brothers' business. The following occurred:

KERNEN: All right, Joel. So the only thing you're going to hear today, and I guarantee you, is that maybe that the relative outperformance just perhaps wasn't as great as previous quarters has been, even though it was a great quarter. Do we need to start worrying about things like that in the homebuilders?

RASSMAN: *I don't think so. I think we just upped guidance just a few weeks ago. . . . [W]e're very pleased with our results, and we think it's indicative of what we'll see in the future*.

\* \* \*

KERNEN: So Toll Brothers will be good, regardless of what happens. But overall, what do you feel about the overall market? Are we going into one of those periods where you do see a slowdown?

RASSMAN: *I think we see a healthy adjustment in the rate of growth in some areas that were super-hot*.

KERNEN: *So that's a slowdown*.

RASSMAN: *Well, it's not a slowdown, it's a* . . . .

KERNEN: *A healthy adjustment of an overheated situation*.

RASSMAN: Well, you're going from *super-hot to hot. That's not really a bad situation*. . . . *Right now, we have demand way above supply in almost every geographic region. And that really is what makes us so excited about the future*.

DENNIS KNEALE, MANAGING EDITOR, FORBES: . . . You know, your stock, at Toll Brothers, has done wonderfully. It has tripled in two years. Housing prices have doubled in five years. Now isn't it pretty clear that there's no way housing prices can double in the next five? There's no way any housing stock can go up triple in the next three years? And if you're giving advice to your mother, do you tell her to buy Toll Brothers stock, or do you tell her to bet somewhere else?

RASSMAN: . . . *we're very confident in the ability of Toll Brothers to continue its earnings trend. We've grown historically in excess of 20 percent a year, and we've already given guidance that we expect to grow earnings approximately 20 percent in each of the next two years. So I'm very confident on the ability of Toll Brothers to continue to grow earnings*.

111. On 8/25/05, Rassman was interviewed on *Bloomberg* and the following transpired:

SUZY: What about in terms of the price of your own stock and activity, insider activity? We're seeing that you, for example, have sold about 200,000 shares over the last several months, uh, at an average of about 65, anywhere from 65 all the way

up to 100,50,000 shares are being sold on a regular basis. There's also reports that either many executives and founders in the company that have sold millions of shares since May of this year.

JOEL: *I think that's a diversification issue*. We have the vast majority of our wealth in Toll Brothers' stock and notwithstanding the fact that *we, uh, firmly believe that the price of the stock will continue to go up. That earnings will continue to grow at, we've given a projection of about 20% a year for each of the next two years*.

112.    On 8/26/05, *The Wall Street Journal* reported:

Toll Brothers Inc., one of the country's largest home builders, said fiscal third-quarter profit more than doubled amid strong land position and pricing power in its affluent markets.

\*       \*       \*

Although Toll Brothers said the supply of buildable lots seems to be constrained by government regulation, *demand continues to grow*, driven by demographics. . . .

"*We've got the supply, and the market has got the demand, so it's a match made in heaven." said Robert I. Toll, Chairman and chief executive officer*.

113.    On 8/25/05, JP Morgan issued a report on Toll Brothers based on the recent conference call and follow-up conversations with Robert Toll and/or Rassman. The report stated:

*Toll Brothers Strong 3Q Reported; FY06 Guidance Conservative* . . .

*Importantly, . . . reiterated 20%+ NI growth for FY06 and FY07*.

114.    On 8/25/05, Lehman Brothers issued a report on Toll Brothers based on the recent conference call and follow-up conversations with Robert Toll and/or Rassman. The report stated:

"*Company maintained its 20% net income growth outlook for '06 and '07*."

115.    On 8/26/05, Susquehanna Financial Group issued a report on Toll Brothers based on the recent conference call and follow-up conversations with Robert Toll and/or Rassman. The report stated: "*[T]he fiscal 2006 guidance stayed unchanged at 20% growth*."

116.    On 8/25/05, BB&T Capital Markets issued a report on Toll Brothers based on the recent conference call and follow-up conversations with Robert Toll and/or Rassman. The report

stated: "***The company continues to expect approximately 20% growth in net income for FY'06 and***

***FY'07***."

117.    On 8/25/05, Wachovia Capital Markets issued a report on Toll Brothers based on the

recent conference call and follow-up conversations with Robert Toll and/or Rassman.  The report

stated: "***TOL maintained FY06 and FY07 net income guidance at +20% yr/yr . . . raising 2006***

***guidance by 6% based on the increase to 2005 guidance***."

118.    On 8/26/05, AG Edwards issued a report on Toll Brothers based on the recent

conference call and follow-up conversations with Robert Toll and/or Rassman.  The report stated:

> ***The decline in West Coast orders stems from a lack of supply on the company's***
> ***part and problems in the Midwest have been well-documented given Detroit's woes.***
> ***Specifically, the company cited that market conditions have improved in Denver,***
> ***Austin and Hilton Head and that worries over the DC market are unfounded as the***
> ***region remains "hot***."

> Given that the company's sales pace improved throughout the quarter, we are
> not overly concerned that traffic declined 10-20% on a per community basis in Q3.
> ***We find management's explanation plausible that internal restrictions on sales due***
> ***to extended backlogs accounted for the lower number of home shoppers***.

119.    On 8/26/05, Janney Montgomery Scott LLC  issued a report on Toll Brothers based

on the recent conference call and follow-up conversations with Robert Toll and/or Rassman.  The

report stated: "***We believe strongly that TOL can grow EPS by 20% or more in 2006 and 2007***."

120.    On the 8/25/05 partial revelation of previously misrepresented or concealed

information, some of the artificial inflation came out of the stock as Toll Brothers' stock price fell

sharply from $51.72 on 8/25/05 to $46.32 on 8/26/05 and to $45.64 over the next few days, a

company specific stock decline that damaged prior Class Period purchasers.  However, due to

defendants' lack of full and complete disclosure, false assurances and continuing misrepresentations,

Toll Brothers stock continued to trade at artificially inflated, albeit lower, prices through the balance

of the Class Period.

121.    Defendants Bruce Toll and Blank continued to take advantage of the artificially inflated price of Toll Brothers stock by selling even more of their holdings.  On 9/28/05 and 9/29/05, Bruce Toll sold 620,000 shares of his Toll Brothers holding for proceeds of ***over $26.1 million***.  On 9/8/05, Blank sold 40,000 shares of his holdings for over $1.8 million in proceeds.

122.    On 9/8/05, Toll Brothers filed its Form 10-Q for its 3Q F05 (ended 7/31/05), which was signed by defendants Rassman and Sicree and certified pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002 by defendants Rassman and Robert Toll.  Robert Toll and Rassman certified, among other things, that the Form 10-Q contained no misleading statements of material fact.  In the Form 10-Q, defendants reiterated Toll Brothers' net income projection for F05 of 80% growth over F04.  This increase for F05 projections again raised Toll Brothers' F06 forecast of 20% net income growth by $147.4 million, another 6%.

123.    On 9/13/05, Robert Toll appeared on *CNBC* to discuss Toll Brothers' business and made the following representations:

> KUDLOW: What do you say to these pessimists?  Why is it that everyone wants to deride the home-building industry, and the housing boom or the housing rally or whatever?
>
> TOLL: . . .  ***I think the problem with all of those people that are predicting the demise or the pop of the bubble are that it comes from people that just haven't bought in the last five years***.
>
>     \*   \*   \*
>
> TOLL: ***I think they've got sour grapes at this point***.
>
>     \*   \*   \*
>
> KUDLOW: First of all, is there a softening in housing prices and a softening in condo prices?
>
> TOLL: ***There hasn't been a softening. . . . [Y]ou still have terrific demand, but it's not ferocious as it was.  Phoenix is still operating off the charts.  Western Florida, Gold Coast is still operating at an all-time high whereas the east coast of Florida has backed down a little bit.  . . .[Y]ou're still operating with a market that has prices going up not even stabilizing***.

124.    On 9/20/05, the Federal Reserve again raised federal funds interest rates by .25% to 3.75%, its tenth consecutive rate hike since June 2004.

125.    On 10/3/05, an article appeared in *USA Today* discussing Toll Brothers' business. For the first time Robert Toll revealed that there was a "'***general slowdown***'" in Toll Brothers business which would lead to a "'***10%***'" decline in building activity due to "'***a slowdown in orders***.'" The article stated:

> Remember for whom the bell tolls, it tolls for thee . . . or something like that. But according to Robert Toll, the CEO of Toll Bros., one of the nation's home builders, there is no bell tolling for the housing market. Toll says that the housing market will be fine for years to come, despite the concerns of "bubble heads" (like myself) who worry the housing boom is about to bust. Toll says not to worry, at least as far as his company is concerned, because the brothers Toll have so many homes left to build, their closing bell is still many years away.
>
> RON INSANA: . . . How are things at Toll Bros.?
>
> ROBERT TOLL: ***I think we've got a general slowdown in most of the markets.*** Now you've got to be careful how you characterize what I said, because when I said that about a month ago, the next day ***I read analysts' reports that I had said that markets were in the toilet, and I don't mean to imply that at all***.
>
> \*       \*       \*
>
> INSANA: But can you quantify the expected decline in building activity?
>
> TOLL: ***I would say something like 10%, but that's a guess***.
>
> INSANA: And that's orders, not starts, right?
>
> TOLL: ***Yeah, that's orders. I think you have a slowdown in orders***.
>
> \*       \*       \*
>
> INSANA: But are the solid housing fundamentals that everyone's talked about the for the last couple of years supportive to housing through 2006?
>
> TOLL: And '07, '08, '09 and '10.
>
> \*       \*       \*
>
> INSANA: What are you telling Wall Street right now about your prospects, not just for the remainder of this year but through 2006?

TOLL: *We expect 2005 to be 80% up over '04, and we expect an approximately 20% increase for '06. I think we even went to '07 and said we expected a 20% increase over '06. So that's pretty good moving and grooving.*

126.     The next day, on 10/4/05, *The New York Times* reported on the huge insider sales by Toll Brothers insiders over the past few months:

> Home builders have never had it so good. . . .  Builders are reporting blistering earnings and their shares are trading at or near record highs.
>
> Now they are cashing in.  Executives and directors at many of the nation's largest development companies sold stock at a record pace this summer.  Insiders at the 10 largest home builders by market value, including D.R. Horton, KB Home, Toll Brothers and M.D.C. Holdings, have sold nearly 11 million shares, worth $952 million, so far this year.  That is a huge jump from the 6.8 million shares, worth $658 million, that insiders sold during all of last year, according to data compiled by Thomson Financial.
>
> *Market specialists often view heavy stock sales by corporate insiders as a possible indicator that share prices are headed lower.  Some analysts say that the share sales by home builders are reminiscent of the heavy dumping of stock by technology company executives just before the technology bubble burst in 2000. For that reason, the staggering level of insider sales has analysts and investors wondering if home builders see something menacing on the horizon, like a cooling of the real estate market.*
>
> *                *                *
>
> "*The stock sales have nothing to do with the state of the market.  It has everything to do with diversification,*" said Joel H. Rassman, the chief financial officer of Toll Brothers, who has sold 105,000 shares worth $8.1 million.  That is almost double the 60,600 shares he sold last year for about $4 million.

