UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE CITY OF HIALEAH EMPLOYEE'S RETIREMENT SYSTEM and LABORERS PENSION TRUST FUND FOR NORTHERN CALIFORNIA, On Behalf of Themselves and All Others Similarly Situated, | ) ) ) ) ) | Civ. Action No. 07-1513 <br><br> CLASS ACTION <br><br> The Honorable C. Darnell Jones II |
| Plaintiffs, | ) ) ) | MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION |
| vs. | ) ) | |
| TOLL BROTHERS, INC., et al., | ) ) | |
| Defendants. | ) ) ) | |

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ................................................................1

II.    STATEMENT OF FACTS ....................................................................7

     A.     Summary of Complaint ...............................................................7

     B.     The Proposed Class Representatives ........................................9

III.   ARGUMENT ........................................................................................13

     A.     Securities Actions, Like the Instant Case, Are Well Suited for Class Treatment .........................................................................13

     B.     The Proposed Class Satisfies Rule 23(a) ...............................14

         1.     The Members of the Class Are so Numerous that Joinder of All Members Is Impracticable..............................14

         2.     Questions of Law and Fact Are Common to the Members of the Class...............................................................16

         3.     Lead Plaintiffs Are Typical.................................................17

         4.     Lead Plaintiffs and Co-Lead Counsel Will Fairly and Adequately Protect the Interests of the Class......................18

     C.     The Proposed Class Satisfies Rule 23(b)(3) .........................21

         1.     Common Questions of Law and Fact Predominate Over Individual Questions...............................................22

             a.     The Fraud-on-the-Market Presumption of Reliance....................23

             b.     Toll Brothers' Stock Traded in an Efficient Market During the Class Period and, Therefore, the Entire Class Is Entitled to the Fraud-on-the-Market Presumption of Reliance.................25

                 (1)     Toll Brothers' Stock Was Publicly Traded on the NYSE ..........................................................25

                 (2)     Toll Brothers Had Substantial Reported Trading Volume During the Class Period .......................................26

                 (3)     A Significant Number of Market Analysts Followed Toll Brothers During the Class Period..............................27

**Page**

(4)     During the Class Period, Toll Brothers Had Several
        Market Makers ....................................................................27

(5)     During the Class Period, Toll Brothers Was Eligible
        to File SEC Form S-3 ..........................................................28

(6)     During the Class Period, Toll Brothers' Stock Price
        Was Quick to Respond to the Release of Company-
        Specific Information ............................................................29

(7)     Toll Brothers' Market Capitalization Supports a
        Finding of Market Efficiency ..............................................30

(8)     Toll Brothers' Public Float Supports a Finding of
        Market Efficiency ................................................................31

(9)     The Ability to Short Sell Toll Brothers' Stock
        Supports a Finding of Market Efficiency ............................32

(10)    No Evidence of Autocorrelation .........................................32

c.      Loss Causation Does Not Need to Be Demonstrated at
        Class Certification, but if the Court Decides to Require
        Such a Showing, Lead Plaintiffs Can Do so Sufficiently ..............33

2.      A Class Action Is Superior to Other Available Methods for
        Resolving This Controversy ....................................................35

IV.     CONCLUSION.........................................................................37

514252_1

# TABLE OF AUTHORITIES

Page

## CASES

*Amchem Prods. v. Windsor*,
   521 U.S. 591 (1997)...........................................................................................19

*Baby Neal for & by Kanter v. Casey*,
   43 F.3d 48 (3d Cir. 1994)...........................................................................17, 19

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988).................................................................................. *passim*

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989).............................................................. *passim*

*Conn. Ret. Plans & Trust Funds v. Amgen, Inc.*,
   No. CV 07-2536 PSG (PLAx), 2009 U.S. Dist. LEXIS 71653
   (C.D. Cal. Aug. 12, 2009)...............................................................................34

*Cortese v. Radian Group, Inc.*,
   No. 07-3375, 2008 U.S. Dist. LEXIS 6958
   (E.D. Pa. Jan. 30, 2008)..................................................................................20

*Darquea v. Jarden Corp.*,
   No. 06 Civ. 722 (CLB), 2008 U.S. Dist. LEXIS 17747
   (S.D.N.Y. Mar. 6, 2008)..................................................................................33

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)...................................................................................6, 13

*Flannick v. First Union Home Equity Bank*,
   134 F. Supp. 2d 389 (E.D. Pa. 2001)..............................................................16

*Fogarazzo v. Lehman Bros.*,
   263 F.R.D. 90 (S.D.N.Y. 2009).......................................................................34

*Georigi v. Recon Auto. Remanufacturers*,
   No. 07-5509, 2009 U.S. Dist. LEXIS 40016
   (E.D. Pa. May 8, 2009)....................................................................................16

*Hayes v. Gross*,
   982 F.2d 104 (3d Cir. 1992)......................................................................24, 27

*Hoxworth v. Blinder, Robinson & Co.*,
   980 F.2d 912 (3d Cir. 1992)............................................................................22

**Page**

*In re Alstom SA Sec. Litig.*,
  253 F.R.D. 266 (S.D.N.Y. 2008) ...............................................................................5, 33

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)..................................................................................24, 25

*In re Cardinal Health Inc. Sec. Litig.*,
  528 F. Supp. 2d 752 (S.D. Ohio 2007) ..........................................................................21

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir. 2001)............................................................................................9

*In re CIGNA Corp. Sec. Litig.*,
  No. 02-8088, 2006 U.S. Dist. LEXIS 58560
  (E.D. Pa. Aug. 18, 2006)...............................................................................................14

*In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee*
*Second Mortgage Loan Litig.*,
  418 F.3d 277 (3d Cir. 2005).........................................................................................23

*In re Connetics Corp. Sec. Litig.*,
  257 F.R.D. 572 (N.D. Cal. 2009)..................................................................................34

*In re Constar Int'l Inc. Sec. Litig.*,
  585 F.3d 774 (3d Cir. 2009)..........................................................................................14

*In re Corel Corp. Sec. Litig.*,
  206 F.R.D. 533 (E.D. Pa. 2002)................................................................17, 18, 22, 23

*In re Credit Suisse-AOL Sec. Litig.*,
  253 F.R.D. 17 (D. Mass. 2008)......................................................................................33

*In re DVI Inc. Sec. Litig.*,
  249 F.R.D. 196 (E.D. Pa. 2008).............................................................................. *passim*

*In re Enron Corp.*,
  586 F. Supp. 2d 732 (S.D. Tex. 2008) ...........................................................................20

*In re HealthSouth Corp. Sec. Litig.*,
  257 F.R.D. 260 (N.D. Ala. 2009)..................................................................................34

*In re Herley Indus. Sec. Litig.*,
  No. 06-2596, 2009 U.S. Dist. LEXIS 91600
  (E.D. Pa. Sept. 30, 2009) ....................................................................................... *passim*

**Page**

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008)............................................................................1, 5, 34

*In re Janney Montgomery Scott LLC Fin. Consultant Litig.*,
  No. 06-3202, 2009 U.S. Dist. LEXIS 60790
  (E.D. Pa. July 16, 2009)........................................................................................22

*In re LDK Solar Sec. Litig.*,
  255 F.R.D. 519 (N.D. Cal. 2009)..................................................................24, 34

*In re Loewen Group Sec. Litig.*,
  233 F.R.D. 154 (E.D. Pa. 2005)................................................14, 17, 23, 36

*In re Micron Techs., Inc.*,
  247 F.R.D. 627 (D. Idaho 2007) .........................................................................34

*In re Mills Corp. Sec. Litig.*,
  257 F.R.D. 101 (E.D. Va. 2009) .........................................................................33

*In re Nature's Sunshine Prods. Sec. Litig.*,
  251 F.R.D. 656 (D. Utah 2008) ...........................................................................34

*In re NetBank, Inc.*,
  259 F.R.D. 656 (N.D. Ga. 2009)...............................................................29, 31, 34

*In re Priceline.com Inc. Sec. Litig.*,
  236 F.R.D. 89 (D. Conn. 2006)............................................................................33

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
  148 F.3d 283 (3d Cir. 1998)..................................................................................22

*In re Red Hat, Inc. Sec. Litig.*,
  261 F.R.D. 83 (E.D.N.C. 2009) ..........................................................................33

*In re Rent-Way Sec. Litig.*,
  218 F.R.D. 101 (W.D. Pa. 2003) ........................................................................25

*In re Rite Aid Corp. Sec. Litig.*,
  362 F. Supp. 2d 587 (E.D. Pa. 2005) ..................................................................21

*In re Sugar Indus. Antitrust Litig.*,
  73 F.R.D. 322 (E.D. Pa. 1976)............................................................................37

*In re Tel-Save Sec. Litig.*,
  No. 98-CV-3145, 2000 U.S. Dist. LEXIS 10134
  (E.D. Pa. July 19, 2000).......................................................................................22

**Page**

*In re Tyco Int'l, Ltd. Multidistrict Litig.,*
    236 F.R.D. 62 (D.N.H. 2006) ..........................................................................33

*In re Unisys Corp. Sec. Litig.,*
    No. 99-5333, 2001 U.S. Dist. LEXIS 20160
    (E.D. Pa. Dec. 6, 2001) ...................................................................................21

*In re Vicuron Pharms. Inc. Sec. Litig.,*
    233 F.R.D. 421 (E.D. Pa. 2006).................................................................. *passim*

*In re Warfarin Sodium Antitrust Litig.,*
    391 F.3d 516 (3d Cir. 2004)..............................................................................16

*In re Wellbutrin SR Direct Purchaser Litig.,*
    No. 04-5525, 2008 U.S. Dist. LEXIS 36719
    (E.D. Pa. May 2, 2008) .............................................................................19, 36

*In re Xcelera.com Sec. Litig.,*
    430 F.3d 503 (1st Cir. 2005)........................................................................24, 27

*Jackson v. SEPTA,*
    260 F.R.D. 168 (E.D. Pa. 2009)........................................................................17

*Kelleher v. ADVO, Inc.,*
    No. 3:06 CV01422 (AVC), 2009 U.S. Dist. LEXIS 68914
    (D. Conn. Mar. 30, 2009)..................................................................................33

*Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds,*
    571 F.3d 672 (7th Cir. 2009), *cert. denied,*
    __ U.S. __, 130 S. Ct. 1504 (2010).....................................................................6

*Krogman v. Sterrit,*
    202 F.R.D. 467 (N.D. Tex. 2001) .....................................................................31

*Lachance v. Harrington,*
    No. 94-CV-4383, 1996 U.S. Dist. LEXIS 5688
    (E.D. Pa. Apr. 30, 1996) .............................................................................13, 35

*Lapin v. Goldman Sachs & Co.,*
    254 F.R.D. 168 (S.D.N.Y. 2008) ......................................................................33

*Markocki v. Old Republic Nat'l Title Ins. Co.,*
    254 F.R.D. 242 (E.D. Pa. 2008).........................................................................19

514252_1

**Page**

*Marsden v. Select Med. Corp.*,
   246 F.R.D. 480 (E.D. Pa. 2007)...............................................................16, 17, 23, 24