127.     Toll Brothers' stock price declined sharply due to the Company specific partial revelation of previous misrepresentation and/or concealment of information disclosed on 10/3-4/05, falling from $45.50 on 9/30/05 (the last trading day prior to 10/3/05) to $43.42 on 10/3/05, $41.28 on 10/4/05, $38.52 on 10/6/05 and to as low as $36.10 on 10/13/05, inflicting damage on earlier Class Period purchasers.  However, due to the false reassurances and forecasts that accompanied these partial revelations, Toll Brothers stock continued to sell at artificially inflated prices through the end of the Class Period.

128.    The 10/16/05 *New York Times* contained an article about Toll Brothers that was based on an interview with Robert Toll and stated:

> His experience with Nimby ["Not in my backyard"] opposition, Toll added, leads him to believe that the political resistance to land development around the country will get more intense in the coming years. When I spoke with him in September, he noted that a drop in consumer confidence in the wake of Hurricane Katrina was not a good sign for an economy "that runs on confidence." ***Still, he said, the fundamentals were the same as before: the supply of developable acreage in many markets would remain limited, ensuring big profits***. Indeed, Toll seemed certain that firms like his – with an expertise at finding and developing land – would become increasingly successful. ***The company expects to grow by 20 percent for the next two years and then will strive for 15 percent annually after that***.

129.    The positive statements, assurances and forecasts made between 7/27/05 and 10/16/05 as pleaded in ¶¶93-128 were false and misleading when made because of the following undisclosed material facts, which were known to or recklessly disregarded by the defendants.

(a)    Toll Brothers had failed by 4Q F05 to add new active selling communities at the rate necessary to achieve its forecasted growth rates for F06. By the end of 3Q F05, at 230 communities, Toll Brothers had only added ten communities since FYE 2004, less than half of what was required to achieve the projection of 240 communities. Even though defendants lowered the projection in August 2005 to 237 communities, they had no reasonable basis for believing that they would add seven communities in 4Q F05. Defendants had known since before 7/27/05 that Toll Brothers would only be able to add ten new active selling communities by the end of F05, and that this would result in a material decline in the number of homes sold in F06, and that their forecasts of 20% net income growth being forecast for F06 and F07 were thus without reasonable basis.

(b)    Demand for Toll Brothers' new homes was softening materially, resulting in impaired pricing power for Toll Brothers, which would adversely impact its profitability in F06 and F07.

(c)    The "traffic" in Toll Brothers' active selling communities had continued to decline through 4Q F05 (8/1/05-10/31/05) because of softening consumer demand for Toll Brothers

homes due to rising interest rates and the prices of the homes – not because communities had been closed, as defendants represented. Robert Toll admitted in November 2005 that traffic had been declining since November 2004. The fact that traffic had declined throughout F05 was material to defendants' F06 net income, since traffic in F05 was an important indication of home deliveries and revenues that would be collected in F06: home sales to potential buyers reflected in the traffic in F05 would not generate revenues for at least 12 more months, in Toll Brothers' F06. Because traffic at Toll Brothers' active selling communities was one of the clearest indicators of future new home sales by Toll Brothers, the continued decline in traffic was a material negative development for Toll Brothers business which indicated to its insiders that Toll Brothers would not be able to achieve F06 and F07 net income growth at the levels being forecast.

(d)     The decline in traffic in Toll Brothers selling communities was not due to any voluntary action on the part of Toll Brothers to restrict sales activity or promotion of its selling communities, but rather due to the adverse factors identified above.

(e)     The number of binding contracts Toll Brothers was actually signing for future sales/delivery of its homes was slowing in the last half of 2005 due to the decline in traffic in its active selling communities, its inability to add new active selling communities and softening demand for its homes – not due to defendants' deliberate slowing of sales, as they represented. This was another serious indicator that Toll Brothers would not be able to achieve the levels of net income growth being forecast for F06 ad F07. Between July 2005 and late October 2005 (4Q F05), new contracts had increased by a mere 1% over the same period in F04. These declines in new contracts were not due to constrained supply, as defendants represented, but to declining demand for Toll Brothers homes. The declines in contracts negatively impacted Toll Brothers' F06 forecasts and made it impossible to achieve 20% net income growth in F06.

(f)     Toll Brothers accelerated the delivery of 200 homes at the end of F05 that would have been delivered in F06, thereby materially reducing F06 earnings projections, as Toll Brothers recognizes revenue from a sale when the home is delivered.

(g)     Toll Brothers could reasonably project future results based on its backlog about one year ahead of time since homes in backlog were likely to be delivered (the point at which Toll Brothers recognized revenue from the sale) over the next nine to twelve months.  By the beginning of 4Q F05, defendants knew that Toll Brothers' backlog was not sufficient to achieve 20% growth in F06.  Toll Brothers' increased forecast of 80% net income growth in F05 over F04 made its F06 forecast of 20% growth even more unlikely and unreasonable, as it would require Toll Brothers to achieve $147.4 million more in net income in F06 than in F05.  Defendants had no reasonable basis to project that they would increase revenues by that amount in F06, particularly with slow traffic, insufficient backlog, new contracts and selling communities, and continuing uncertainties in the housing market and the economy in general, such as steadily rising interest rates.

(h)     As a result of all of the foregoing, there was no reasonable basis in fact for the forecasts of "approximately" or "at least" 20% net income growth for Toll Brothers during either F06 or F07 as of July 2005, especially after having raised its F05 net income forecast to 80% growth.  Toll Brothers did not have visibility into F06 that was consistent with the forecasts of 20% net income growth during that year, as the visibility that existed was in fact inconsistent with and contradicted such forecasts.  Based upon information then available to them, the defendants actually knew that those forecasts were false and misleading when made as there was no possibility or reasonable probability that the forecasted levels of growth would in fact be achieved.

### DEFENDANTS' NOVEMBER 8, 2005 DISCLOSURES ABOUT TRAFFIC, ACTIVE SELLING COMMUNITIES, DEMAND AND EXPECTED PROFITABILITY

130.     On 11/8/05, in a press release reporting Toll Brothers' 4Q F05 and F05 results, defendants finally admitted that their prior representations, reassurances and forecasts had been false

with the shocking revelation that "a shortage of selling communities" and a "**softening of demand in a number of markets**" had "negatively impacted our contract results."  Toll Brothers disclosed it ended F05 with only 230 selling communities, compared to its original projection of 240, and consequently was lowering its estimate for homes delivered in F06 by 400-700 homes.  As a result, Toll Brothers was abandoning its forecast of 20% net income growth in F06 and F07, and would provide further guidance on 12/8/05.  Later on 11/8/05, defendants confirmed during a conference call with analysts that the "softening of demand" was "**pretty much across the board**" – a **decrease in overall demand**" – and shockingly admitted that "**[t]raffic has been down for about a year**" – *i.e.*, **since November 2004**.

131.     Investors, analysts and members of the financial media were furious at defendants' deception of the market and insider trading.  For instance, the following article appeared after the 11/8/05 revelations:

- 11/9/05: *USA Today*:

**Toll Bros. insiders sold stock in July; company has cut building forecast**.

Toll Bros. shareholders might feel as if a roof collapsed on them Tuesday, but **company insiders were able to avoid some of the financial house of pain with well-timed selling**.

**The company stunned Wall Street with news it wouldn't build as many homes as expected in 2006, sending the stock down $5.50, or 14%, to $33.91, which wiped out $856 million in shareholder value**.

*            *            *

The stock is down $24.34, or 42%, since it peaked July 20, erasing $3.8 billion in shareholder wealth.

Some investors had dismissed the summer swoon as just trading noise, and the company gave no indication to be nervous.  In an Oct. 3 interview in USA TODAY, CEO Robert Toll said housing market fundamentals looked strong through 2010. "That's pretty good moving and grooving," he said.

But the company wasn't so bullish Tuesday, saying it now expects to deliver between 9,500 and 10,200 homes in fiscal 2006 – roughly 5% below the previous forecast of up to 10,600 homes.

*Some executives were fortunate to sell in July ahead of the slide culminating with Tuesday's news*:

CEO Robert Toll sold nearly 1.5 million shares worth nearly $100 million, according to a USA TODAY review of regulatory filings. . . .

Vice Chairman Bruce Toll sold 687,700 shares worth $52.2 million. He still owns 11.9 million shares, or about 8% of the outstanding shares, Capital IQ says.

Other executives sold 250,000 shares worth $14.2 million.

- 11/9/05 Dallas Morning News:

*Follow the housing insiders' money*

At 5:07 a.m. Tuesday, toxic words crossed the wires: "softening demand."

The two words were nestled in Toll Brothers' fiscal fourth-quarter earnings release and referred to the high-end homebuilder's prognosis for 2006.

\* \* \*

[T]he market seized only on "softening demand," dragging the stock down 14 percent. At $33.91, Toll closed 42 percent off its 52-week high of $58.67 on July 20.

\* \* \*

*With all this money disappearing, it's a good thing the people running the homebuilding companies got out when they did*.

So far this year, insiders at Toll have sold $588 million worth of the company's stock – representing nearly 10 percent of the current market capitalization.

- 11/9/05 Susquehanna Financial Group:

TOL Creates an Unforgettable Day in the Homebuilder Universe

The market's reaction to Toll's Orders and Revenue release speaks volumes. *The disappointing outlook was quite a surprise and unfortunately likely has a lengthy fall to it* . . . .

HIGHLIGHTS

*Investors shocked by TOL's disappearing Order growth.  1% unit Order growth was completely unexpected.  The primary culprit was lack of community growth, which caught the Street off guard*.  We are very disappointed in how it transpired as well.  By the company's own admission, management will typically know four to six months in advance whether a community will likely open on time.

That takes us back to early summer.  To us, maybe the great visibility in community openings.  Negative Factor.

> ***Continued weak conversion rates hampers sales in communities that are open***.  TOL still has 25% of its communities with 12 month backlogs.  While that sounds positive, it is not.  TOL is in dire need of accelerating its backlog conversion rate yet even with an Order level that will likely grow a negligible amount in F06, the backlog conversion rate will likely fall again. . . .

Slower demand is a secondary culprit here.