*Meckenstock v. Int'l Heritage, Inc.*,
   No. 5:98-CV-237-BR(2), 1998 U.S. Dist. LEXIS 21042
   (E.D.N.C. Dec. 9, 1998)...........................................................................................24

*Moore v. Comcast Corp.*,
   No. 08-773, 2010 U.S. Dist. LEXIS 34691
   (E.D. Pa. Apr. 6, 2010) .....................................................................................18, 22

*Nursing Home Pension Fund v. Oracle Corp.*,
   No. C01-00988 MJJ, 2006 U.S. Dist. LEXIS 94470
   (N.D. Cal. Dec. 20, 2006) .......................................................................................33

*Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*,
   487 F.3d 261 (5th Cir. 2007) .............................................................................33, 34

*Rosen v. Fid. Fixed Income Trust*,
   169 F.R.D. 295 (E.D. Pa. 1995)..............................................................................17

*Roth v. Aon Corp.*,
   238 F.R.D. 603 (N.D. Ill. 2006)..............................................................................33

*Schleicher v. Wendt*,
   No. 1:02-cv-1332-DFH-TAB, 2009 U.S. Dist. LEXIS 24810
   (S.D. Ind. Mar. 20, 2009).................................................................................31, 33

*Seidman v. Am. Mobile Sys.*,
   157 F.R.D. 354 (E.D. Pa. 1994)........................................................................17, 19

*Semerenko v. Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000).................................................................................5, 6

*Silverman v. Motorola, Inc.*,
   259 F.R.D. 163 (N.D. Ill. 2009)..............................................................................33

*Stewart v. Abraham*,
   275 F.3d 220 (3d Cir. 2001)...................................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................................................13

*Wagner v. Barrick Gold Corp.*,
   251 F.R.D. 112 (S.D.N.Y. 2008) ...........................................................................33

**Page**

*Yang v. Odom,*
392 F.3d 97 (3d Cir. 2004)..........................................................................13, 35


**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
§78j(b) ...........................................................................................3, 5, 23
§78u-4 ..................................................................................................*passim*
§78u-4(a)(3)(B) ...........................................................................................1
§78u-4(a)(3)(B)(i) .....................................................................................20

29 U.S.C.
§1102(c)(3) ...............................................................................................10

Federal Rules of Civil Procedure
Rule 23 ..................................................................................................*passim*
Rule 23(a)..............................................................................................*passim*
Rule 23(a)(1) ........................................................................................14, 15
Rule 23(a)(3) ...............................................................................................17
Rule 23(a)(4) ........................................................................................18, 21
Rule 23(b)(3) ........................................................................................*passim*

17 C.F.R.
§240.10b-5 ...................................................................................................3


**LEGISLATIVE HISTORY**

H.R. Rep. No. 104-369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679 .........................................13

S. Rep. No. 104-98 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679................................................20


**SECONDARY AUTHORITIES**

4 Alan R. Bromberg & Lewis D. Lowenfels,
*Securities Fraud and Commodities Fraud* (Aug. 1988)
§8.6 ...........................................................................................................26

Lead Plaintiffs The City of Hialeah Employee's Retirement System ("Hialeah") and Laborers Pension Trust Fund for Northern California ("Laborers") (collectively, "Plaintiffs," "Lead Plaintiffs" or the "Pension Funds"), by the undersigned attorneys, respectfully submit this memorandum of law in support of the accompanying motion for class certification ("Motion").

## I.      PRELIMINARY STATEMENT

Plaintiffs bring this Motion seeking to certify this securities litigation as a class action on behalf of those persons and entities who purchased or otherwise acquired Toll Brothers, Inc.'s ("Toll Brothers" or the "Company") common stock between December 9, 2004 and November 8, 2005 (the "Class Period"), and who were injured thereby (the "Class").[1]   In addition, Plaintiffs request that the Court appoint them as class representatives of the plaintiff Class certified pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure ("Rule 23").[2]   Plaintiffs also move for an Order appointing the law firms of Robbins Geller Rudman & Dowd LLP ("Robbins Geller") and Berger & Montague, P.C. ("Co-Lead Counsel") as lead class counsel.[3]

In order to certify this Class of defrauded investors, the Court must first conduct a rigorous analysis to ensure that the dictates of Rule 23 have been met by a preponderance of the evidence.  *In*

---

[1]      Excluded from the Class is defendant Toll Brothers and the nine individual defendants: Robert Toll (CEO), Bruce Toll (Vice Chairman), Zvi Barzilay ("Barzilay") (President and COO), Joel H. Rassman ("Rassman") (CFO), Joseph R. Sicree ("Sicree") (Chief Accounting Officer), Robert S. Blank ("Blank") (Director), Richard Braemer ("Braemer") (Director), Paul E. Shapiro ("Shapiro") (Director) and Carl B. Marbach ("Marbach") (Director), and members of their immediate families, any officer, director or partner of any defendant, any entity in which a defendant has a controlling interest and the heirs, successors or assigns of any such excluded party.

[2]      By Order dated June 29, 2007, the Court appointed Plaintiffs as Lead Plaintiffs pursuant to 15 U.S.C. §78u-4(a)(3)(B).  Dkt. No. 22.

[3]      On March 31, 2010, Lead Counsel, formerly known as Coughlin Stoia Geller Rudman & Robbins, LLP ("Coughlin Stoia"), changed its name to Robbins Geller Rudman & Dowd LLP.

514252_1

*re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309, 320 (3d Cir. 2008).[4]  As Plaintiffs

demonstrate below, these requirements are easily satisfied.  First, just as the Private Securities

Litigation Reform Act of 1995 ("PSLRA") intended, here two sophisticated institutional investors

serve as Lead Plaintiffs.  *See In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 203 (E.D. Pa. 2008)  ("The

largest investors of most corporations are generally institutional investors, and the PSLRA was

designed, at least in part, to 'increase the likelihood that institutional investors will serve as lead

plaintiffs.'").[5]  In assuming the responsibilities that come with serving as Lead Plaintiffs, both have

consistently remained active in the prosecution of this litigation by receiving quarterly updates on

the status of the litigation from Co-Lead Counsel, getting additional case updates periodically from

law firms that serve as their independent outside counsel, and by recently participating in discovery

by providing responses to document requests, producing all relevant, non-privileged documents in

their possession, providing detailed responses to defendants' interrogatories, and by flying to New

York from California and Florida to have their depositions taken.  This vigorous prosecution led by

both Lead Plaintiffs and their experienced and qualified class counsel meets, if not exceeds, Rule

23(a)'s adequacy threshold.  Second, because this case involves a Fortune 500 company whose stock

was nationally traded on the New York Stock Exchange ("NYSE") throughout the Class Period, and

because the allegations against defendants arise from a common course of fraudulent conduct in

---

[4]     The prerequisites of Rule 23(a) are as follows: (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy").  Fed. R. Civ. P. 23(a).  Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

[5]     Citations are omitted and emphasis is added throughout unless otherwise noted.

which all class members suffered damages, Rule 23(a)'s numerosity, commonality and typicality prongs are also satisfied.

Because the requirements of Rule 23(a) are easily fulfilled, the only potential remaining challenge is whether the predominance requirement of Rule 23(b)(3) is met. The "predominance" issue centers around whether questions of law or fact common to class members predominate over any questions affecting only individual members. In a §10(b) securities class action, a plaintiff must prove the following elements by a preponderance of the evidence: (1) a false statement or omission; (2) materiality; (3) scienter (state of mind); (4) reliance; (5) loss causation; and (6) damages.

The only element that has the potential to be an "individual" issue not warranting class action treatment is the reliance element. In fact, defendants will likely assert that, in this action, individual questions related to the element of reliance will predominate over common ones. However, the United States Supreme Court holds that investors, like those here, who buy stock at the price set by an efficient market do so in reliance on the integrity of that price and, therefore, are entitled to a rebuttable presumption of reliance and do not need to show actual reliance on the statements issued by defendants. *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988). Thus, if a plaintiff can demonstrate that the market for a particular security was "efficient," *i.e.*, the price of the stock incorporated all relevant publicly available information, then "an investor's reliance on any public material misrepresentations . . . may be ***presumed*** for purposes of a Rule 10b-5 action." *Id.* at 247.

While issues of market efficiency may arise in cases involving debt securities or penny stocks where sometimes there is limited trading or limited public information about a stock or bond, no such issues are present here. In this case, it is beyond any doubt that Toll Brothers' stock traded in an efficient market since it was a Fortune 500 company that was traded on the NYSE, and was widely followed by financial analysts. As the Court in *DVI* stated, "***neither Defendants nor this***

- 3 -

*Court have been able to locate a single case where the market for a NYSE-traded security was deemed inefficient*." 249 F.R.D. at 208.

Although expert analysis is not even necessary considering the characteristics of Toll Brothers' stock, Plaintiffs have submitted the expert analysis of Dr. John D. Finnerty ("Dr. Finnerty") to corroborate that Toll Brothers' common stock easily meets the market efficiency factors enunciated in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989).[6] In *Cammer*, the court set out a non-exhaustive list of indicators of market efficiency, a list otherwise known as the "*Cammer* factors."[7] As Dr. Finnerty explains *infra*, Toll Brothers' common stock traded in an efficient market during the Class Period because, *inter alia*, it: (1) traded on the NYSE; (2) had a substantial reported trading volume; (3) was followed by a significant number of market analysts; (4) had several market makers; (5) was eligible to file on SEC Form S-3; (6) responded quickly to the release of company-specific information; (7) had over a $3.5 billion market capitalization; (8) had a significant public float; (9) could be sold by short sellers; and (10) was not subject to

---

[6]    Declaration of John D. Finnerty, Ph.D. in Support of Lead Plaintiffs' Motion for Class Certification ("Finnerty Decl."), filed herewith. Dr. Finnerty is a Professor of Finance at the Graduate School of Business Administration at Fordham University and Managing Principal of Finnerty Economic Consulting. Finnerty Decl., Appendix A. His area of expertise includes securities valuation and calculation of damages, among many other areas. Dr. Finnerty has testified as an expert in both state and federal court on securities and other financial matters, and published 13 books and more than 90 articles and professional papers in corporate finance, business and securities valuation and other areas of finance. *Id.*

[7]    Under *Cammer*, a security trades in an efficient market if it: (1) was traded on a public exchange; (2) had a large trading volume; (3) was followed by market analysts; (4) had several market makers; (5) could be and was registered on the Securities and Exchange Commission ("SEC") Form S-3; and (6) responded quickly to the release of company-specific information. *DVI*, 249 F.R.D. at 208. Recently, two courts within this District certified classes in which they analyzed the *Cammer* factors, along with four additional indicators of market efficiency: (7) the size of a company's market capitalization; (8) the size of the public float for a company's security; (9) the ability to short sell the security; and (10) the level of autocorrelation. *DVI*, 249 F.R.D. at 208; *In re Herley Indus. Sec. Litig.*, No. 06-2596, 2009 U.S. Dist. LEXIS 91600, at *46-*47 n.16 (E.D. Pa. Sept. 30, 2009) (citing *DVI*, 249 F.R.D. at 208).

autocorrelation.[8]  *See* Finnerty Decl., ¶¶10, 101.  Applying this expanded list of *Cammer* factors, it is

evident that Toll Brothers' common stock traded in an efficient market during the Class Period.  As a

result, the price of Toll Brothers' stock incorporated all relevant publicly-available information, and

the element of reliance can be treated on a class-wide basis and will predominate since there will be

no individual class member issues.