132.    Upon these shocking revelations of the serious problems with Toll Brothers' business that had been previously misrepresented or concealed, and the fact that its prior assurances and forecasts for F06 and F07 were false, more of the remaining artificial inflation quickly came out of Toll Brothers stock.  The stock price fell sharply from $39.50 on 11/7/05 to $33.71 on 11/8/05 on huge and much higher than normal volume of over 16.6 million shares – the highest volume in the Class Period – and continued to fall to $33.29 on 11/9/05 and to $33.13 on 11/10/05, damaging earlier purchasers of Toll Brothers stock during the Class Period.

133.    Then, on 12/8/05, defendants announced in a press release reporting F05 results that they were slashing their projection for F06 net income growth from 20% to ***0.5%-10%***.  Rassman admitted that the reduced projection was due partly to "the accelerated growth we achieved in 2004 and 2005" – essentially admitting that the Company's strong performance in 2005 rendered defendants' F06 forecasts unreasonable and unachievable.  Rassman also now admitted that because of the "uncertain times," F07 "results could prove better or worse than the previous guidance we gave of 20% growth," so that Toll Brothers would have to "defer giving more detailed guidance with respect to fiscal 2007 until later in the year."

134.    In the financial year after the Class Period, Toll Brothers' net income declined 15% and the Company was forced to take write-downs of $92.7 million.  By 4Q F06, profits had fallen 19%, sales had dropped by 48%, and shares in Toll Brothers had lost 57% of their value since July 2005.  During that quarter alone, orders plummeted by 58%, as more than one-third of customer

contracts were cancelled.  By year-end F06, the number of contracts held by Toll Brothers had

plunged 41% and the backlog of new orders was down 27% compared to F05.

### SCIENTER AND SCHEME ALLEGATIONS

135.    As alleged in the following paragraphs, defendants had the motive and opportunity to

commit fraud and had actual knowledge of the falsity of the statements they made, or acted in

reckless disregard of the truth or falsity of those statements.  In doing so, defendants participated in a

scheme to defraud and committed acts, practices and participated in a course of business that

operated as a fraud or deceit on purchasers of Toll Brothers stock during the Class Period.

**Defendants' Knowledge of Facts Rendering Their Class Period Statements False**

136.    Most of the Insider Defendants were Toll Brothers' top executive officers charged

with not only developing Toll Brothers' business strategy, but also overseeing the implementation

and execution of that strategy during the Class Period.  Due to the circumstances described in this

Complaint, nothing was more important to defendants than continuing to open new selling

communities, keeping traffic up in Toll Brothers' existing communities, signing binding contracts

and continuing home price appreciation to generate "inventory profits."  They consequently

monitored and reviewed specific reports on these material indicators on at least a weekly basis, as

detailed below, and knew, based on their review of such information, that their alleged Class Period

misrepresentations were false or misleading and their F06 and F07 forecasts were made without

reasonable basis and were false or misleading.

137.    Toll Brothers tracked the amount of traffic at its individual home-selling sites on a

weekly basis.  Visitors to the sites were required to fill out cards containing their name, phone

number, email address and personal financial history.  These cards were sent to Toll Brothers'

corporate office every weekend where they were compiled into a comprehensive report.  Toll

Brothers' top officers received, at least weekly, "traffic reports" which measured the foot traffic of

potential customers (buyers) to its home developments.  These "traffic reports" were known inside

the Company to be highly sensitive and reliable indicators of customer interest and demand, a measure of sales and thus revenues and profits going forward. The Toll Brothers' insiders knew from their long experience in and exposure to the home building industry that slowing of foot traffic would likely be followed by a decline in sales and prices of its new homes, revenues, and profits. By 1Q F05, Toll Brothers' internal "traffic reports" showed a material slowing of foot traffic to and in its developed selling communities, a metric which worsened throughout F05.

138.   Sales Managers in each Toll Brothers community closely monitored the sales activity in that community. They tracked how many contracts were written, how many non-binding reservations were signed, and the number of buyers who backed out of sales contracts. Every Sunday night, Sales Managers compiled the week's data on the number of homes sold, the amount of deposits received, the number of settlements (*i.e.*, closings of home sale transactions), the number of new homesites released (*i.e.,* available for sale) and the number of people who backed out of contracts. The Sales Managers assembled this data into a report called the "Sunday Night Report" or "Sales Report." Sales Managers faxed this report to Toll Brothers' corporate headquarters every week and community Project Managers sent this report to the community Vice Presidents, who sent it to the regional Vice President, who sent it to defendants Robert Toll and Barzilay, who reviewed these reports.

139.   Defendant Rassman received weekly and monthly reports concerning the Company's earnings, which he reviewed in preparation for Toll Brothers' quarterly conference calls with analysts. These reports contained information about market conditions, progress reports on housing developments in progress, and earnings information, such as a comparison of actual sales against projected sales. These reports also contained information on contracts for home sales, as well as traffic and backlog. Rassman knew from the data in the reports that, for example, by at least

September 2004, Toll Brothers' growth in Maryland and North Virginia began to decline and that during 2005, New York, New Jersey, and New England's homebuilding industries were in a slump.

140. Toll Brothers also held division-level "Project Review Meetings" three times per year: in spring, late summer, and winter. All Sales Managers, Sales Associates, Project Managers and Assistant Project Managers attended the meetings, as did the Division Presidents and Vice Presidents. "Profitability Reports" were prepared for and reviewed at these meetings. The Profitability Reports detailed the revenue for each community for the fiscal year, and contained data on actual and projected traffic numbers, new contracts, new home construction starts, closings, and permitting. The Profitability Reports also contained data on homes sales by year, quarters, and months. All matters discussed at the Project Review meetings were communicated to Robert Toll and Barzilay.

141. The Insider Defendants also admitted to their review and knowledge of important indicators for Toll Brothers' future performance.

(a) On the 11/8/05 conference call, Robert Toll referred to written reports containing traffic comparisons by year and by month.

(b) Robert Toll admitted that senior management "closely monitor[ed]" the Company's backlog on a weekly basis. As he stated on the 2/8/05 conference call: ". . . we pretty closely monitor the backlog times on each community and we do this every single week to make sure that we're not selling too far out in advance."

(c) On the 12/8/05 conference call, Robert Toll confirmed that he monitored Toll Brothers' sales on a weekly basis: ". . . [W]e view the sales in each community every Sunday night in our homes and together every Monday morning. So every community is analyzed."

(d)     On the 12/8/05 conference call, Robert Toll confirmed that he and senior management carefully monitored performance in Toll Brothers' communities and personally managed selling points such as pricing in response to sales data:

> If we sold three this week and we sold three last week, then we'll go look at the backlog in that community and let us say the backlog in that community is 35 and we had ballparked that community for selling 35 in a year, then we've obviously getting ahead [of] what we had ballparked so we think there's strong enough demand we would bang that community five or up ten and that's basically the way we run the Company. Every community, every week is up for re-evaluation for price increase.

> Obviously, if the community is going in the other direction and you've got zeros for three weeks, then first thing you do is inquire about the sales traffic, the sales management, the representation on site, and then finally, if you're satisfied that everything's as good as you can make it and you're still not making sales, then something's wrong with your price and the first thing you would do is turn to a minor incentive and the second thing you do is turn to a mortgage program.

On the 12/8/05 conference call, defendant Robert Toll confirmed that he and senior management tracked Toll Brothers' price increases, stating: "we do track every week what we raise."

142.    In December 2004, Toll Brothers' Executive Compensation Committee established performance goals for defendant Barzilay for F05 which confirm that his duties during that year required him to be knowledgeable about and report to Robert Toll on the Company's progress in adding new communities and its F06 sales outlook.  According to a Form 8-K filed by Toll Brothers on 4/28/05, the performance goals for F05 required Barzilay to personally visit at least four remote divisions, provide weekly recommendations to Robert Toll arising out of weekly sales and production reports, and follow-up with the Vice President of Operations; meet with and review on at least a monthly basis support departments relating to land development; increase production in an amount approximating the increase in sales from F04 and F05; and review and approve all new land transactions.

143.    Toll Brothers' F04 Annual Report also confirmed that the Company and its entire management team conducted detailed reviews of the progress of every community owned or controlled by Toll Brothers three times per year:

Three times a year, each of our communities undergoes a top-to-bottom project review. The entire management team convenes and reviews its performance with a senior executive from another division and plans for the future. As with everything we do, the process is very intense and detailed.

144. A 4/8/05 *Fortune* article about Toll Brothers described its management practices, confirming that defendants held weekly operations meetings and were intimately involved with the day-to-day operations of Toll Brothers:

On a recent Monday evening in suburban Philadelphia, two dozen sober-suited executives huddle around a giant conference table for the weekly "ops" meeting inside the nerve center of Toll Brothers, the hottest homebuilder in America. As another half-dozen division heads join the conversation by satellite, the group begins wrestling with brick-and-mortar matters such as how many digits to include in the codes for custom options that distinguish, for example, butterfly staircases from Palladian kitchens. Suddenly co-founder and CEO Bob Toll bursts in and starts firing questions at his brain trust: Are local managers doing enough to deter the buy-and-flip crowd? Are rival builders throwing up houses without signing up buyers first? His lieutenants reassure the boss that their customers are bona fide primary- and vacation-home owners who just keep coming, and that speculative building isn't widespread. Finally, with his paranoia assuaged, Toll allows himself to do what he loves best: ratchet up prices.

Over the past half-decade this veteran builder's weekly strategy session has evolved into a kind of ritualistic celebration of the boom going on in the U.S. housing market. Every Sunday, his company's divisions e-mail Toll, his top brass, and other managers the sales figures for each of his 220 developments around the country. After digesting the data, Toll himself makes the final decision on whether to raise home costs.

**Defendants' Insider Trading**

145. During the Class Period, the Insider Defendants had both the motive and opportunity to commit fraud in order to sell vast amounts of their own Toll Brothers' stock at high prices, as alleged in the following paragraphs.