Although loss causation is not relevant to the Court's rigorous analysis of Rule 23's

predominance requirement, defendants are likely to argue otherwise.  Loss causation is an element in

a §10(b) action that requires Plaintiffs to show at trial that the losses suffered by investors were

caused by the revelation of fraud-related information about Toll Brothers' business, which was a

substantial cause of the Class' losses.  *Semerenko v. Cendant Corp.*, 223 F.3d 165, 186-87 (3d Cir.

2000).  As explained below (*see* n.27, *infra*), the vast majority of courts *reject* defendants' assertions

that loss causation is somehow relevant to class certification.  There is also no requirement in this

Circuit that a district court find that plaintiff can *prove* the element of loss causation at the class

certification stage.

Loss causation is not an individual issue, but rather one that either exists or does not exist for

the class as a whole, and for that reason it is irrelevant to class certification.  *In re Alstom SA Sec.*

*Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) ("Defendants have not sufficiently established how

Loss Causation is related to any necessary element of Rule 23."); *see also Hydrogen*, 552 F.3d at

307 (stating that a court must resolve all factual or legal disputes "*relevant* to class certification").

Furthermore, a holding that there are *no* individual class member issues related to proving the

---

[8]  "A security exhibits autocorrelation if the change in price of the security on a given day provides an indication of what the change in price for the security will be on the following day.  If new information about a company is incorporated slowly into the price of a security, then the security will exhibit autocorrelation, suggesting an inefficient market." *DVI*, 249 F.R.D. at 213.

element of loss causation is consistent with United States Supreme Court authority.  The Supreme

Court in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005), only required that plaintiff at the

pleading stage put defendants on notice of their theory of loss causation and did not require its proof

at the class certification stage.  *See Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds*, 571 F.3d

672, 679 (7th Cir. 2009) (Posner, J.) ("PIMCO's repeated, indeed obsessive, citations to the Supreme

Court's decision in *Dura* . . . , a case that does not involve class certification, suggests

desperation."), *cert. denied*, __ U.S. __, 130 S. Ct. 1504 (2010).

Nevertheless, since one outlier circuit, the Fifth Circuit, has made proof of loss causation a

requirement at class certification, defendants have argued in other cases that courts should follow

this approach.  No other circuit (including the Third Circuit) has adopted the Fifth Circuit's approach

and virtually all district courts to address the issue have rejected it.  *See* nn.26 & 27, *infra*.  Yet, in an

abundance of caution, and despite its irrelevance at this stage, Dr. Finnerty also demonstrates

through a widely accepted methodology (event study), how defendants' misrepresentations and

omissions were a "substantial" cause of the Class' losses.  *See* Finnerty Decl., ¶¶28-54, 83-97, 102;

*see, e.g.*, *Cendant*, 223 F.3d at 186-87 ("So long as the alleged misrepresentations were a substantial

cause of the inflation in the price of a security and in its subsequent decline in value, other

contributing forces will not bar recovery.").

Lastly, given the potential size of the putative Class and the interrelatedness of the claims,

there can be no doubt that a class action is the superior means to resolve issues raised by this case.

Accordingly, because this action satisfies all necessary requirements of Rule 23(a) and (b)(3),

Plaintiffs' Motion should be granted.

## II.   STATEMENT OF FACTS

### A.   Summary of Complaint[9]

Plaintiffs allege that throughout the Class Period, defendants issued false and misleading statements that misrepresented Toll Brothers' ability to open new communities, the demand for Toll Brothers' homes and its ability to continue its strong earnings growth beyond its fiscal 2005 ("F05").[10]   Defendants repeatedly assured investors that Toll Brothers' unique business model, combined with the fact that the Company controlled a steadily increasing number of active selling communities, would enable it to achieve "at least" 20% earnings growth in F06 over F05, and 20% growth again in fiscal 2007 ("F07") over F06.   Defendants' positive statements drove Toll Brothers' stock price from $28.50 per share on December 19, 2004 to a Class Period high of $58.67 per share in July 2005, an increase during that time period that substantially outstripped that of its competitors.

But defendants knew that their representations were false and Toll Brothers was experiencing increasing difficulties opening new active selling communities in F05, a critical indicator of future growth.   ¶3.   In F05, the Company failed to open the new selling communities necessary to achieve its projected 20% growth in F06.   *Id*.   In addition, demand for Toll Brothers' homes fell during F05 and "traffic" to Toll Brothers' existing active selling communities, a key measure of the Company's future sales, slowed throughout F05.   *Id*.

---

[9]   The allegations of the Amended Consolidated Complaint for Violation of the Securities Exchange Act of 1934 ("Complaint"), filed August 13, 2007 (Dkt. No. 29), are incorporated herein by reference and will not be repeated at length.   This summary is merely intended to place Lead Plaintiffs' Motion in proper context.   Unless otherwise noted, all "¶__" or "¶¶__" references are to the Complaint.

[10]   Toll Brothers' fiscal year ends on October 31, so its fiscal 2004 ("F04") was November 1, 2003 through October 31, 2004, its F05 was November 1, 2004 through October 31, 2005 and its fiscal 2006 ("F06") was November 1, 2005 through October 31, 2006.

As Toll Brothers' stock moved sharply higher during the Class Period in response to defendants' misrepresentations, several defendants collectively sold over 14 million shares of their own Toll Brothers' stock – up to 93% of their holdings – *for insider-trading proceeds of over $617 million*.  Robert Toll and Bruce Toll reaped $323.4 million and $206.4 million by selling 29% and 37% of their holdings, respectively.  COO Barzilay sold 92% of his holdings for over $45.8 million. CFO Rassman sold 68% of his holdings for over $12.1 million.  Blank, Shapiro and Marbach, Toll Brothers directors, sold 93%, 84% and 82% of their holdings, respectively, for over $26 million. ¶146.  These sales were highly suspicious in that the insider defendants all sold at the same time and their Class Period sales far surpassed their pre-Class Period sales in volume and proceeds.  ¶147. Further, the Class Period sales of Robert Toll, Barzilay and Rassman were substantial relative to their compensation.  ¶148.

In addition to defendants' massive insider trading, Plaintiffs have supported their allegations of scienter with references to internal and external documents, and defendants' own admissions, including that they monitored metrics related to Toll Brothers' current demand and future performance.  ¶¶136-144.  In fact, on November 8, 2005, Robert Toll admitted that "*[t]raffic has been down for about a year*," providing direct evidence that defendants knew about this key fact since November 2004.  ¶130.

Within days after completing the vast majority of their insider sales of Toll Brothers' stock at all-time high prices, defendants shocked investors by admitting in a series of disclosures between August 4, 2005 and November 9, 2005 that: (i) traffic at Toll Brothers' active selling communities had been down since November 2004; (ii) demand for Toll Brothers' homes had softened throughout the country; (iii) new order growth had slowed to a halt; and (iv) Toll Brothers had not added the new active selling communities it needed to achieve its F06 forecasts.  ¶5.  As a result of these developments, defendants abandoned Toll Brothers' projections for F06 and F07 net income growth.

- 8 -

*Id.*  On these belated revelations, Toll Brothers' stock cratered from its Class Period high of $58.67 per share to as low as $33.13 per share on November 10, 2005 – a 43% decline – as analysts and the media expressed outrage at defendants' shocking disclosures on the heels of their own stock sales. *Id.*

### B.     The Proposed Class Representatives

The proposed class representatives are Lead Plaintiffs Hialeah and Laborers.  The proposed class representatives in this case are responsible for administering the pensions for thousands of people within the United States.  Collectively, they manage over a billion dollars in assets and are well-qualified to represent the Class.  Indeed, these Pension Funds are the exact type of institutional investors that Congress sought to empower by the enactment of the PSLRA.  *See In re Cendant Corp. Litig.*, 264 F.3d 201, 243-44 (3d Cir. 2001) ("the PSLRA's legislative history expressly states that Congress anticipated and intended that such [institutional] investors would serve as lead plaintiffs"); *Herley*, 2009 U.S. Dist. LEXIS 91600, at *33 ("[T]he legislative history shows Congress believed institutional investors with the largest financial loss are generally the party best positioned to 'balance the interests of the class with the long-term interests of the company and its public investors.'"); *In re Vicuron Pharms. Inc. Sec. Litig.*, 233 F.R.D. 421, 427 (E.D. Pa. 2006) (reaffirming "the intentions of Congress embodied in the PSLRA that institutional investors should oversee more securities actions").

Hialeah has approximately $480 million in total assets.  Hialeah maintains a board of trustees consisting of seven trustees "in whom is vested the general administration, management and responsibility for the proper operation of the retirement system."   Hialeah Code §70-131.[11]

---

[11]     *See also* http://library8.municode.com/default-test/home.htm?infobase=10914&doc_action= whatsnew.

Hialeah's board of trustees elects from its members a chairman and vice-chairman and designates a person to act as secretary. Hialeah Code §70-135(a). In addition, the "city treasurer" serves as the "treasurer of the retirement system and the custodian of its funds." Hialeah Code §70-135(b). Furthermore, in compliance with Hialeah Code §70-170, the board of trustees retains qualified outside investment managers to engage in transactions in securities pursuant to state and federal law and the investment policy of the board. The entity Navallier & Associates was one of Hialeah's outside investment managers, and the entity that purchased Toll Brothers' stock on behalf of Hialeah during the Class Period. April 14, 2010 Deposition Transcript of Alan Voorhees ("Voorhees Tr.") at 134:20-135:7, 136:4-20 (attached as Ex. 1 to the Declaration of Spencer A. Burkholz in Support of Lead Plaintiffs' Motion for Class Certification ("Burkholz Decl."), filed herewith); *see also* Schedule A to Hialeah's Corrected Certification (Docket No. 107-1 at 4).

Laborers was created in 1963 and, since its inception, Laborers has provided benefits in excess of $1.2 billion and currently has approximately 30,000 retirees and beneficiaries receiving benefits. Laborers' total assets currently are approximately $1.4 billion. Laborers is a multi-employer Taft-Hartley employee benefit plan, governed by The Employee Retirement Income Security Act ("ERISA"), which provides pension benefits to participants and beneficiaries who qualify under the terms of the Laborers' plan. Laborers maintains a board of trustees consisting of ten trustees, five of whom are appointed by the Northern California chapter of the Associated General Contractors of America, Inc. ("AGC"), and five of whom are appointed by the Northern California District Council of Laborers (the "Union"). Laborers' board of trustees selects from its members a chairman and co-chairman and also appoints person(s) to serve as its secretary/fund manager and assistant fund manager. In compliance with 29 U.S.C. §1102(c)(3) and Article IV, §1(A), of the Amended and Restated Trust Agreement Establishing the Laborers Pension Trust Fund for Northern California, Laborers' board of trustees retains qualified outside investment managers to

- 10 -

engage in transactions in securities.  New York Life Investment Management was the outside investment manager that purchased Toll Brothers' stock for Laborers during the Class Period.  *See* April 15, 2010 Deposition Transcript of Edward J. Smith ("Smith Tr.") at 92:24-93:8 (Burkholz Decl., Ex. 2); *see also* Schedule A to Laborers' Certification (Docket No. 16-1 at 6).