146. The Insider Defendants took advantage of their knowledge of the material non-public negative information concerning Toll Brothers' business, financials, and future prospects by selling during the same time period a total of over 14.1 million shares of their Toll Brothers stock for over $617.7 million in insider trading proceeds. These sales are set forth below:

| Insider | Date | Shares | Price | Proceeds | % of Shares Owned Sold |
|---|---|---|---|---|---|
| Zvi Barzilay | 12/10/2004 | 200,000 | $32.24 | $6,448,000 | |
| | 1/14/2005 | 100,000 | $37.03 | $3,702,500 | |
| | 2/9/2005 | 33,000 | $42.65 | $1,407,450 | |
| | 2/9/2005 | 5,000 | $42.66 | $213,300 | |
| | 2/9/2005 | 2,400 | $43.16 | $103,572 | |
| | 2/9/2005 | 800 | $42.69 | $34,148 | |
| | 2/25/2005 | 200,000 | $44.39 | $8,878,000 | |
| | 6/20/2005 | 116,400 | $51.03 | $5,939,892 | |
| | 6/21/2005 | 63,200 | $50.25 | $3,175,800 | |
| | 6/22/2005 | 200,000 | $50.56 | $10,112,000 | |
| | 7/20/2005 | 100,000 | $58.24 | $5,824,000 | |
| | | **1,020,800** | | **$45,838,662** | **92%** |
| | | | | | |
| Robert Blank | 3/7/2005 | 40,000 | $44.99 | $1,799,538 | |
| | 6/21/2005 | 80,000 | $50.19 | $4,015,368 | |
| | 9/8/2005 | 40,000 | $46.63 | $1,865,200 | |
| | | **160,000** | | **$7,680,106** | **93%** |
| | | | | | |
| Richard Braemer | 12/15/2004 | 40,000 | $32.45 | $1,298,000 | |
| | 5/31/2005 | 30,000 | $45.96 | $1,378,650 | |
| | | **70,000** | | **$2,676,650** | **52%** |
| | | | | | |
| Carl Marbach | 1/13/2005 | 15,000 | $35.81 | $537,075 | |
| | 3/1/2005 | 15,000 | $44.10 | $661,500 | |
| | 6/16/2005 | 120,000 | $51.14 | $6,136,680 | |
| | | **150,000** | | **$7,335,255** | **82%** |
| | | | | | |
| Joel Rassman | 12/10/2004 | 41,200 | $32.25 | $1,328,700 | |
| | 12/15/2004 | 80,000 | $32.77 | $2,621,200 | |
| | 2/25/2005 | 10,000 | $44.42 | $444,200 | |
| | 6/22/2005 | 100,000 | $50.04 | $5,004,000 | |
| | 7/12/2005 | 50,000 | $54.58 | $2,729,000 | |
| | | **281,200** | | **$12,127,100** | **68%** |
| | | | | | |
| Paul Shapiro | 12/10/2004 | 50,000 | $32.20 | $1,610,000 | |
| | 12/10/2004 | 10,000 | $32.25 | $322,500 | |
| | 2/9/2005 | 60,000 | $42.85 | $2,571,000 | |
| | 7/18/2005 | 100,000 | $56.21 | $5,621,000 | |
| | | **220,000** | | **$10,124,500** | **84%** |
| | | | | | |
| Joseph Sicree | 12/15/2004 | 11,912 | $32.75 | $390,118 | |
| | 3/4/2005 | 7,200 | $44.67 | $321,588 | |
| | 3/4/2005 | 2,800 | $44.68 | $125,090 | |
| | 6/1/2005 | 5,200 | $46.90 | $243,880 | |
| | 6/1/2005 | 4,000 | $46.88 | $187,520 | |
| | 6/1/2005 | 400 | $46.90 | $18,758 | |
| | 6/1/2005 | 400 | $46.89 | $18,754 | |
| | 6/30/2005 | 8,000 | $51.40 | $411,200 | |
| | 7/20/2005 | 2,500 | $57.94 | $144,850 | |
| | 7/20/2005 | 2,500 | $57.99 | $144,975 | |

| Insider | Date | Shares | Price | Proceeds | % of Shares Owned Sold |
|---------|------|--------|-------|----------|------------------------|
| | 7/20/2005 | 2,400 | $57.55 | $138,120 | |
| | | **47,312** | | **$2,144,853** | **74%** |
| | | | | | |
| Bruce Toll | 12/13/2004 | 1,000,000 | $31.51 | $31,513,450 | |
| | 2/28/2005 | 664,400 | $44.37 | $29,479,428 | |
| | 3/1/2005 | 335,600 | $44.40 | $14,900,640 | |
| | 5/31/2005 | 500,000 | $45.86 | $22,930,000 | |
| | 6/24/2005 | 600,000 | $48.77 | $29,262,000 | |
| | 7/7/2005 | 600,000 | $50.82 | $30,492,000 | |
| | 7/25/2005 | 387,000 | $56.03 | $21,683,610 | |
| | 9/28/2005 | 405,300 | $42.14 | $17,079,342 | |
| | 9/28/2005 | 120,000 | $42.10 | $5,052,000 | |
| | 9/29/2005 | 94,700 | $42.34 | $4,009,598 | |
| | | **4,707,000** | | **$206,402,068** | **37%** |
| | | | | | |
| Robert Toll | 12/10/2004 | 1,737,400 | $32.09 | $55,744,479 | |
| | 12/10/2004 | 240,000 | $32.09 | $7,700,544 | |
| | 12/13/2004 | 500,000 | $31.48 | $15,738,075 | |
| | 2/24/2005 | 1,555,000 | $43.87 | $68,217,850 | |
| | 2/25/2005 | 945,000 | $44.30 | $41,863,500 | |
| | 6/21/2005 | 37,400 | $50.51 | $1,889,074 | |
| | 6/23/2005 | 200,000 | $51.03 | $10,206,000 | |
| | 6/23/2005 | 91,000 | $51.03 | $4,643,730 | |
| | 6/28/2005 | 171,600 | $51.05 | $8,760,180 | |
| | 6/28/2005 | 66,800 | $51.05 | $3,410,140 | |
| | 6/30/2005 | 111,400 | $51.34 | $5,719,276 | |
| | 7/7/2005 | 221,640 | $51.06 | $11,315,830 | |
| | 7/8/2005 | 330,160 | $51.75 | $17,084,129 | |
| | 7/8/2005 | 200,000 | $51.75 | $10,349,000 | |
| | 7/11/2005 | 70,000 | $52.56 | $3,679,200 | |
| | 7/21/2005 | 193,700 | $57.09 | $11,058,333 | |
| | 7/22/2005 | 673,300 | $57.13 | $38,465,629 | |
| | 7/25/2005 | 133,000 | $56.62 | $7,530,460 | |
| | | **7,477,400** | | **$323,375,429** | **29%** |
| | | | | | |
| | Totals: | **14,133,712** | | **$617,704,623** | |

147.    These sales were unusual and suspicious in amount, percentages and timing.  As indicated in ¶40(a)(i), Defendants' Class Period sales of stock greatly exceeded their sales during the equivalent time period (eleven months) directly preceding the class period:

(a)    During the Class Period, defendant Robert Toll sold 7,477,400 shares of Toll Brothers stock, representing 29% of his holdings, for proceeds of over $323.3 million; yet during the eleven months before the Class Period, Robert Toll sold none of his Company stock.  The number of

shares he sold during the Class Period were almost twice his sales of 4,023,600 shares during the entire five-year period preceding the Class Period.

(b)      During the Class Period, defendant Bruce Toll sold 4,707,000 shares of his Toll Brothers stock, representing 37% of his holdings, for proceeds of over $206 million; yet during the eleven months before the Class Period, Bruce Toll sold only 1,090,000 shares of Company stock for proceeds of $26,245,927.  The number of shares he sold during the eleven-month Class Period equaled more than half of his sales of 8,409,200 shares during the entire five-year period preceding the Class Period.

(c)      During the Class Period, defendant Barzilay sold 1,020,800 shares of his Toll Brothers stock, representing 92% of his holdings, for proceeds of almost $46 million; yet during the eleven months before the-Class Period, Barzilay sold only 100,000 shares of Company stock for proceeds of $2,245,400. The number of shares he sold during the eleven-month Class Period also exceeded his sales of 992,122 shares during the entire five-year period preceding the Class Period.

(d)      During the Class Period, defendant Rassman sold 281,200 shares of his Toll Brothers stock, representing 68% of his holdings, for proceeds of over $12.1 million; yet during the eleven months before the Class Period, Rassman sold none of his Company stock.  The number of shares he sold during the eleven-month Class Period was roughly half of his sales of 464,000 shares during the entire five-year period preceding the Class Period.

(e)      During the Class Period, defendant Blank sold 160,000 shares of his Toll Brothers stock, representing 93% of his holdings, for proceeds of over $7.6 million; yet during the eleven months before the Class Period, Blank sold only 60,000 shares of his Company stock for $1,503,900.  The number of shares he sold during the eleven-month Class Period roughly equaled his sales of 168,000 shares during the entire five-year period preceding the Class Period.

(f)     During the Class Period, defendant Shapiro sold 220,000 shares of his Toll Brothers stock, representing 84% of his holdings, for proceeds of over $10 million; yet during the eleven months before the Class Period, Shapiro sold none of his Company stock.  The number of shares he sold during the eleven-month Class Period were nearly five times his sales of 46,830 shares during the entire five-year period preceding the Class Period.

(g)     During the Class Period, defendant Sicree sold 47,312 shares of Toll Brothers stock, representing 74% of his holdings, for proceeds of over $2.1 million; yet during the eleven months before the Class Period, Sicree sold only 15,288 shares of his Company stock for $365,844.

(h)     During the Class Period, defendant Braemer sold 70,000 shares of Toll Brothers stock, representing 52% of his holdings, for proceeds of over $2.6 million; yet during the eleven months before the Class Period, Braemer sold only 20,000 shares of his Company stock for $533,800.  The number of shares he sold during the eleven-month Class Period was nearly 60% of his sales of 120,000 shares during the entire five-year period preceding the Class Period.

(i)     During the Class Period, defendant Marbach sold 150,000 shares of Toll Brothers stock, representing 82% of his holdings, for proceeds of over $7.3 million; yet during the eleven months before the Class Period, Marbach sold only 109,540 shares of his Company stock for $2,535,204.  The number of shares he sold during the eleven-month Class Period exceeded his sales of 120,000 shares during the entire five-year period preceding the Class Period.

148.     In addition, the Class Period insider trading proceeds realized by defendants Robert Toll, Barzilay and Rassman were substantial relative to their compensation:

| Defendant | 2005 Salary; 2005 Bonus | Class Period Insider Trading Proceeds |
|---|---|---|
| Robert Toll | $1,300,000; $27,322,547 | $323.3 million |
| Barzilay | $1,000,000; $1,400,000 | $45.8 million |
| Rassman | $1,000,000; $1,000,000 | $12.1 million |

149.    Further, the timing of certain Insider Defendants' Class Period sales was highly suspicious, as they were timed to take maximum advantage of the artificial price inflation caused by defendants' misrepresentations.  For example:

(a)    On 12/8/04, Toll Brothers stock closed at $27.05.  As described in ¶¶43-44, on 12/9/04, Toll Brothers held a telephone conference call for analysts to discuss its business and its 4Q F04 and F04 results.  On 12/10/04, Toll Brothers stock traded at an intraday high of $32.89, closing at $32.  That same day, defendant Robert Toll sold 1,977,400 shares of Toll Brothers stock at $32.09 per share, for proceeds of $63,445,023; defendant Barzilay sold 200,000 shares of his Toll Brothers stock at $32.24 per share, for proceeds of $6,448,000; defendant Rassman sold 41,200 shares of his Toll Brothers stock at $32.25 per share, for proceeds of $1,328,700; defendant Shapiro sold 50,000 shares of his Toll Brothers stock at $32.20 per share, for proceeds of $1,610,000, and 10,000 shares at $32.25 per share, for proceeds of $322,500.  On 12/15/04, Toll Brothers stock closed at $33.01.  That same day, defendant Braemer sold 40,000 shares of his Toll Brothers stock at $32.45 per share, for proceeds of $1,298,000; defendant Sicree sold 11,912 shares of his Toll Brothers stock at $32.75 per share, for proceeds of $390,118.