The Pension Funds have their own outside counsel that monitor the litigation on their behalf and report to the board of directors of each fund on the status of the litigation.  Hialeah uses the law firm of Cypen & Cypen as its outside counsel and Laborers uses Weinberg, Roger & Rosenfeld, P.C. These firms have assisted the Pension Funds in responding to defendants' discovery requests and communications with Co-Lead Counsel about the status of the case.  Voorhees Tr. at 148:9-23; Smith Tr. at 67:16-68:6, 138:2-13.

Both representatives of the Pension Funds testified that they understood the nature of the action and were willing to continue to work with Co-Lead Counsel to obtain the largest recovery for the Class.

For example, Mr. Alan Voorhees ("Voorhees") (Hialeah's representative) testified that:

- Hialeah was fighting for the Class to recover the most money (Voorhees Tr. at 92:14-93:8);

- Hialeah had hired competent counsel, based on the advice of its separate counsel, to litigate the case and provided them direction to pursue the case but relied on their expertise (*id.* at 93:9-20, 94:8-95:21) ("Mr. Cypen has spoken very highly of Coughlin Stoia . . . if we ever came across something where we needed legal action, that that was one of the best firms to have, to use");

- Hialeah has "a very conservative board" and considered the facts of the case and easily voted to approve the prosecution of the case (*id.* at 76:7-77:3);

- Hialeah has a very good understanding of the purpose of a class action (*id.* at 113:8-14) and clearly understands the responsibilities of a lead plaintiff (*id.* at 92:14-24) ("everything is distributed equally and you do the best that you can for the entire group");

- Hialeah understands the parties to the case (*id.* at 98:2-6);

- Hialeah understands the nature of a class action (*id.* at 102:4-19);

- 11 -

- Hialeah's attorneys conducted an investigation prior to filing the Complaint (*id.* at 110:14-12);

- Hialeah understands the current status of the case and that discovery was bifurcated with class discovery before merits (*id.* at 113:8-14);

- Hialeah knew the money manager (Navallier & Associates) that purchased Toll Brothers' stock for Hialeah (*id.* at 134:20-135:7);

- Hialeah confirmed with Liz Andrews, Secretary for Hialeah, that Hialeah produced all documents in response to defendants' document requests since they would all be in Hialeah's office (*id.* at 174:14-175:6, 179:8-16) and that all of Hialeah's records were open for public inspection at any time (*id.* at 181:3-8); and

- since Hialeah keeps all of its records, there was no need to preserve any relevant documents (*id.* at 184:14-185:11) ("[t]he City . . . preserves everything").

Mr. Edward Smith ("Smith"), representative for Laborers testified that:

- the board of directors discussed and approved initiation of the Toll Brothers' lawsuit (Smith Tr. at 43:13-20);

- he worked with Laborers' counsel to answer interrogatory and document requests and turn over all relevant documents, including an email search done in 2009 that found no Toll Brothers' emails during the Class Period or even after, up to early 2009 (*id.* at 67:16-68:6, 138:7-139:2, 167:18-168:25, 176:9-17);

- Laborers was updated on a quarterly basis by Co-Lead Counsel as to status of the case (*id.* at 104:8-22);

- Laborers relied on its counsel and Co-Lead Counsel to keep it abreast of the litigation (*id.* at 71:12-16);

- Laborers understands its responsibilities to work on behalf of the Class and engage in discovery (*id.* at 72:9-73:12);

- Laborers understands the nature of a class action (*id.* at 78:13-79:11); and

- Laborers understands the nature of the action and referred to the Complaint for the details (*id.* 97:13-98:17).

Notably, it was the first time that either Voorhees or Smith had been deposed in a securities class action. Both representatives showed that both institutions are adequate class representatives.

III.   **ARGUMENT**

   A.   **Securities Actions, Like the Instant Case, Are Well Suited for Class Treatment**

The United States Supreme Court and courts within this Circuit have repeatedly recognized the utility and appropriateness of private class action prosecutions involving the violations of federal securities laws.   *See Dura*, 544 U.S. at 345 ("The securities statutes seek to maintain public confidence in the marketplace. . . .  They do so by deterring fraud, in part, through the availability of private securities fraud actions."); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the [SEC]."); *DVI*, 249 F.R.D. at 200 (viewing the class action tool as "'particularly appropriate and desirable means to resolve claims based on the securities laws, since the effectiveness of the securities laws may depend in large measure on the application of the class action device'") (quoting *Yang v. Odom*, 392 F.3d 97, 109 (3d Cir. 2004)).[12]   In fact, Congress, while enacting the PSLRA, reiterated the importance of private enforcement of the securities laws:

> ***Private securities litigation is an indispensable tool with which defrauded investors can recover their losses without having to rely upon government action***.   Such private lawsuits promote public and global confidence in our capital markets and help to deter wrongdoing and to guarantee that corporate officers, auditors, directors, lawyers and others properly perform their jobs.

H.R. Rep. No. 104-369, at 31 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 730.

---

[12]   *See also Lachance v. Harrington*, No. 94-CV-4383, 1996 U.S. Dist. LEXIS 5688, at *15 (E.D. Pa. Apr. 30, 1996) ("class treatment of securities law claims is not only fair to putative class members, it is also generally necessary to any vindication of their rights").

514252_1

Because this case satisfies all requirements of Rule 23, this Court should certify it as a class action.

## B.     The Proposed Class Satisfies Rule 23(a)

Both the requirements of Rule 23 and relevant case law demonstrate that this case should be certified.  Rule 23(a) states that one or more members of a class may sue or be sued as representative parties if:

> "(1) the class is so numerous that joinder of all members is impracticable [numerosity]; (2) there are questions of law or fact common to the class [commonality]; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and (4) the representative parties will fairly and adequately protect the interests of the class [adequacy]."

*In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 780 (3d Cir. 2009) (quoting Fed. R. Civ. P. 23(a)).

As demonstrated below, the instant litigation satisfies all four of these criteria.

### 1.     The Members of the Class Are so Numerous that Joinder of All Members Is Impracticable

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members be impracticable.  *Constar*, 585 F.3d at 780.  Although there is no specific number of class members required to maintain a class action, "the Third Circuit recognizes that a class of more than 40 generally meets the numerosity requirement." *Herley*, 2009 U.S. Dist. LEXIS 91600, at *37 (citing *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001)).[13]  Moreover, courts within this District have "'recognized a presumption that "the numerosity requirement is satisfied when a class action involves a nationally traded security."'"  *DVI*, 249 F.R.D. at 200 (citing *CIGNA*, 2006 U.S. Dist. LEXIS 58560, at *6); *see also In re Loewen Group Sec. Litig.*, 233 F.R.D. 154, 162 (E.D. Pa. 2005)

---

[13]     *See also In re CIGNA Corp. Sec. Litig.*, No. 02-8088, 2006 U.S. Dist. LEXIS 58560, at *6 (E.D. Pa. Aug. 18, 2006) ("'[I]mpracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class" calls for class certification.).

(finding numerosity to exist where "[m]illions of shares were traded during the class period by thousands of geographically-diverse shareholders" even though "the exact number of shareholders has not been determined").

Here, the Class is so numerous that joinder of all members is impracticable.  During the Class Period, Toll Brothers' common stock was actively traded on the NYSE, and the number of Toll Brothers' shares outstanding during the Class Period exceeded 150 million.  Finnerty Decl., ¶¶18-20. Moreover, the average weekly trading volume during the Class Period was over 22 million shares per day.  *Id.*, ¶19.  Between 68% and 79% of the shares outstanding were held by hundreds of institutional investors, as disclosed in Schedule 13-F filings.  *Id.*, ¶¶24, 62.  As of September 30, 2004, there were 284 institutional holders of Toll Brothers' common stock and, by September 30, 2005, there were 405 institutional holders.  *Id.*  "These institutions actively adjusted their holdings of Toll Brothers' common stock" and the "sum of the absolute values of the quarterly changes in securities held by each individual institutional shareholder ranged from 34.4 million shares to 80.9 million shares."  *Id.*[14]  Thus, there are hundreds, and potentially thousands of investors who purchased Toll Brothers' securities during the Class Period.  While the exact number of persons who purchased Toll Brothers' securities during the Class Period is unknown to Lead Plaintiffs at this time – and can only be ascertained from discovery of documents and records maintained by defendants – the Class unquestionably meets the numerosity requirements of Rule 23(a)(1) under Third Circuit law.[15]

---

[14]    This total significantly underestimates "the total volume of trading by these institutional shareholders by failing to account for instances where institutional shareholders bought and sold shares during the respective periods."  Finnerty Decl., ¶24.

[15]    In order to meet the numerosity requirement for class certification, Lead Plaintiffs may rely on reasonable inferences drawn from available facts in order to demonstrate that the Class is so numerous that joinder of all class members in impracticable.  *See, e.g., Herley*, 2009 U.S. Dist.

### 2.    Questions of Law and Fact Are Common to the Members of the Class

The nature of the misrepresentations detailed in the Complaint – the most crucial issues in a securities fraud case – present questions of fact and law common to all members of the Class. Defendants' false statements appeared in a number of press releases, SEC filings and other documents disseminated to the investing public.  As a result, the claims against defendants arise out of a common course of fraudulent conduct perpetrated throughout the Class Period.  *Georigi v. Recon Auto. Remanufacturers*, No. 07-5509, 2009 U.S. Dist. LEXIS 40016, at *7 (E.D. Pa. May 8, 2009) (finding Rule 23(a)'s "commonality" prong met where defendants' course of conduct was common to all class members and, therefore, "subject to common proof in a single trial"); *DVI*, 249 F.R.D. at 201 (in finding "commonality," the court stated that "the issue of whether Defendants' conduct violated securities laws is common to all class members").  Lead Plaintiffs can satisfy the "commonality" requirement even if every class member's claims and facts are not identical.  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 530 (3d Cir. 2004); *see also Vicuron*, 233 F.R.D. at 426.  Rather, this requirement "is easily met, and will be satisfied if the named plaintiffs ***share even one common question*** with the grievances of each member of the prospective class."  *Marsden v. Select Med. Corp.*, 246 F.R.D. 480, 484 (E.D. Pa. 2007).