(b)    On 2/23/05, as described in ¶¶60-61, Toll Brothers reported its results for 1Q F05, the period ending 1/31/05, the Company hosted a conference call with analysts and Robert Toll appeared on *Fox: Your World* with Neil Cavuto and CNBC, and was interviewed by Bloomberg.  Toll Brothers stock soared higher on the 2/23/05 announcements, comments and statements by defendants, rising from as low as $40.62 on 2/22/05, to as high as $44.10 on 2/24/05, $44.95 on 2/25/05 and $45.10 on 2/26/05.  The Insider Defendants immediately took advantage of the artificial inflation in the price of Toll Brothers stock, selling off 3.8 million shares of their Toll Brothers' stock for $168 million in illegal insider trading proceeds between 2/24/05 and 3/7/05.

(c)     As described in ¶¶77-78, on 5/26/05, Toll Brothers issued a release reporting its results for 2Q F05, the period ended 4/30/05, and hosted a conference call with analysts.  On the same day, Rassman appeared on CNBC to discuss Toll Brothers' business.  News and analyst reports followed (*see* ¶¶79-84).  Toll Brothers stock soared higher from $42.76 on 5/25/05 to $45.82 on 5/26/05 to $46.32 on 5/27/05 and $47.63 on 6/1/05 two trading days later – all new all time high prices.  On 5/31/05, defendant Bruce Toll sold 500,000 shares of his Company stock at $45.86 per share, for proceeds of $22,930,000.  The same day, defendant Braemer sold 30,000 shares of his Company stock at $45.96 per share, for proceeds of $1,378,650.

(d)     As detailed in ¶¶86-88, on 6/1/05, Robert Toll appeared on *Nightly Business Report*; on 6/9/05, Toll Brothers issued a release announcing a two for one stock split; on 6/14/05, Robert Toll appeared on CNBC's *Kudlow & Co.*  Due to these positive statements, assurances and forecasts, Toll Brothers stock increased from $39.65 on 5/10/05 to over $50 on 6/15/05.  The stock continued to soar higher during July 2005 and reached $58.67 on 7/20/05, its all time and Class Period high.  Defendants took advantage of this price inflation: Between 6/21/05 and 7/11/05, defendant Robert Toll sold 1.5 million shares of his Company stock for proceeds of $77,056,559; between 6/24/05 and 7/7/2005, defendant Bruce Toll sold 1.2 million of his Company shares for proceeds of $60,118,000; between 6/20/05 and 7/20/05, defendant Barzilay sold 479,600 of his Company shares for proceeds of $25,051,962; on 6/21/05, defendant Blank sold 80,000 of his Company shares for proceeds of $4,015,368; on 6/16/05, defendant Marbach sold 120,000 of his Company shares for proceeds of $6,136,680; between 6/22/05 and 7/12/05, defendant Rassman sold 150,000 of his Company shares for proceeds of $7,733,000; on 7/18/05, defendant Shapiro sold 100,000 of his Company shares for proceeds $5,621,000; and between 6/1/05 and 7/20/05, defendant Sicree sold 25,400 shares of his Company stock for proceeds of $1,308,057.

150.    The Insider Defendants' Class Period trading was also suspicious in that these high-level officers and directors of Toll Brothers sold their shares at the same times during the Class Period, often on the same day and almost consistently within days of each other's sales.

151.    Robert Toll was in fact forced to admit his early Class Period sales between 12/10/04 and 2/25/05, for proceeds of over $189 million, were not "kosher" during a 5/26/05 CNBC interview with James Cramer on *Mad Money*:

> JIM CRAMER, CNBC ANCHOR: Toll Brothers, 52-week high, up monstrous today. . . . . All right.  Let's get right to it.  Last quarter you had a great quarter, you came on, you said you were going to beat up the shorts, and then you blew out the stock. **Was that kosher?**

> TOLL: . . . **Although, if it doesn't look kosher, and it doesn't smell kosher, I guess maybe it should be regarded as not and I'm sorry that I did it**.

After making this statement, Robert Toll sold an additional $134 million of his own Toll Brothers stock during a one month time period between 6/21/05 and 7/25/05.

## LOSS CAUSATION/ECONOMIC LOSS

152.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Toll Brothers' stock price and operated as a fraud or deceit on Class Period purchasers of Toll Brothers stock by misrepresenting the Company's present and future operational and financial performance.  Later, however, when the truth concerning Toll Brothers' present and future operational and financial performance entered the market and became apparent to investors, Toll Brothers' stock price fell as the prior artificial inflation came out of it.  As a result of their purchases of Toll Brothers stock during the Class Period at artificially inflated prices, and defendants' subsequent disclosures which removed the inflation from their stock, plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

153.    By misrepresenting the strength of demand for Toll Brothers homes, failing to disclose the decline in that demand and traffic to Toll Brothers' existing communities, failing to

disclose Toll Brothers' difficulty in adding new selling communities at rates necessary to meet F06

and F07 projections, and issuing false or misleading projections for Toll Brothers' future financial

performance, defendants presented a misleading picture of Toll Brothers' business and prospects.

Defendants' omissions and false and misleading statements caused Toll Brothers stock to trade at

artificially inflated levels throughout the Class Period, reaching a Class Period high of $58.67 per

share in July 2005.

154.    On 8/4/05, however, Toll Brothers insiders admitted that there was some "cooling in

some local markets," but assured investors that "this is good," sales had not "slowed down at all"

and "demand is still there [–] on the West Coast (*i.e.*, California)" where it was "very strong."  They

said that Toll Brothers markets were "still hotter than a normal market."  On this partial revelation of

previously misrepresented or concealed information, some of the artificial inflation came out of the

price of Toll Brothers stock, which fell sharply from $56.12 on 8/3/05 to $49.51 on 8/5/05 and to

$48 over the next few days, a company specific stock decline that damaged prior Class Period

purchasers.  The stock price, however, continued to trade at artificially inflated prices due to

defendants' continued misrepresentations, false assurances and false projections.

155.    About three weeks later, on 8/25/05, Toll Brothers disclosed that traffic was down

"from last year" "by 10 to 20%" on a "per community [basis]," but said that this was due to so many

Toll Brothers' communities having waiting lists and essentially being "closed" to traffic.  On the

8/25/05 partial revelation of previously misrepresented or concealed information, some of the

artificial inflation came out of Toll Brothers stock, which again fell sharply from $51.72 on 8/25/05

to $46.32 on 8/26/05 and to $45.64 over the next few days, a company specific stock decline that

damaged prior Class Period purchasers.  However, due to defendants' lack of full and complete

disclosure, false assurances and continuing misrepresentations, Toll Brothers stock continued to

trade at artificially inflated, albeit lower, prices through the balance of the Class Period.

156.     On 10/3/05, Robert Toll told *USA Today* that Toll Brothers was suffering from a "general slowdown in most markets" and he was expecting a "10% decline" in building activity as "you have a slowdown in orders."  Nevertheless, Robert Toll insisted Toll Brothers would still achieve "20%" net income growth in F06 and F07 and that that was "pretty good moving and growing."  On this partial revelation of previously misrepresented or concealed information some of the artificial inflation came out of the price of Toll Brothers stock, which again fell sharply from $45.50 on 9/30/05 (the last trading day prior to 10/3/05) to $41.28 on 10/4/05; $38.52 on 10/6/05 and $37.44 on 10/11/05 – a company specific stock decline that damaged prior Class Period purchasers.  However, due to defendants' lack of full and complete disclosure, false assurances and continuing misrepresentations, Toll Brothers stock continued to trade at artificially inflated, albeit lower, prices through the balance of the Class Period.

157.     Then, on 11/8/05, defendants finally admitted their prior representations, assurances and forecasts had been false with the shocking revelation that Toll Brothers was seeing "softening of demand" which was "pretty much across the board" – "a decrease in overall demand."  In addition to this drop in demand, Toll Brothers also admitted it was going to have "fewer selling communities" – not the 240 forecasted, but only about 230 active selling communities at FYE 2005, and the same in early F06.  The Company had added only ten more active selling communities from the end of F04, a sharp slowdown from its addition of twenty new selling communities in F04.  Defendants also shockingly admitted that "[t]raffic has been down for about a year," since early November 2004, and that California, responsible for about 25% of Toll Brothers' revenues, was its weakest market with a decline in contracts, a decline in orders, and a decline in backlog.  Defendants also revealed that new contracts had grown by only 1% in 4Q F05 over 4Q F04.

158.     On the revelations on 11/8/05 of previously misrepresented or concealed information, additional artificial inflation came out of the price of the stock as Toll Brothers stock fell sharply

from $39.50 on 11/7/05 to $33.71 on 11/8/05 and to $33.13 over the next few days, a company-specific stock decline that damaged prior Class Period purchasers.

159.     The timing and magnitude of Toll Brothers' stock price decline negates any inference that the loss suffered by plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiffs and other members of the Class was a direct and proximate result of defendants' fraudulent scheme to artificially inflate Toll Brothers' stock price and the subsequent significant decline in the value of Toll Brothers' stock when the truth was revealed to the market.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE MARKET DOCTRINE

160.     The presumption of reliance established by the fraud-on-the-market doctrine applies to plaintiffs' allegations because:

(a)     The common stock of Toll Brothers met the requirements for listing, and was listed and traded on the New York Stock Exchange, a highly developed and efficient market, under the ticker symbol "TOL";

(b)     During the Class Period, Toll Brothers stock was heavily traded, with volume average at least several million shares daily;

(c)     As a regulated issuer, Toll Brothers filed periodic public reports with the SEC, and regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases;

(d)     Toll Brothers was followed by securities analysts from several major brokerages, including Goldman Sachs, JP Morgan, and Banc of America, who wrote reports that were redistributed to certain customers of such firms and were available through various automated data retrieval services;

http

(e)      The misrepresentations and omissions alleged herein were material and would tend to induce a reasonable investor to misjudge the value of Toll Brothers stock; and

(f)      Plaintiffs and the members of the Class purchased common stock during the Class Period without knowledge of the omitted or misrepresented facts.