Common questions of fact and law are clear from Lead Plaintiffs' allegations, including: (i) whether defendants violated the Securities Exchange Act of 1934 ("Exchange Act"); (ii) whether defendants misstated and/or omitted to state material facts in their public statements and filings with

---

LEXIS 91600, at *37 (finding that numerosity was "clearly satisfied" based on the number of outstanding shares, average daily trading volume, approximate holders of record and beneficial stockholders); *Flannick v. First Union Home Equity Bank*, 134 F. Supp. 2d 389, 400 (E.D. Pa. 2001) ("Given First Union's size and prominence in the home equity business it is likely that hundreds, if not thousands, of borrowers fall within the definition of the class.  The numerosity requirement is therefore easily satisfied.").

the SEC; (iii) whether defendants participated directly or indirectly in the course of misconduct; (iv) whether defendants knew or recklessly disregarded that their statements were false and misleading; (v) whether the price of Toll Brothers' common stock was artificially inflated; and (vi) the extent of damage sustained by class members and the appropriate measure of damages. Securities fraud complaints alleging such common questions have consistently been held to be prime candidates for class certification. *See, e.g.*, *Herley*, 2009 U.S. Dist. LEXIS 91600, at *37-*38; *DVI*, 249 F.R.D. at 201; *Marsden*, 246 F.R.D. at 484; *Vicuron*, 233 F.R.D. at 426; *Loewen*, 233 F.R.D. at 162; *Rosen v. Fid. Fixed Income Trust*, 169 F.R.D. 295, 298 (E.D. Pa. 1995); *Seidman v. Am. Mobile Sys.*, 157 F.R.D. 354, 360 (E.D. Pa. 1994).

These issues present quintessential "common questions" of law and fact supporting Lead Plaintiffs' request for class certification.

### 3.      Lead Plaintiffs Are Typical

Rule 23(a)(3) requires that "the claims . . . of the representative parties [be] typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3).  In fact, "[a]lthough they are distinct requirements under Rule 23(a), '[t]he concepts of commonality and typicality are broadly defined and tend to merge.' . . .  Both focus on whether a class can be practically, efficiently, and fairly maintained." *Jackson v. SEPTA*, 260 F.R.D. 168, 191 (E.D. Pa. 2009) (quoting *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)).  Like the "commonality" requirement, "typicality" does not require that "the claims of the individual plaintiffs and class representatives must be identical." *In re Corel Corp. Sec. Litig.*, 206 F.R.D. 533, 541 (E.D. Pa. 2002).  "Typicality only requires that the interests of the named representatives and the class as a whole align – making sure the representatives adequately represent and protect the interests of the absentees." *Id*.  Again, like its 23(a) counterpart, "where claims involve the same conduct on the part of the defendant, factual differences among the claims cannot alone" defeat typicality nor, more broadly, defeat certification.

- 17 -

*Id.*; *see also Moore v. Comcast Corp.*, No. 08-773, 2010 U.S. Dist. LEXIS 34691, at *17 (E.D. Pa. Apr. 6, 2010) (stating that "'cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims'").

Typicality is satisfied here since Lead Plaintiffs' claims arise from the same course of conduct that gave rise to the claims of all other class members and are based on the same legal theory. *See* §III.B.2., *supra*. Lead Plaintiffs, like all class members, purchased Toll Brothers' common stock during the Class Period, unaware that defendants had made materially false and misleading statements that had artificially inflated the price of the stock. Furthermore, Lead Plaintiffs, along with the entire Class, were damaged as revelations of defendants' misrepresentations and omissions caused the price of Toll Brothers' shares to fall precipitously. *See* Finnerty Decl., ¶¶45-53, 84-97, 102. All class members were damaged by defendants' materially false and misleading statements and omissions during the Class Period, such that the typicality requirement is met. *See Herley*, 2009 U.S. Dist. LEXIS 91600, at *41 (finding typicality in a securities fraud action where plaintiffs' holdings during the class period were "negatively affected due to Defendants' misleading public statements"); *Vicuron*, 233 F.R.D. at 426 ("Plaintiffs satisfy both the commonality and typicality prerequisites for class certification. They allegedly have suffered damages from the same course of fraudulent conduct on the part of Vicuron and share common factual questions."). Since Lead Plaintiffs' claims arise from the same misrepresentations and omissions, Lead Plaintiffs' claims are typical of those of the Class.

### 4. Lead Plaintiffs and Co-Lead Counsel Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)(4) permits the certification of a class action when "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Third Circuit established two criteria for determining the adequacy of representation: (a) that the plaintiffs'

attorney is experienced and qualified to prosecute the claims on behalf of the entire class; and (b) that the class representatives do not have interests antagonistic to the interests of the class. *Markocki v. Old Republic Nat'l Title Ins. Co.*, 254 F.R.D. 242, 249 (E.D. Pa. 2008) (citing *Baby Neal*, 43 F.3d at 55).  In this case, defendants cannot seriously contest Lead Plaintiffs' common interests with the absent class members, nor can they dispute Co-Lead Counsel's adequacy.

Both prongs of the "adequacy" test have been met in this case.  First, there is no antagonism between Lead Plaintiffs and the absent class members. *DVI*, 249 F.R.D. at 206.  Lead Plaintiffs and all class members have suffered losses due to their purchases of Toll Brothers' common stock at artificially inflated prices.  They have been injured by the identical wrongful conduct of the defendants, and it is in Lead Plaintiffs' interest to prosecute this action vigorously on behalf of the Class.  *Cf. Amchem Prods. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) ("The adequacy-of-representation requirement 'tends to merge' with the commonality and typicality criteria of Rule 23(a) . . . .").  Furthermore, both Lead Plaintiffs held their Toll Brothers' stock through the end of the Class Period.  Voorhees Tr. at 120:21-121:22; Smith Tr. at 89:25-92:5.  The only possible variation in proof among class members would relate to the ***amount*** of damages, which alone is insufficient to defeat class certification.  *See, e.g.*, *In re Wellbutrin SR Direct Purchaser Litig.*, No. 04-5525, 2008 U.S. Dist. LEXIS 36719, at *33 (E.D. Pa. May 2, 2008) (stating that it "'is settled law that the necessity for proving damages individually does not defeat class predominance or class certification'"); *Seidman*, 157 F.R.D. at 360 ("Thus, the only questions affecting individual members of the class in this case are damages, and the need for individual damage calculations does not defeat class certification where common questions as to liability predominate.").

Furthermore, in enacting the PSLRA, Congress encouraged courts to place institutional investors (such as Lead Plaintiffs here) in charge of securities fraud class actions.  *See DVI*, 249 F.R.D. at 203 ("[T]he [PSLRA] instructs that under most circumstances, a class should be

- 19 -

represented by the eligible investor holding the largest financial stake. . . .  The largest investors of most corporations are generally institutional investors, and the PSLRA was designed, at least in part, to 'increase the likelihood that institutional investors will serve as lead plaintiffs.'") (quoting in part S. Rep. No. 104-98, at 11 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 690); *Cortese v. Radian Group, Inc.*, No. 07-3375, 2008 U.S. Dist. LEXIS 6958, at *12 (E.D. Pa. Jan. 30, 2008) ("In addition, Iron Workers is an institutional investor, the kind of plaintiff that Congress anticipated would serve as lead plaintiff when it enacted the PSLRA.").

Lead Plaintiffs are exactly the type of institutional investors Congress envisioned when it drafted the PSLRA.  Lead Plaintiffs suffered significant losses as a result of defendants' fraud and have every incentive to actively litigate this case on behalf of the Class.  In fact, by appointing these funds as Lead Plaintiffs, this Court has already made a preliminary determination that Hialeah and Laborers are adequate.  *See* June 29, 2007 Memorandum and Order (Dkt. No. 22); *see also* 15 U.S.C. §78u-4(a)(3)(B)(i) ("the court shall . . . appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be the most capable of adequately representing the interests of class members  . . . the 'most adequate plaintiff'").

Second, there can be no legitimate dispute that Co-Lead Counsel is capable of prosecuting this litigation.  Co-Lead Counsel possesses extensive experience in the area of securities litigation and has successfully prosecuted numerous securities fraud class actions and other complex actions, on behalf of injured investors in this District and across the country.[16]  *See, e.g.*, *In re Enron Corp.*, 586 F. Supp. 2d 732, 790 (S.D. Tex. 2008) ("This Court considers Coughlin Stoia 'a lion' at the securities bar on the national level.  Lead Counsel's outstanding reputation, experience, and success

---

[16]    *See* firm resumes of Robbins Geller (formerly known as Coughlin Stoia) and Berger & Montague, attached as Exs. 3 and 4, respectively, to the Burkholz Decl.

in securities litigation nationwide were a major reason why the Regents selected the firm."). As the court in *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752 (S.D. Ohio 2007), stated:

> The quality of representation in this case was superb. Lead Counsel, Coughlin Stoia Geller Rudman & Robbins LLP, are nationally recognized leaders in complex securities litigation class actions. The quality of the representation is demonstrated by the substantial benefit achieved for the Class and the efficient, effective prosecution and resolution of this action. Lead Counsel defeated a volley of motions to dismiss, thwarting well-formed challenges from prominent and capable attorneys from six different law firms.

*Id.* at 768; *see also In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 590 (E.D. Pa. 2005) ("through the exercise of their considerable skill, [Berger & Montague] obtained a historic recovery for the class in a rare and complex kind of case where victory at trial would have been, at best, remote and uncertain").[17] Thus, the adequacy of Lead Plaintiffs' counsel is beyond reproach. Lead Plaintiffs, along with Co-Lead Counsel, have shown they have and will continue to "fairly and adequately protect the interests of the class." *See* Fed. R. Civ. P. 23(a)(4).

**C.     The Proposed Class Satisfies Rule 23(b)(3)**

In addition to meeting the prerequisites of Rule 23(a), the present action also satisfies Rule 23(b)(3), which requires that the proposed class representatives establish that common questions of law or fact predominate over individual questions and that a class action is superior to other available methods of adjudication. *See Herley*, 2009 U.S. Dist. LEXIS 91600, at *36. As shown, *infra*, common questions of law and fact predominate in this case and a class action is the superior, if not the only, method available to fairly and efficiently litigate this securities action.

---

[17]     *See also Vicuron*, 233 F.R.D. at 428 (finding Robbins Geller to be "sufficiently experienced and qualified to conduct this securities fraud class action"); *In re Unisys Corp. Sec. Litig.*, No. 99-5333, 2001 U.S. Dist. LEXIS 20160, at *10 (E.D. Pa. Dec. 6, 2001) (stating that Berger & Montague conducted the litigation "with skill, professionalism, and extraordinary efficiency").

514252_1

1.      **Common Questions of Law and Fact Predominate Over
        Individual Questions**

Where a complaint alleges a "common course of conduct" of misrepresentations, omissions

and other wrongdoings that affect all members of the class in the same manner, common questions

of both law and fact predominate.  *See, e.g.*, *In re Janney Montgomery Scott LLC Fin. Consultant

Litig.*, No. 06-3202, 2009 U.S. Dist. LEXIS 60790, at *17 (E.D. Pa. July 16, 2009) ("Predominance

is normally satisfied when plaintiffs have alleged a common course of conduct on the part of the

defendant.") (citing *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283,

314-15 (3d Cir. 1998)); *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 924 (3d Cir. 1992)

(finding that plaintiffs satisfied the predominance requirement of Rule 23(b)(3) because "the well-

pleaded complaint fairly claimed a uniform scheme to defraud investors in the class securities, who

relied on [defendants'] material omissions").  Therefore, in assessing whether common questions

predominate, this Court's inquiry should be primarily directed toward the issue of defendants'

liability, and not whether individual damages vary in amount from class member to class member.