161.    Based upon the foregoing, the market for Toll Brothers' stock was efficient at all relevant times in that it promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the price.  Plaintiffs and the other members of the Class are entitled to a presumption of reliance upon the integrity of the market for Toll Brothers stock for the purpose of class certification as well as for ultimate proof of their claims on the merits.

## NO SAFE HARBOR

162.    The statutory Safe Harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The specific statements pleaded in this Complaint were either not forward looking or were not identified as "forward-looking statements" when made.  To the extent there were identified forward-looking statements when made, specific meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements were not presented.  The Safe Harbor warnings in Toll Brothers' SEC filings and releases as well as those made at the start of Toll Brothers conference calls were boilerplate and did not materially change during the Class Period, even though the economic and business conditions in which Toll Brothers operated and the risks facing its business did.  Alternatively, to the extent that the statutory Safe Harbor does apply to any forward-looking statements pleaded in this Complaint, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-

looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Toll Brothers who knew that the statement was false when made.

163. Toll Brothers SEC Report on Form 10-Q for the quarter ended 1/31/03 contained the following "Safe Harbor" language:

> Certain information included herein and in our other reports, SEC filings, statements and presentations is forward-looking within the meaning of the Private Securities Litigation Reform Act of 1995, including, but not limited to, statements concerning our anticipated operating results, financial resources, changes in revenues, changes in profitability, anticipated income to be realized from our investments in joint ventures and the Toll Brothers Realty Trust Group, interest expense, growth and expansion, ability to acquire land, ability to sell homes and properties, ability to deliver homes from backlog, ability to gain approvals and to open new communities, ability to secure materials and subcontractors, average delivered prices of homes, ability to maintain the liquidity and capital necessary to expand and take advantage of future opportunities and stock market valuations. In some cases you can identify those so called forward-looking statements by words such as "may," "will," "should," "expect," "plan," "anticipate," "believe," "estimate," "predict," "potential," "project," "intend," "can," "could," "might," or "continue" or the negative of those words or other comparable words. Such forward-looking information involves important risks and uncertainties that could significantly affect actual results and cause them to differ materially from expectations expressed herein and in our other reports, SEC filings, statements and presentations. These risks and uncertainties include local, regional and national economic and political conditions, the consequences of any future terrorist attacks such as those that occurred on September 11, 2001, the effects of governmental regulation, the competitive environment in which we operate, fluctuations in interest rates, changes in home prices, the availability and cost of land for future growth, the availability of capital, fluctuations in capital and securities markets, the availability and cost of labor and materials, and weather conditions.

> Additional information concerning potential factors that we believe could cause our actual results to differ materially from expected and historical results is included under the caption "Factors That May Affect Our Future Results" in Item 1 of our Annual Report on Form 10-K for the fiscal year ended October 31, 2002. If one or more of the assumptions underlying our forward-looking statements proves incorrect, then our actual results, performance or achievements could differ materially from those expressed in, or implied by the forward-looking statements contained in this report. Therefore, we caution you not to place undue reliance on our forward-looking statements. This statement is provided as permitted by the Private Securities Litigation Reform Act of 1995.

164. Toll Brothers SEC Report on Form 10-Q for the quarter ended 1/31/04 contained the following "Safe Harbor" language:

Certain information included herein and in our other reports, SEC filings, statements and presentations is forward-looking within the meaning of the Private Securities Litigation Reform Act of 1995, including, but not limited to, statements concerning our anticipated operating results, financial resources, changes in revenues, changes in profitability, anticipated income to be realized from our investments in joint ventures and the Toll Brothers Realty Trust Group, interest expense, growth and expansion, ability to acquire land, ability to sell homes and properties, ability to deliver homes from backlog, ability to gain approvals and to open new communities, ability to secure materials and subcontractors, average delivered prices of homes, ability to maintain the liquidity and capital necessary to expand and take advantage of future opportunities and stock market valuations. In some cases you can identify those so called forward-looking statements by words such as "may," "should," "expect," "plan," "anticipate," "believe," "estimate," "predict," "potential," "project," "intend," "can," "could," "might," or "continue" or the negative of those words or other comparable words. Such forward-looking information involves important risks and uncertainties that could significantly affect actual results and cause them to differ materially from expectations expressed herein and in our other reports, SEC filings, statements and presentations. These risks and uncertainties include local, regional and national economic and political conditions, the consequences of any future terrorist attacks such as those that occurred on September 11, 2001, the effects of governmental regulation, the competitive environment in which we operate, fluctuations in interest rates, changes in home prices, the availability and cost of land for future growth, the availability of capital, fluctuations in capital and securities markets, the availability and cost of labor and materials, and weather conditions.

Additional information concerning potential factors that we believe could cause our actual results to differ materially from expected and historical results is included under the caption "Factors That May Affect Our Future Results" in Item 1 of our Annual Report on Form 10-K for the fiscal year ended October 31, 2003. If one or more of the assumptions underlying our forward-looking statements proves incorrect, then our actual results, performance or achievements could differ materially from those expressed in, or implied by the forward-looking statements contained in this report. Therefore, we caution you not to place undue reliance on our forward-looking statements. This statement is provided by the Private Securities Litigation Reform Act of 1995.

165.    Toll Brother SEC Report on Form 10-Q for the quarter ended 7/31/05 contained the

following "Safe Harbor" language:

Statement on Forward-Looking Information

Certain information included herein and in our other reports, SEC filings, statements and presentations is forward-looking within the meaning of the Private Securities Litigation Reform Act of 1995, including, but not limited to, statements concerning our anticipated operating results, financial resources, changes in revenues, changes in profitability, anticipated income to be realized from our investments in unconsolidated entities, interest expense, growth and expansion,

ability to acquire land, ability to sell homes and properties, ability to deliver homes from backlog, ability to gain approvals and to open new communities, ability to secure materials and subcontractors, average delivered prices of homes, ability to maintain the liquidity and capital necessary to expand and take advantage of future opportunities and stock market valuations. In some cases you can identify those so called forward-looking statements by words such as "may," "will," "should," "expect," "plan," "anticipate," "believe," "estimate," "predict," "potential," "project," "intend," "can," "could," "might," or "continue" or the negative of those words or other comparable words. Such forward-looking information involves important risks and uncertainties that could significantly affect actual results and cause them to differ materially from expectations expressed herein and in our other reports, SEC filings, statements and presentations. These risks and uncertainties include local, regional and national economic and political conditions, the consequences of any future terrorist attacks such as those that occurred on September 11, 2001, the effects of governmental regulation, the competitive environment in which we operate, fluctuations in interest rates, changes in home prices, the availability and cost of land for future growth, the availability of capital, fluctuations in capital and securities markets, the availability and cost of labor and materials, and weather conditions.

Additional information concerning potential factors that we believe could cause our actual results to differ materially from expected and historical results is included under the caption "Factors That May Affect Our Future Results" in Item 1 of our Annual Report on Form 10-K for the fiscal year ended October 31, 2004. If one or more of the assumptions underlying our forward-looking statements proves incorrect, then our actual results, performance or achievements could differ materially from those expressed in, or implied by the forward-looking statements contained in this report. Therefore, we caution you not to place undue reliance on our forward-looking statements. This statement is provided as permitted by the Private Securities Litigation Reform Act of 1995.

166. Toll Brothers SEC Report on Form 10-K for the year ended 10/31/03 contained the

following "Safe Harbor" language:

Factors That May Affect Our Future Results (Cautionary Statements Under the Private Securities Litigation Reform Act of 1995)

Certain information included in this report or in other materials we have filed or will file with the Securities and Exchange Commission (as well as information included in oral statements or other written statements made or to be made by us) contains or may contain forward looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended. You can identify these statements by the fact that they do not relate strictly to historical or current facts. They contain words such as "anticipate," "estimate," "expect," "project," "intend," "plan," "believe," "may," "can," "could," "might" and other words or phrases of similar meaning in connection with any discussion of future operating or financial performance. Such statements include information relating to anticipated operating results, financial resources, changes in revenues, changes in profitability, interest

expense, growth and expansion, anticipated income to be realized from our investments in joint ventures and the Toll Brothers Realty Trust Group, the ability to acquire land, the ability to gain approvals and to open new communities, the ability to sell homes and properties, the ability to deliver homes from backlog, the ability to secure materials and subcontractors, the ability to produce the liquidity and capital necessary to expand and take advantage of opportunities in the future, and stock market valuations. From time to time, forward-looking statements also are included in our other periodic reports on Forms 10-Q and 8-K, in press releases, in presentations, on our Web site and in other material released to the public.

Any or all of the forward-looking statements included in this report and in any other reports or public statements made by us may turn out to be inaccurate. This can occur as a result of incorrect assumptions or as a consequence of known or unknown risks and uncertainties. Many factors mentioned in this report or in other reports or public statements made by us, such as government regulation and the competitive environment, will be important in determining our future performance. Consequently, actual results may differ materially from those that might be anticipated from our forward-looking statements.

We undertake no obligation to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise. However, any further disclosures made on related subjects in our subsequent reports on Forms 10-K, 10-Q and 8-K should be consulted. The following cautionary discussion of risks, uncertainties and possible inaccurate assumptions relevant to our business includes factors we believe could cause our actual results to differ materially from expected and historical results. Other factors beyond those listed below, including factors unknown to us and factors known to us which we have not determined to be material, could also adversely affect us. This discussion is provided as permitted by the Private Securities Litigation Reform Act of 1995, and all of our forward-looking statements are expressly qualified in their entirety by the cautionary statements contained or referenced in this section.

We operate in a very competitive environment, which is characterized by competition from a number of other home builders in each market in which we operate. Actions or changes in plans by competitors may negatively affect us.

Our business can be affected by changes in general economic and market conditions, as well as local economic and market conditions where our operations are conducted and where prospective purchasers of our homes live.

The impact and uncertainties created by the September 11, 2001 terrorist attacks and the consequences of any future terrorist attacks, as well as other events affecting the national and world economies, may affect our business.

The plans for future development of our residential communities can be affected by a number of factors including, for example, time delays in obtaining necessary governmental permits and approvals and legal challenges to our proposed communities.

Our operations depend on our ability to continue to obtain land for the development of residential communities at reasonable prices. Changes in competition, availability of financing, customer trends and market conditions may impact our ability to obtain land for new residential communities.

The development of our residential communities may be affected by circumstances beyond our control, including weather conditions, work stoppages, labor disputes, unforeseen engineering, environmental or geological problems and unanticipated shortages of or increases in the cost of materials and labor. Any of these circumstances could give rise to delays in the completion of, or increase the cost of, developing one or more of our residential communities.