*In re Tel-Save Sec. Litig.*, No. 98-CV-3145, 2000 U.S. Dist. LEXIS 10134, at *18 (E.D. Pa. July 19,

2000); *see also Moore*, 2010 U.S. Dist. LEXIS 34691, at *24 (rejecting defendants' argument, the

court stated that "'it has been commonly recognized that the necessity for calculation of damages on

an individual basis should not preclude class determination when the common issues which

determine liability predominate'").

As discussed above, there are a host of common questions of law and fact.  These questions

clearly predominate over individual questions because defendants' fraudulent conduct affected all

class members in the same manner and, through false and/or misleading statements, artificially

inflated the price of Toll Brothers' common stock.  *See, e.g.*, *Corel*, 206 F.R.D. at 544 (finding

predominance "[b]ecause all plaintiffs base their claims on common questions of law or fact –

whether or not the defendants engaged in a course of conduct concerning the financial situation of

- 22 -

the company – the evidence offered in these cases will be nearly identical"). In fact, one would be hard pressed to find any issues relating to defendants' liability that are not common to all members of the Class. *Id.*; *see also Marsden*, 246 F.R.D. at 488 ("We find that common questions do predominate over individual questions of law or fact in this case. The factual and legal questions involved in proving the essential elements of the 10b-5 claim are common to all class members and eclipse any lesser individual questions."); *Herley*, 2009 U.S. Dist. LEXIS 91600, at *45 (same). Once these common questions are resolved, all that will remain is the purely mechanical act of computing the amount of damages suffered by each class member. As the court in *Loewen* articulated:

> Moreover, the predominant issues relate to all putative class members as individual defendants' alleged comprehensive scheme to defraud stockholders affected each putative member, the only divergence being the extent and calculation of damages as to each individual. ***These damages calculations will not require an enormous amount of additional information; upon settlement or resolution of the liability portion of the litigation, we can derive a formula for determining damages***.

233 F.R.D. at 167; *see also In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortgage Loan Litig.*, 418 F.3d 277, 305-06 (3d Cir. 2005) (same).

As set forth above, the element of reliance is the only element in a §10(b) action that has the potential to become an individual issue and, even then, only if each class member must prove actual reliance on defendants' false statements. However, the putative Class here is entitled to a rebuttable presumption of reliance because Lead Plaintiffs are able to demonstrate that Toll Brothers' securities traded in an "efficient" market. Thus, common issues related to defendants' fraudulent course of conduct predominate over any potential individual issues.

### a.      The Fraud-on-the-Market Presumption of Reliance

In a securities fraud case, "the 'fraud on the market' theory, operates to create a rebuttable presumption of reliance as to 'an investor who buys or sells securities at the price set by the market

- 23 -

[since that investor] does so in reliance on that market.'" *DVI*, 249 F.R.D. at 207 (quoting *Basic*,

485 U.S. at 247).   Under this theory:

> Lead Plaintiffs need not individually show that they, or any member of the class, knew of or relied upon the alleged misrepresentations.  "Instead, lead plaintiffs are accorded the presumption of reliance based on the theory that in an efficient market the misinformation directly affects the stock prices at which the investor trades and thus, through the inflated or deflated price, causes injury even in the absence of direct reliance."

*DVI*, 249 F.R.D. at 207-08 (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1419

n.8 (3d Cir. 1997) (citing *Basic*, 485 U.S. at 241-42)).[18]

The Third Circuit defines an "efficient market" "as one where 'information important to

reasonable investors . . . is immediately incorporated into stock prices.' [*Burlington Coat*], 114 F.3d

at 1425." *DVI*, 249 F.R.D. at 208.  As a guidepost for determining whether a plaintiff sufficiently

demonstrates a presumption of an efficient market for a particular security, recently, courts in this

District have looked to an expanded version of the *Cammer* factors.  *Id.*; *Herley*, 2009 U.S. Dist.

LEXIS 91600, at *46-*47 n.16 (citing *DVI*, 249 F.R.D. at 208).[19]  This non-exhaustive list of factors

is as follows:

> (1) whether [the stock was] publicly traded; (2) [the stock's] trading volume; (3) whether [it was] followed by market analysts; (4) if [it was] listed by several market makers; (5) whether [the stock was eligible to be filed] on SEC Form S-3; (6) if [the stock was] quick to respond to the release of company-specific information; (7) the

---

[18]    *See also Marsden*, 246 F.R.D. at 489 n.6 ("[T]he issue of whether the public knew about the coming regulatory changes could also relate to the element of reliance.  However, when the claim – such as Plaintiffs' claim here – involves a fraud-on-the-market theory, reliance is presumed.").

[19]    *Cf. Hayes v. Gross*, 982 F.2d 104, 107 n.1 (3d Cir. 1992) (noting that *Cammer* sets forth examples of factual allegations that "could support an inference that the market for a security was efficient"); *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 512 (1st Cir. 2005) (noting that "*Cammer* factors are not exhaustive, and are 'an analytical tool,' not 'a checklist'"); *In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 526 n.3 (N.D. Cal. 2009) (same); *Meckenstock v. Int'l Heritage, Inc.*, No. 5:98-CV-237-BR(2), 1998 U.S. Dist. LEXIS 21042, at *21 (E.D.N.C. Dec. 9, 1998) (same).

514252_1

size of [the company's] market capitalization; (8) the size of the public float for the security; (9) the ability to short sell the security; and (10) the level of autocorrelation.

*Id.*

As Lead Plaintiffs demonstrate below, because each of these market efficiency factors are present in regards to Toll Brothers' securities traded during the Class Period, the entire Class is entitled to a presumption of reliance.

> **b.    Toll Brothers' Stock Traded in an Efficient Market During the Class Period and, Therefore, the Entire Class Is Entitled to the Fraud-on-the-Market Presumption of Reliance**

Using these ten factors as relevant indicators of an efficient market, it becomes clear that during the Class Period, Toll Brothers' stock was traded in an efficient market. As a result, the entire Class is entitled to the Supreme Court's fraud-on-the-market's presumption of class-wide reliance. *DVI*, 249 F.R.D. at 207 (citing *Burlington Coat*, 114 F.3d at 1419 n.8 (citing *Basic*, 485 U.S. at 241-42)).

> **(1)    Toll Brothers' Stock Was Publicly Traded on the NYSE**

During the Class Period, Toll Brothers' common stock traded in an open and developed market. Specifically, Toll Brothers' stock traded on the NYSE, "the world's largest and most liquid stock exchange. Its infrastructure and participants allow it to provide a reliable, liquid, and efficient marketplace." Finnerty Decl., ¶¶55, 59-61. As a result, courts commonly find that this fact "strongly favors a finding of market efficiency" at class certification. *DVI*, 249 F.R.D. at 208 (noting "***neither Defendants nor this Court have been able to locate a single case where the market for a NYSE-traded security was deemed inefficient***"); *In re Rent-Way Sec. Litig.*, 218 F.R.D. 101, 118 (W.D. Pa. 2003) ("PwC does not seriously dispute that Rent-Way's stock, which was traded nationally on the New York Stock Exchange, was traded in an open and developed

market. . . . '[T]he *fraud on the market theory is particularly applicable to a large national market such as the NYSE . . . .'").[20]

### (2) Toll Brothers Had Substantial Reported Trading Volume During the Class Period

"High trading volume is often seen as indicative of efficiency because 'many investors are executing trades on the basis of newly available or disseminated corporate information.'" *DVI*, 249 F.R.D. at 208 (quoting *Cammer*, 711 F. Supp. at 1286). Turnover measured by average weekly trading volume of 2% or more of a company's outstanding shares support a strong presumption that the market for that company's stock was efficient. *Cammer*, 711 F. Supp. at 1293. Here, throughout the Class Period, the average weekly reported trading volume for Toll Brothers' common stock was 22,817,667 and its weekly trading volume averaged 14.80%, thereby providing a strong presumption of a "highly liquid and efficient market." Finnerty Decl., ¶19.

Looking at the annualized turnover ratio of Toll Brothers' common stock during the Class Period, Dr. Finnerty found further evidence that the market for the stock was efficient. The total number of Toll Brothers' shares traded during the Class Period was 1,108,006,300, and the average number of shares outstanding during the Class Period was 154,147,892. *Id.*, ¶20. Because the Class Period spans 0.92 years, the annualized turnover ratio was 783.16%, almost seven times the ratio for NYSE-listed common stocks during the same time period, again justifying a substantial presumption that the market for Toll Brothers' common stock was efficient. *Id.*[21]

---

[20]    *See also Cammer*, 711 F. Supp. at 1292 ("'We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges . . . .'") (quoting 4 Alan R. Bromberg & Lewis D. Lowenfels, *Securities Fraud and Commodities Fraud* §8.6 (Aug. 1988)).

[21]    The annualized turnover ratio is the annual reported trading volume divided by the number of shares outstanding. Finnerty Decl., ¶22.

### (3)   A Significant Number of Market Analysts
### Followed Toll Brothers During the Class Period

"Extensive coverage by securities analysts likewise indicates market efficiency, since the price of a company's security is often affected by analysts' reports of information learned through their own investigation and analysis." *DVI*, 249 F.R.D. at 209 (citing *Cammer*, 711 F. Supp. at 1286). From 2004 to 2005, at least 13 securities firms had stock analysts covering Toll Brothers. Finnerty Decl., ¶22. A significant amount of analyst coverage, such as this, is evidence that the market for Toll Brothers' common stock during the Class Period was efficient. *Id.*, ¶¶22-23; *see also DVI*, 249 F.R.D. at 209 (finding that this *Cammer* factor was met even though only three analysts covered DVI).[22]

### (4)   During the Class Period, Toll Brothers Had
### Several Market Makers

During the Class Period, Toll Brothers' common stock traded in an over-the-counter market as well as on the NYSE. Finnerty Decl., ¶25. The NYSE employs a single specialist that acts as the market maker for a given stock. *Id.*; *see also DVI*, 249 F.R.D. at 210 ("Because market makers are used only for securities traded on the NASDAQ or in the over-the-counter market, this factor is not relevant" to the NYSE.). However, often times there are also "third market makers" that "stand ready to buy and sell stocks listed on an exchange, such as the New York Stock Exchange." http://www.sec.gov/answers/mktmaker.htm; *see also Xcelera.com*, 430 F.3d at 515. Dr. Finnerty found such market makers to exist as numerous financial entities were actively buying and trading Toll Brothers' common stock during the Class Period, and notes that according to Bloomberg, there

---

[22]    *See also Hayes*, 982 F.2d at 107 (a security "actively followed during the class period by at least five market analysts whose reports were widely disseminated to the public" sufficiently alleges an efficient market); *Cammer*, 711 F. Supp. at 1283 n.30, 1285-86 (the existence of "'15 research reports on the Company'" during the class period constitutes "a significant number" and gives rise to an inference that the security traded in an efficient market).

were 19 market makers during this period for Toll Brothers' stock.  Finnerty Decl., ¶¶25, 58.  This large number of market makers facilitating trading in Toll Brothers' common stock indicates that the market during the Class Period was liquid and efficient.  *Id.*

**(5)     During the Class Period, Toll Brothers Was Eligible to File SEC Form S-3**

Eligibility to file on Form S-3 is indicative of market efficiency.  *See, e.g.*, *DVI*, 249 F.R.D. at 210.  "Form S-3, which incorporates by reference a company's prior public securities filings, 'is predicated on the [SEC's] belief that the market operates efficiently for these companies, *i.e.*, that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place.'"  *Id.* (quoting *Cammer*, 711 F. Supp. at 1284).  At the time of the *Cammer* opinion, the conditions for S-3 registration were that the Company filed financial reports with the SEC for 36 months, and had outstanding float over $150 million held by non-affiliates or $100 million of such float coupled with annual trading volume exceeding 3 million shares.  *Cammer*, 711 F. Supp. at 1271 n.5.  The rules today require 12 months of filings and that the public float of the company's common equity is $75 million or more.  *See* http://www.sec.gov/about/forms/forms-3.pdf.  Satisfying such conditions on filings and float, according to the *Cammer* court, indicates that the subject company would be well known in the marketplace and information about it would be readily available – fostering the efficiency of the market for the company's stock.  *Cammer*, 711 F. Supp. at 1271 n.5.  Because it was listed on the NYSE beginning on July 16, 1986 and continuing through, and past, the Class Period, Toll Brothers was eligible to file on Form S-3, which is indicative of market efficiency.  Finnerty Decl., ¶¶26-27.