The interest rate on our revolving credit facility is subject to fluctuation based on changes in short-term interest rates, the amount of borrowings we have incurred and the ratings which national ratings agencies assign to our outstanding debt securities. Our interest expense could increase as a result of these factors.

Our business and earnings are substantially dependent on our ability to obtain financing for our development activities. Increases in interest rates, concerns about the market or the economy, or consolidation of dissolution or financial institutions could increase our cost of borrowing and/or reduce our ability to obtain the funds required for our future operations.

Our business and earnings are also substantially dependent on the ability of our customers to finance the purchase of their homes. Limitations on the availability of financing or increases in the cost of such financing could adversely affect our operations.

We believe that our recorded tax balances are adequate. However, it is not possible to predict the effects of possible changes in the tax laws or changes in their interpretation. These changes or interpretations, if made, could have a material negative effect on our operating results.

Claims have been brought against us in various legal proceedings which have not had, and are not expected to have, a material adverse effect on our business or financial condition; however, additional legal and tax claims may arise from time to time, and it is possible that our cash flows and results of operations could be affected from time to time by the resolution of one or more of such matters.

We are subject to construction defect and home warranty claims arising in the ordinary course of business. These claims are common in the homebuilding industry and can be costly. In addition, the costs of insuring against construction defects and product liability claims are high, the amount of coverage offered by insurance companies is currently limited, and the amounts of deductibles and self insured retentions are high. There can be no assurance that this coverage will not be further restricted or become more costly. If we are not able to obtain adequate insurance against these claims, we may experience losses that could hurt our business.

There is intense competition to attract and retain management and key employees in the markets where our operations are conducted.  Our business could be adversely affected if we are unable to recruit or retain key personnel in one or more of the markets in which we conduct our operations.

167.    Toll Brothers SEC Report on Form 10-K for the year ended 10/31/04 contained the

following "Safe Harbor" language:

Factors That May Affect Our Future Results (Cautionary Statements Under The Private Securities Litigation Reform Act Of 1995)

Certain information included in this report or in other materials we have filed or will file with the Securities and Exchange Commission (as well as information included in oral statements or other written statements made or to be made by us) contains or may contain forward looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended.  You can identify these statements by the fact that they do not relate strictly to historical or current facts.  They contain words such as "anticipate," "estimate," "expect," "project," "intend," "plan," "believe," "may," "can," "could," "might" and other words or phrases of similar meaning in connection with any discussion of future operating or financial performance.  Such statements include information relating to anticipated operating results, financial resources, changes in revenues, changes in profitability, interest expense, growth and expansion, anticipated income to be realized from our investments in joint ventures and the Toll Brothers Realty Trust Group, the ability to acquire land, the ability to gain approvals and to open new communities, the ability to sell homes and properties, the ability to deliver homes from backlog, the ability to secure materials and subcontractors, the ability to produce the liquidity and capital necessary to expand and take advantage of opportunities in the future, and stock market valuations.  From time to time, forward-looking statements also are included in our other periodic reports on Forms 10-Q and 8-K, in press releases, in presentations, on our web site and in other material released to the public.

Any or all of the forward-looking statements included in this report and in any other reports or public statements made by us may turn out to be inaccurate.  This can occur as a result of incorrect assumptions or as a consequence of known or unknown risks and uncertainties.  Many factors mentioned in this report or in other reports or public statements made by us, such as government regulation and the competitive environment, will be important in determining our future performance.  Consequently, actual results may differ materially from those that might be anticipated from our forward-looking statements.

We undertake no obligation to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise.  However, any further disclosures made on related subjects in our subsequent reports on Forms 10-K, 10-Q and 8-K should be consulted.  The following cautionary discussion of risks, uncertainties and possible inaccurate assumptions relevant to our business includes factors we believe could cause our actual results to differ materially from expected and historical results.  Other factors beyond those listed

below, including factors unknown to us and factors known to us which we have not determined to be material, could also adversely affect us. This discussion is provided as permitted by the Private Securities Litigation Reform Act of 1995, and all of our forward-looking statements are expressly qualified in their entirety by the cautionary statements contained or referenced in this section.

We operate in a very competitive environment, which is characterized by competition from a number of other home builders in each market in which we operate. Actions or changes in plans by competitors may negatively affect us.

Our business can be affected by changes in general economic and market conditions, as well as local economic and market conditions where our operations are conducted and where prospective purchasers of our homes live.

The impact and uncertainties created by the September 11, 2001 terrorist attacks and the consequences of any future terrorist attacks, as well as other events affecting the national and world economies, may affect our business.

The plans for future development of our residential communities can be affected by a number of factors including, for example, time delays in obtaining necessary governmental permits and approvals and legal challenges to our proposed communities.

Our operations depend on our ability to continue to obtain land for the development of residential communities at reasonable prices. Changes in competition, availability of financing, customer trends and market conditions may impact our ability to obtain land for new residential communities.

The development of our residential communities may be affected by circumstances beyond our control, including weather conditions, work stoppages, labor disputes, unforeseen engineering, environmental or geological problems and unanticipated shortages of or increases in the cost of materials and labor. Any of these circumstances could give rise to delays in the completion of, or increase the cost of, developing one or more of our residential communities.

The interest rate on our revolving credit facility is subject to fluctuation based on changes in short-term interest rates, the amount of borrowings we have incurred and the ratings which national ratings agencies assign to our outstanding debt securities. Our interest expense could increase as a result of these factors.

Our business and earnings are substantially dependent on our ability to obtain financing for our development activities. Increases in interest rates, concerns about the market or the economy, or consolidation or dissolution of financial institutions could increase our cost of borrowing and/or reduce our ability to obtain the funds required for our future operations.

Our business and earnings are also substantially dependent on the ability of our customers to finance the purchase of their homes. Limitations on the availability of financing or increases in the cost of such financing could adversely affect our operations.

We believe that our recorded tax balances are adequate. However, it is not possible to predict the effects of possible changes in the tax laws or changes in their interpretation. These changes or interpretations, if made, could have a material negative effect on our operating results.

Claims have been brought against us in various legal proceedings which have not had, and are not expected to have, a material adverse effect on our business or financial condition; however, additional legal and tax claims may arise from time to time, and it is possible that our cash flows and results of operations could be affected from time to time by the resolution of one or more of such matters.

We are subject to construction defect and home warranty claims arising in the ordinary course of business. These claims are common in the homebuilding industry and can be costly. In addition, the costs of insuring against construction defects and product liability claims are high, the amount of coverage offered by insurance companies is currently limited, and the amounts of deductibles and self insured retentions are high. There can be no assurance that this coverage will not be further restricted or become more costly. If we are not able to obtain adequate insurance against these claims, we may experience losses that could hurt our business.

There is intense competition to attract and retain management and key employees in the markets where our operations are conducted. Our business could be adversely affected if we are unable to recruit or retain key personnel in one or more of the markets in which we conduct our operations.

168.    Toll Brothers 8/5/04 press release contained the following "Safe Harbor" language:

Certain information included herein and in other Company reports, SEC filings, statements and presentations is forward-looking within the meaning of the Private Securities Litigation Reform Act of 1995, including, but not limited to, statements concerning anticipated operating results, financial resources, changes in revenues, changes in profitability, interest expense, growth and expansion, anticipated income from joint ventures and the Toll Brothers Realty Trusts Group, the ability to acquire land, the ability to secure governmental approvals and the ability to open new communities, the ability to sell homes and properties, the ability to deliver homes from backlog, the average delivered price of homes, the ability to secure materials and subcontractors, the ability to maintain the liquidity and capital necessary to expand and take advantage of future opportunities, and stock market valuations. Such forward-looking information involves important risks and uncertainties that could significantly affect actual results and cause them to differ materially from expectations expressed herein and in other Company report, SEC filings, statements and presentations. These risks and uncertainties include local, regional and national economic conditions, the demand for homes, domestic and international political events, uncertainties created by terrorist attacks, the effects of governmental regulation, the competitive environment in which the Company operates, fluctuations in interest rates, changes in home prices, the availability and cost of land for future growth, the availability of capital, uncertainties and fluctuations in capital and securities markets, changes in tax laws and their interpretation, legal proceedings, the availability of adequate insurance at reasonable

- 107 -

cost, the ability of customers to finance the purchase of homes, the availability and cost of labor and materials, and weather conditions.

169.    Toll Brothers 8/25/05 press release contained the following "Safe Harbor" language:

Certain information included herein and in other Company reports, SEC filings, statements and presentations is forward-looking within the meaning of the Private Securities Litigation Reform Act of 1995, including, but not limited to, statements concerning our anticipated operating results, financial resources, changes in revenues, changes in profitability, interest expense, growth and expansion, anticipated income from joint ventures and the Toll Brothers Realty Trusts Group, the ability to acquire land, the ability to secure governmental approvals and the ability to open new communities, the ability to sell homes and properties, the ability to deliver homes from backlog, the average delivered price of homes, the ability to secure materials and subcontractors, the ability to maintain the liquidity and capital necessary to expand and take advantage of future opportunities, and stock market valuations. Such forward-looking information involves important risks and uncertainties that could significantly affect actual results and cause them to differ materially from expectations expressed herein and in other Company reports, SEC filings, statements and presentations. These risks and uncertainties include local, regional and national economic conditions, the demand for homes, domestic and international political events, uncertainties created by terrorist attacks, the effects of governmental regulation, the competitive environment in which the Company operates, fluctuations in interest rates, changes in home prices, the availability and cost of land for future growth, the availability of capital, uncertainties and fluctuations in capital and securities markets, changes in tax laws and their interpretation, legal proceedings, the availability of adequate insurance at reasonable cost, the ability of customers to finance the purchase of homes, the availability and cost of labor and materials, and weather conditions.

170.    Toll Brothers F04 Annual Report contained the following "Safe Harbor" language:

Certain information included herein and in other Company reports, SEC filings, statements and presentations is forward looking within the meaning of the Private Securities Litigation Reform Act of 1995, including, but not limited to, statements concerning anticipated operating results, financial resources, changes in revenues, changes in profitability, interest expense, growth and expansion, anticipated income from joint ventures and the Toll Brothers Realty Trust Group, the ability to acquire land, the ability to secure governmental approvals and the ability to open new communities, the ability to sell homes and properties, the ability to deliver homes from backlog, the average delivered price of homes, the ability to secure materials and subcontractors, the ability to maintain the liquidity and capital necessary to expand and take advantage of future opportunities, and stock market valuations. Such forward-looking information involves important risks and uncertainties that could significantly affect actual results and cause them to differ materially from expectations expressed herein and in other Company reports, SEC filings, statements and presentations. These risks and uncertainties include local, regional and national economic conditions, the demand for homes, domestic and international political events, uncertainties created by terrorist attacks, the effects of

governmental regulation, the competitive environment in which the Company operates, fluctuations in interest rates, changes in home prices, the availability and cost of land for future growth, the availability of capital, uncertainties and fluctuations in capital and securities markets, changes in tax laws and their interpretation, legal proceedings, the availability of adequate insurance at reasonable cost, the ability of customers to finance the purchase of homes, the availability and cost of labor and materials and weather conditions.