### (6)     During the Class Period, Toll Brothers' Stock Price Was Quick to Respond to the Release of Company-Specific Information

"In considering the efficiency of the market for a security, courts often focus on whether the security's price reacted quickly to significant corporate events and disclosures. The *Cammer* court found this 'cause-and-effect' factor to be 'the essence of an efficient market and the foundation for the fraud on the market theory.'" *DVI*, 249 F.R.D. at 210 (quoting *Cammer*, 711 F. Supp. at 1287); *see also In re NetBank, Inc.*, 259 F.R.D. 656, 673 (N.D. Ga. 2009) ("'Evidence that unexpected corporate events or financial releases cause an immediate response in the price of a security has been considered "the most important *Cammer* factor."'"). Toll Brothers' stock price reacted immediately to a number of the Company's public disclosures as demonstrated by the event study performed by Dr. Finnerty, which supports the conclusion that Toll Brothers' stock traded in an efficient market.[23]

One example of Toll Brothers' stock reacting quickly to new information is Toll Brothers' release on November 8, 2005 of its preliminary earnings report for the Company's 4Q05 and F05. Finnerty Decl., ¶52. The defendants announced that Toll Brothers lowered guidance on both orders and earnings growth for F06, citing softening demand, moderating house prices, waning customer confidence and tougher regulatory requirements. *Id.* Instead of 20% growth next fiscal year (F06), Toll Brothers was withdrawing guidance. *Id.* Toll Brothers also announced lower than expected

---

[23]     *See, e.g.*, Finnerty Decl., ¶29 ("An event study is a standard statistical technique that financial economists use to determine whether a security's price reaction to a news announcement (or some other event) is statistically significant. . . . In order to focus on the impact of the company-specific news on the price of a security, one calculates a security's abnormal return around the time of the announcement. A security's abnormal return is the difference between the security's actual return and its expected return. A security's expected return is the return one would expect based on general stock market price movements and industry-related factors that are unrelated to the specific event that is being examined, as reflected in the changes in the prices of stocks of firms in the same industry. Once one has calculated a security's abnormal returns, one can use standard statistical tests to determine whether these abnormal returns are statistically significant."); *see also id*., ¶¶28-54.

order growth in the current quarter 4Q05. *Id.* Toll Brothers' common stock price was down sharply in electronic trading before the opening of the NYSE. *Id.* Furthermore, CEO Robert Toll stated, "'[t]he shortage of selling communities, coupled with some softening of demand in a number of markets, negatively impacted our contract results.'" *Id.* Following this news, several analysts issued reports lowering expectations and price targets for Toll Brothers, and the stock was downgraded to "Market Perform" from "Outperform" at Raymond James, while Deutsche Bank issued a stock alert suggesting a significant sell-off based on the new report. *Id.* A report issued by analyst Susquehanna Financial Group on November 9, 2005 pointed out that Toll Brothers' stock decline was due to information specific to Toll Brothers: "'The market's reaction to Toll's Orders and Revenue release speaks volumes. ***The disappointing outlook was quite a surprise*** . . . . ***Investors shocked by TOL's disappearing Order growth. 1% unit Order growth was completely unexpected***. ***The primary culprit was lack of community growth, which caught the Street off guard. We are very disappointed in how it transpired as well. By the company's own admission, management will typically know four to six months in advance whether a community will likely open on time. That takes us back to early summer***.'" ¶31; Finnerty Decl., ¶97 & n.127. This is but one example showing that Toll Brothers' stock price reacted quickly to new information. *See also* Finnerty Decl., ¶¶39-54, 83-97, 100.

Dr. Finnerty further determined that as a result of the weaker-than-expected earnings report, Toll Brothers' common stock fell 8.04%, net of industry or market declines on November 8, 2005, demonstrating how quickly Toll Brothers' stock reacted to firm specific information. *Id.*, ¶53.

### (7) Toll Brothers' Market Capitalization Supports a Finding of Market Efficiency

As the court in *DVI* articulated, "'[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations.'" 249

- 30 -

F.R.D. at 212 (quoting *Krogman v. Sterrit*, 202 F.R.D. 467, 478 (N.D. Tex. 2001)).  Toll Brothers'

market capitalization ranged from $3.5 billion to $7.9 billion during the Class Period.  Finnerty

Decl., ¶55.  This evidence strongly supports market efficiency.  *See DVI*, 249 F.R.D. at 212 (finding

market capitalization of $300 million and $12 million weighs in favor of market efficiency).[24]  As

Dr. Finnerty points out in his report, to be listed on the NYSE, the market capitalization of publicly

held equity must exceed $60 million.  Finnerty Decl., ¶55.  Toll Brothers' market capitalization *was*

*more than 50 times as large during the Class Period*.  *Id.*

### (8)    Toll Brothers' Public Float Supports a Finding of Market Efficiency

The public float of a company, defined as the percentage of a security held by the public as

opposed to company insiders, can also be a relevant indicator of market efficiency.  *DVI*, 249 F.R.D.

at 212 (citing *Krogman*, 202 F.R.D at 478).  "'Because insiders may have private information that is

not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less

likely to accurately reflect all available information about the security.'"  *Id.*   During the Class

Period, the percentage of outstanding shares held by insiders only ranged from 17% to 25%,

implying that Toll Brothers' common stock was mostly held by the public.  Finnerty Decl., ¶57.  As

Dr. Finnerty concludes, "[t]he size of the public float for Toll Brothers' common stock is consistent

with the hypothesis that the market for Toll Brothers' common stock was liquid and efficient during

the Class Period."  *Id.*

---

[24]    *NetBank*, 259 F.R.D. at 672 (finding market capitalization ranging between approximately $250 million and $430 million during the class period "weighs in favor of a determination of market efficiency"); *Schleicher v. Wendt*, No. 1:02-cv-1332-DFH-TAB, 2009 U.S. Dist. LEXIS 24810, at *19 (S.D. Ind. Mar. 20, 2009) (finding market efficiency based in part on the fact that "[t]he company's average market capitalization throughout the class period was $ 2.3 billion").

### (9)   The Ability to Short Sell Toll Brothers' Stock Supports a Finding of Market Efficiency

The ability to sell securities short is an indication of market efficiency.  *DVI*, 249 F.R.D. at 212-13.  Short selling allows investors with a negative outlook on a stock to trade on their views and have these negative views reflected in the demand and supply of the stock.  Throughout the Class Period, Toll Brothers' average short interest as a percentage of shares outstanding was 12.19%.  Finnerty Decl., ¶74.  Although this is "somewhat elevated" in comparison to the average short interest for a company on the NYSE, the level of short interest during the Class Period, coupled with the put-call parity test results found by Dr. Finnerty,[25] suggest that there was no issue with respect to selling shares short for Toll Brothers' common stock.  *See id.*, ¶¶63-74.  This evidence is consistent with market efficiency.  *Id.*, ¶74.

### (10)   No Evidence of Autocorrelation

Some courts look at whether the change in the stock price on one day provides an indication regarding the change in the stock price the following day, or autocorrelation.  *DVI*, 249 F.R.D. at 213.  Autocorrelation would weigh against market efficiency because it often exists "[i]f new information about a company is incorporated slowly into the price of a security."  *Id.*  As demonstrated above, new information about Toll Brothers was rapidly reflected and incorporated into the Company's stock price during the Class Period.  Further, Dr. Finnerty tested for autocorrelation, also known as serial correlation, and found that "there is no significant serial correlation evident in Toll Brothers' common stock returns during the Class Period."  Finnerty Decl.

---

[25]     *See* Finnerty Decl., ¶63 ("Put-call parity is a relationship that exists in an efficient market between the prices of a company's put and call options and the price of its common stock.  Testing whether put-call parity holds can assist in assessing whether the market for a company's common stock is efficient."); *see also id.*, ¶¶64-73.

¶82; *see also id.*, ¶¶75-81.  Thus, there is no evidence of autocorrelation, and the market for Toll

Brothers' stock was efficient.[26]

> **c.    Loss Causation Does Not Need to Be Demonstrated at**
> **Class Certification, but if the Court Decides to Require**
> **Such a Showing, Lead Plaintiffs Can Do so Sufficiently**

In the event that defendants assert that this action cannot be certified because Lead Plaintiffs

cannot show loss causation on a common basis throughout the Class Period, these assertions should

fail.  First, as courts in this Circuit and throughout the country have recognized, any attempt to

resolve loss causation at the class certification stage is improper.  *See, e.g.*, *DVI*, 249 F.R.D. at 219;

*Silverman v. Motorola, Inc.*, 259 F.R.D. 163, 171 (N.D. Ill. 2009); *Kelleher v. ADVO, Inc.*, No. 3:06

CV01422 (AVC), 2009 U.S. Dist. LEXIS 68914, at *21 n.5 (D. Conn. Mar. 30, 2009); *In re Credit

Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 30 (D. Mass. 2008); *Nursing Home Pension Fund v. Oracle

Corp.*, No. C01-00988 MJJ, 2006 U.S. Dist. LEXIS 94470, at *32 (N.D. Cal. Dec. 20, 2006); *In re

Priceline.com Inc. Sec. Litig.*, 236 F.R.D. 89, 94 (D. Conn. 2006); *In re Tyco Int'l, Ltd. Multidistrict

Litig.*, 236 F.R.D. 62, 71 (D.N.H. 2006); *Roth v. Aon Corp.*, 238 F.R.D. 603, 609 (N.D. Ill. 2006).[27]

---

[26]    The average bid-ask spread for Toll Brothers' common stock during the Class Period is further evidence of market efficiency.  As Dr. Finnerty explains, the bid-ask spread was $0.05 during the Class Period.  Finnerty Decl., ¶56.  This represented an average of 0.07% of the share price for Toll Brothers' common stock.  *Id.*  For the calendar year 2005, the average bid-ask spread for all ordinary common shares traded on the NYSE was 2.19%, and the median was 1.81%.  *Id.*  The fact that Toll Brothers' common stock had such a narrow bid-ask spread is indicative of a liquid and efficient market.  *Id.*