171.    The preceding excerpts from Toll Brothers 10-Qs, 10-Ks, Annual Reports, and press releases show that Toll Brothers, before and during the Class Period, used boilerplate language in connection with its forward looking statements – warning language that did not change in any material meaningful respect over a more than two-year period even though the external factors affecting Toll Brothers' business and the actual operations of Toll Brothers' business changed significantly during that period, and for the worse, especially during the Class Period.

## CLASS ACTION ALLEGATIONS

172.    This is a class action pursuant to Federal Rules of Civil Procedures §§23(a) and (b)(3) on behalf of purchasers of Toll Brothers common stock during the Class Period, excluding defendants (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, as well as their families, and the families of the defendants, and any entity in which defendants have or had a controlling interest. Class members are so numerous that joinder of them is impracticable.

173.    Common questions of law and fact predominate and include: (i) whether defendants violated the 1934 Act; (ii) whether defendants omitted and/or misrepresented material facts; (iii) whether defendants knew or recklessly disregarded that their statements were false or misleading; (iv) whether the price of Toll Brothers' common stock was artificially inflated during the Class Period as a result of defendants' misrepresentations; (v) the extent of and appropriate measure of damages; and (vi) loss causation.

174.    Plaintiffs' claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiffs will adequately protect the interests of

the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### Violation of §10(b) of the 1934 Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

175.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶1-174.

176.    During the Class Period, defendants carried out a plan, scheme, and course of conduct which was intended to, and throughout the Class Period did, deceive the investing public, including plaintiffs and other Class members, as alleged in this Complaint, and caused plaintiffs and other members of the Class to purchase Toll Brothers stock at artificially inflated prices. In furtherance of this unlawful scheme and course of conduct, defendants, and each of them, took the actions set forth in this Complaint.

177.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Toll Brothers stock in violation of §10(b) of the 1934 Act and Rule 10b-5. All defendants are sued as primary participants in the wrongful and illegal conduct and fraudulent scheme and course of business charged in this Complaint.

178.    These defendants employed devices, schemes, and artifices to defraud. While in possession of material adverse non-public information, they engaged in acts, practices, and a scheme as alleged herein in an effort to assure investors of Toll Brothers' business and financial success and prospects for continued substantial growth. This included the making of, or the participation in the making of, untrue statements of material fact and concealing facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

- 110 -

This conduct artificially inflated the price of Toll Brothers stock and operated as a fraud and deceit upon the purchasers of Toll Brothers stock during the Class Period, proximately causing them economic loss and damage. Through a series of disclosures beginning in August 2005, the prior misrepresentations and other fraudulent conduct of defendants became apparent, *i.e.*, the truth entered the market and the artificial inflation in Toll Brothers' stock price came out of the price as it collapsed to as low as $33.13 per share – a statistically significant, company-specific stock price decline not due to general stock market movements, changed economic conditions, changed investor expectations or company-specific negative events or information unrelated to the alleged misrepresentations and other fraudulent conduct.

179.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth in this Complaint, or acted with reckless disregard of the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

180.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Toll Brothers stock was artificially inflated during the Class Period. Relying directly, or indirectly, on the false and misleading statements made by defendants or upon the integrity of the market in Toll Brothers stock, plaintiffs and the other members of the Class purchased Toll Brothers stock during the Class Period at artificially high prices.

181.    At the time of defendants' misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity. Had plaintiffs and the other members of the Class and the market known the truth which was not disclosed by defendants, plaintiffs and other members of the Class would not have purchased their Toll Brothers stock, or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

182.     As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's stock during the Class Period.

## COUNT II

### Violation of §20(a) of the 1934 Act
### Against All Defendants

183.     Plaintiffs repeat and reallege each and every allegation contained in ¶¶1-182.

184.     The Individual Defendants acted as controlling persons of Toll Brothers within the meaning of §20(a) of the 1934 Act as alleged in this Complaint.  By virtue of their business expertise, their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

185.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, each is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged in this Complaint, and exercised the same.  The Company controlled the Individual Defendants and all of its employees.

186.     As set forth above, Toll Brothers and the Insider Defendants each violated §10(b) of the 1934 Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, defendants are liable pursuant to §20(a) of the 1934 Act.  As a

direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the
Class suffered damages in connection with their purchases of the Company's stock during the Class
Period.

## COUNT III

### Violation of §20A of the 1934 Act Against
### Defendants Robert Toll, Bruce Toll and Sicree

187.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶1-186.

188.    This claim is asserted by plaintiffs under §20A of the Exchange Act against
defendants Robert Toll, Bruce Toll, and Sicree on behalf of all persons who purchased Toll Brothers
common stock contemporaneously with the sale of Toll Brothers common stock by these defendants.

189.    During the Class Period, defendants Robert Toll, Bruce Toll, and Sicree occupied
positions with Toll Brothers that allowed access to confidential information concerning the
Company, its operations, finances, financial condition and future business prospects.  Robert Toll's
and Bruce Toll's public representations on these subjects set forth herein were materially false
and/or misleading.

190.    Notwithstanding their duty to refrain from trading in Toll Brothers common stock
unless they disclosed the material adverse facts alleged herein, and in violation of their fiduciary
duties to plaintiff and other members of the Class, Robert Toll, Bruce Toll, and Sicree sold in the
aggregate hundreds of millions of dollars worth of Toll Brothers common stock during the Class
Period contemporaneously with plaintiff and other Class members' purchases of Toll Brothers
common stock.

191.    Defendants Robert Toll, Bruce Toll, and Sicree sold their shares of Toll Brothers
common stock, as alleged above, at market prices artificially inflated by nondisclosure and
misrepresentation of material adverse facts in the public statements released during the Class Period.

- 113 -

192.     The following chart details sales of Toll Brothers common stock by defendants Robert Toll, Bruce Toll, and Sicree made contemporaneously with purchases of Toll Brothers common stock by Lead Plaintiffs The City of Hialeah Employees' Retirement System and Laborers Pension Trust Fund for Northern California:

| Defendant | Date Sold | Shares | Lead Plaintiff | Purchase Date | Shares |
|---|---|---|---|---|---|
| Bruce Toll | 7/7/05 | 600,000 | The City of Hialeah Employees' Retirement System | 7/8/05 | 5,800 |
| Robert Toll | 7/8/05 | 530,160 | | | |
| | | | | | |
| Bruce Toll | 7/25/05 | 387,000 | Laborers Pension Trust Fund for Northern California | 7/26/05 | 1,860 |
| Robert Toll | 7/25/05 | 133,000 | | | |
| | | | | | |
| Bruce Toll | 9/28/05 | 525,300 | Laborers Pension Trust Fund for Northern California | 9/28/05 | 1,798 |

193.     Robert Toll, Bruce Toll, and Sicree knew that they were in possession of material adverse information that was not known to the investing public, including plaintiffs and other members of the Class.  Before selling their stock to the public, they were obligated to disclose that information to plaintiffs and other members of the Class.

194.     By reason of the foregoing, Robert Toll, Bruce Toll, and Sicree, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of the national securities exchanges, employed devices, schemes, and artifices to defraud, and engaged in acts and transactions and a course of business which operated as a fraud or deceit upon members of the investing public who purchased Toll Brothers common stock contemporaneously with the sale of such stock by Robert Toll, Bruce Toll, and Sicree.

195.     Plaintiffs and other members of the Class who purchased shares of Toll Brothers common stock contemporaneously with Robert Toll's, Bruce Toll's, and Sicree's sales of Toll Brothers common stock: (a) have suffered substantial damages because they relied upon the integrity of the market and paid artificially inflated prices for Toll Brothers common stock as a result of the

violations of §10(b) of the 1934 Act and Rule 10b-5 alleged herein; and (b) would not have purchased Toll Brothers common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements and concealment. At the time of the purchases by plaintiffs and members of the Class, the fair and true value of Toll Brothers common stock was substantially less than the prices paid by them.

196. This action was commenced within five years after the sales by Robert Toll, Bruce Toll, and Sicree while in possession of material, non-public information.

197. As a result of the foregoing, plaintiffs and the other members of the Class have suffered substantial damages.

## PRAYER

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action, certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating this Complaint as the operable complaint for class purposes;

B. Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 to assure that the Class has an effective remedy;

D. Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

- 115 -

DATED: August 13, 2007

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
PATRICK J. COUGHLIN
SPENCER A. BURKHOLZ
LAURA M. ANDRACCHIO
SHANNON M. MCKENNA


       s/ LAURA M. ANDRACCHIO
_____
      LAURA M. ANDRACCHIO

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: 619/231-1058
619/231-7423 (fax)

BERGER & MONTAGUE, P.C.
SHERRIE R. SAVETT
BARBARA PODELL
RUSSELL D. PAUL
1622 Locust Street
Philadelphia, PA  19103
Telephone: 215/875-3000
215/875-4604 (fax)

Co-Lead Counsel for Plaintiffs

S:\CasesSD\Toll Bros\amd cpt.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 13, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 13, 2007.

s/ LAURA M. ANDRACCHIO
LAURA M. ANDRACCHIO

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail:LauraA@lerachlaw.com

# Mailing Information for a Case 2:07-cv-01513-JG

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **RAMZI ABADOU**
  ramzia@lcsr.com

- **LAURA ANDRACCHIO**
  lauraa@lerachlaw.com,e_file_sd@lerachlaw.com

- **SPENCER A. BURKHOLZ**
  spenceb@lerachlaw.com,e_file_sd@lerachlaw.com

- **ROBERT C. HEIM**
  robert.heim@dechert.com,lisa.ricchezzs@dechert.com

- **MICHAEL L. KICHLINE**
  michael.kichline@dechert.com,lisa.ricchezza@dechert.com

- **WILLIAM S. LERACH**
  e_file_sd@lerachlaw.com,lisamp@lerachlaw.com

- **RUSSELL D. PAUL**
  rpaul@bm.net,kwalker@bm.net,lbauer@bm.net

- **BARBARA A. PODELL**
  bpodell@bm.net

- **SHERRIE R. SAVETT**
  ssavett@bm.net,sdavis@bm.net,mgatter@bm.net

- **SCOTT A. THOMPSON**
  scott.thompson@dechert.com,gerilene.marshall@dechert.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`