[27]    In *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007), the Fifth Circuit held that plaintiffs, in order to utilize the fraud-on-the-market presumption of reliance, need to prove loss causation by a preponderance of the evidence at class certification.  This is a mischaracterization of *Basic* and has likewise been rejected by district courts throughout the country. *See, e.g.*, *Alstom*, 253 F.R.D. at 280-81; *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 184-85 (S.D.N.Y. 2008); *Darquea v. Jarden Corp.*, No. 06 Civ. 722 (CLB), 2008 U.S. Dist. LEXIS 17747, at *11 (S.D.N.Y. Mar. 6, 2008); *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112 , 118-20 (S.D.N.Y. 2008); *In re Red Hat, Inc. Sec. Litig.*, 261 F.R.D. 83, 93-94 (E.D.N.C. 2009); *In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 107-08 (E.D. Va. 2009); *Schleicher*, 2009 U.S. Dist. LEXIS 24810, at *33-

In fact, the element of loss causation, which is clearly distinguishable from the element of reliance, is not an individual issue, but rather one that either exists or does not exist for the class as a whole and, therefore, is irrelevant to class certification. *Micron*, 247 F.R.D. at 634 ("Loss causation . . . is an issue related to the merits rather than to the Rule 23 inquiry into whether common issues will predominate."); *Hydrogen*, 552 F.3d at 307 (stating that a court must resolve all factual or legal disputes "***relevant*** to class certification").[28]

Second, any inquiry at class certification as to loss causation should only involve the determination of whether Lead Plaintiffs have a suitable methodology to demonstrate loss causation on a class-wide basis. *See Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 106-07 (S.D.N.Y. 2009) ("Plaintiffs need not show definitively that they will be able to demonstrate loss causation; rather, they must demonstrate that the element of loss causation may be proven class-wide, which may be shown by proposing a suitable methodology."). Here, Lead Plaintiffs' Complaint sets forth a loss

---

*40; *Conn. Ret. Plans & Trust Funds v. Amgen, Inc.*, No. CV 07-2536 PSG (PLAx), 2009 U.S. Dist. LEXIS 71653, at *33-*37 (C.D. Cal. Aug. 12, 2009); *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 578-79 (N.D. Cal. 2009); *LDK*, 255 F.R.D. at 530; *In re Micron Techs., Inc.*, 247 F.R.D. 627, 634 (D. Idaho 2007); *In re Nature's Sunshine Prods. Sec. Litig.*, 251 F.R.D. 656, 665 (D. Utah 2008); *NetBank*, 259 F.R.D. at 675 n.5; *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 283 (N.D. Ala. 2009). As the dissent in *Oscar* articulated, "the majority departs drastically from the Supreme Court's decision in *Basic* . . . , which held that securities class action plaintiffs are entitled to a rebuttable presumption of reliance, or transaction causation, if the plaintiffs traded in the stock at issue during the proposed class period in reliance on the integrity of the price set by an open and efficient market." 487 F.3d at 272 (Dennis, J., dissenting).

[28]    *See also LDK*, 255 F.R.D. at 531 ("In a case like this one, if fraud did inflate the market and subsequently cause market losses, some appropriately defined group of investors who traded at pertinent times are likely to share common claims with respect to those losses. Defining the precise contours of the class is a separate, and potentially challenging, inquiry, as explained above, but that is no reason to eliminate the presumption and deny certification across the board. If fraud did not inflate the market and subsequently cause losses, the plaintiff will simply have failed to prove the merits of the case. ***Either way, it is unclear how proof of loss causation becomes a prerequisite to Rule 23 certification***. *Not surprisingly, most if not all courts outside of the Fifth Circuit that have considered the issue have rejected the requirement. This order does the same*.").

causation theory based on Company-specific fraud-related disclosures that caused a decline in Toll Brothers' stock price and losses for all investors. *See* ¶¶27-31, 94-131, 151-158. Furthermore, although not required, Dr. Finnerty, through the use of an event study, a methodology approved by countless courts throughout the country, demonstrates that investors who purchased Toll Brothers' stock during the Class Period at inflated prices due to defendants' misrepresentations and omissions, then suffered losses when the truth was disclosed and Toll Brothers' stock price declined. Finnerty Decl., ¶¶83-97, 102.

Plaintiffs have proposed a suitable methodology for proving loss causation on a class-wide basis. Nothing further is required at this stage. Thus, all class members suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and, as such, any forthcoming challenge as to loss causation should be rejected.

### 2.    A Class Action Is Superior to Other Available Methods for Resolving This Controversy

Rule 23(b)(3) also requires the Court to determine that "a class action is superior to other available methods for fairly and efficiently adjudicating of the controversy." Fed. R. Civ. P. 23(b)(3). Courts have recognized that the class action device is superior to other available methods for the fair and efficient adjudication of controversies involving a large number of purchasers of securities injured by violations of the securities laws. As mentioned above, this Circuit recognizes that class actions are clearly the preferred mechanism for adjudicating securities fraud cases. *DVI*, 249 F.R.D. at 200 (viewing the class action tool as "'particularly appropriate and desirable means to resolve claims based on the securities laws, since the effectiveness of the securities laws may depend in large measure on the application of the class action device'") (quoting *Yang*, 392 F.3d at 109) . Here, class certification is both useful and necessary, and the class action device offers judicial efficiencies because it permits common claims and issues to be tried only once, with binding effect on all parties. *See also Lachance*, 1996 U.S. Dist. LEXIS 5688, at *15 ("class treatment of securities

- 35 -

law claims is not only fair to putative class members, it is also generally necessary to any vindication of their rights").

To determine the issue of "superiority," Rule 23(b)(3) enumerates the following factors for the court to consider:

> (A)  the . . . interests [of members of the class] in individually controlling the prosecution . . . of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by . . . members [of the class];
> (C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties [to be encountered] in managing a class action.

Fed. R. Civ. P. 23(b)(3).  Each of these factors is satisfied in this case.  The number of class members is far too numerous and the typical claim is too small for each individual class member to maintain a separate action.  *Wellbutrin*, 2008 U.S. Dist. LEXIS 36719, at *39 ("'[T]he cost associated with individual claims may require claimants with potentially small claim amounts to abandon otherwise valid claims simply because pursuing those claims would not be economical.  This in turn would result in unjustly enriching the Defendants; precisely the result [federal securities] laws are designed to remedy.'").

Further, the nationwide geographical dispersion of the class members, based upon Toll Brothers' sale of its stock on a national exchange, makes it desirable that litigation of the claims involved be concentrated in this forum.  *See Loewen*, 233 F.R.D. at 162 (finding numerosity and joinder impracticable where "[m]illions of shares were traded during the class period by thousands of geographically-diverse shareholders" even though "the exact number of shareholders has not been determined").

Finally, Lead Plaintiffs can foresee no management difficulties which would preclude this action from being maintained as a class action and is confident that any potential management problems can be addressed and resolved by the parties or by the Court.  In any event, possible

- 36 -

management problems are not, standing alone, grounds for denying this Motion.  *See, e.g.*, *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 356 (E.D. Pa. 1976) ("[D]enial of class certification because of suspected manageability problems is disfavored among both the courts and the legal commentators because a court refusing to certify a class action on the basis of vaguely perceived manageability obstacles is acting counter to the policy behind Rule 23, and because that court is discounting unduly its power and creativity in dealing with a class action flexibly as difficulties arise.").

## IV.     CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request entry of an order certifying this action as a class action pursuant to Rule 23 and appointing Lead Plaintiffs Hialeah and Laborers as class representatives and Co-Lead Counsel as counsel for the Class.

DATED:  May 14, 2010                          Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN
SPENCER A. BURKHOLZ
SHANNON M. MATERA
MATTHEW I. ALPERT


                         s/ SPENCER A. BURKHOLZ
                    SPENCER A. BURKHOLZ

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

- 37 -

514252_1

BERGER & MONTAGUE, P.C.
SHERRIE R. SAVETT
BARBARA A. PODELL
RUSSELL D. PAUL
1622 Locust Street
Philadelphia, PA  19103
Telephone:  215/875-3000
215/875-4604 (fax)

Co-Lead Counsel for Plaintiffs

CYPEN & CYPEN
STEPHEN H. CYPEN
777 Arthur Godfrey Road, Suite 320
Miami Beach, FL  33140
Telephone:  305/532-3200
305/535-0050 (fax)

WEINBERG ROGER & ROSENFELD, P.C.
BARRY HINKLE
1001 Marina Village Parkway, Suite 200
Alameda, CA  94501
Telephone:  510/337-1001
510/337-1023 (fax)

Additional Counsel for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 14, 2010.

s/ SPENCER A. BURKHOLZ
SPENCER A. BURKHOLZ

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  SpenceB@rgrdlaw.com

# Mailing Information for a Case 2:07-cv-01513-CDJ

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **MATTHEW ALPERT**
  malpert@csgrr.com,e_file_sd@csgrr.com

- **LAURA ANDRACCHIO**
  lauraa@csgrr.com,e_file_sd@csgrr.com

- **ALEXANDER BILUS**
  sandy.bilus@dechert.com

- **SPENCER A. BURKHOLZ**
  spenceb@lerachlaw.com,e_file_sd@lerachlaw.com

- **MICHAEL P. CARROLL**
  michael.carroll@davispolk.com

- **ANTHONY WARNER CLARK**
  anthony.clark@skadden.com

- **WILLIAM F. CLARKE , JR**
  william.clarke@skadden.com

- **STEVEN B. FEIRSON**
  steven.feirson@dechert.com

- **DANIEL M. GONEN**
  daniel.gonen@skadden.com

- **ROBERT C. HEIM**
  robert.heim@dechert.com,lisa.ricchezzs@dechert.com

- **MICHAEL L. KICHLINE**
  michael.kichline@dechert.com,lisa.ricchezza@dechert.com

- **KIMBERLY A. LAMAINA**
  klamaina@skadden.com,dlmlcwas@skadden.com

- **CHRISTOPHER P. MALLOY**
  christopher.malloy@skadden.com,paris.abell@skadden.com,jason.skorupka@skadden.com

- **RAJESH RAY MANDLEKAR**
  raym@csgrr.com,e_file_sd@csgrr.com

- **JONATHAN D. MARTIN**
  jonathan.martin@davispolk.com,ecf.ct.papers@dpw.com,seth.caffrey@davispolk.com,kevin.vanlandingham@dpw.com

- **SHANNON MCKENNA MATERA**
  SMatera@csgrr.com,e_file_sd@csgrr.com

- **MICHAEL J. NEWMAN**
  michael.newman@dechert.com,lisa.ricchezza@dechert.com

- **ALYSON M. OSWALD**
  alyson.oswald@dechert.com,lisa.ricchezza@dechert.com

- **RUSSELL D. PAUL**
  rpaul@bm.net,kwalker@bm.net,lbauer@bm.net

- **BARBARA A. PODELL**
  bpodell@bm.net,emagnus@bm.net

- **EDMUND POLUBINSKI , III**
  edmund.polubinski@davispolk.com

- **SHERRIE R. SAVETT**
  ssavett@bm.net,sdavis@bm.net,mgatter@bm.net

- **ROBERT E. ZIMET**
  robert.zimet@skadden.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)