UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE CITY OF HIALEAH EMPLOYEES'
RETIREMENT SYSTEM and LABORERS
PENSION TRUST FUNDS FOR NORTHERN
CALIFORNIA, On Behalf of Themselves and
All Others Similarly Situated,

                Civil Action No. 07-1513

            Plaintiffs,

                Honorable C. Darnell Jones II

       - against -

TOLL BROTHERS, INC., et al.,

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

June 15, 2010

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ...........................................................................................................5

    A.    Factual Background ..................................................................................5

        1.    Toll Brothers' Forecasts for FY2005 and FY2006 ......................................5

        2.    The Gap Between Analysts' Expectations and the Company's Forecasts ........................................................................................7

        3.    The Cooling in the Housing Market at the End of FY2005 .........................8

    B.    Procedural History ..................................................................................11

STANDARDS FOR CLASS CERTIFICATION ..............................................................12

ARGUMENT ..............................................................................................................14

I.    PLAINTIFFS CANNOT ESTABLISH PREDOMINANCE BECAUSE THEY CANNOT RELY ON THE FRAUD-ON-THE-MARKET PRESUMPTION ..................14

    A.    The Fraud-on-the-Market Presumption Is Not Applicable Where the Alleged Fraud Did Not Affect a Company's Stock Price ....................................15

    B.    There Is No Link Between Toll Brothers' Stock Price and the Alleged Misrepresentations ..................................................................................19

        1.    Because Toll Brothers' Forecasts During the Alleged Class Period Were Always Below or Within Its Concededly Non-Fraudulent Forecast After the Close of the Class Period, They Neither Artificially Inflated the Company's Stock Price Nor Caused Its Stock Price to Decline ..............................................................................20

        2.    Movements in Toll Brothers' Stock Price During the Alleged Class Period Are Best Explained By the Divergence of Analyst Expectations From the Company's Own Forecasts ....................................23

        3.    Plaintiffs' Expert Cannot Establish a Link Between the Alleged Misstatements and Toll Brothers' Stock Price ..............................................27

II.  PLAINTIFFS PROVIDE NO BASIS FOR THE COURT TO DETERMINE AN
     APPROPRIATE CLASS PERIOD ...................................................................................30

III. PLAINTIFFS CANNOT SATISFY THE ADEQUACY AND TYPICALITY
     REQUIREMENTS OF RULE 23(a) .................................................................................31

     A.  Plaintiffs Are Not Adequate Because They Do Not Function as a "Group"
         Under the PSLRA ................................................................................................31

     B.  Plaintiffs Are Atypical Because They Are Subject to Unique Defenses ...............35

CONCLUSION ...........................................................................................................................38

## TABLE OF AUTHORITIES

### Cases

PAGE

Alaska Elec. Pension Fund v. Pharmacia Corp., 554 F.3d 342 (3d Cir. 2009)............................16

Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997) .........................................................13, 14

Basic Inc. v. Levinson, 485 U.S. 224 (1988) ....................................................................... passim

Beck v. Maximus, Inc., 457 F.3d 291 (3d Cir. 2006) ...................................................................31

In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3d Cir. 1997) ............................ passim

In re CIGNA Corp. Sec. Litig., 459 F. Supp. 2d 338 (E.D. Pa. 2006) .........................................30

In re Cendant Corp., 260 F.3d 183 (3d Cir. 2001)................................................................33, 34

In re Cendant Corp. Litig., 264 F.3d 201 (3d Cir. 2001)..................................................31, 32, 33

In re Constar Int'l Inc. Sec. Litig., 585 F.3d 774 (3d Cir. 2009) ..................................................13

In re DVI Inc. Sec. Litig., 249 F.R.D. 196 (E.D. Pa. 2008)...............................................2, 17, 23

Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147 (1982) ..................................................................12

In re Herley Indus. Inc. Sec. Litig.,
    No. 06-2596, 2009 WL 3169888 (E.D. Pa. Sept. 30, 2009)...................................................34

In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305 (3d Cir. 2008)................................ passim

Institutional Investors Group v. Avaya, Inc., 564 F.3d 242 (3d Cir. 2009)...............................1, 14

Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147 (2d Cir. 2007) ..............................................26

In re Loewen Sec. Litig., 233 F.R.D. 154 (E.D. Pa. 2005)......................................................17, 18

Malack v. BDO Seidman, LLP,
    No. 08-0784, 2009 WL 2393933 (E.D. Pa. Aug. 3, 2009) ...............................................13, 14

Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154 (3d Cir. 2001) ..........16, 17

Oran v. Stafford, 226 F.3d 275 (3d Cir. 2000) ...........................................................................16

<u>Oscar Private Equity Invs. v. Allegiance Telecom, Inc.</u>, 487 F.3d 261 (5th Cir. 2007)...............19

<u>In re Party City Sec. Litig.</u>, 189 F.R.D. 91, 106 (D.N.J. 1999) ....................................31

<u>Peil v. Speiser</u>, 806 F.2d 1154 (3d Cir. 1986) ................................................15, 16, 17

<u>In re Razorfish, Inc. Sec. Litig.</u>, 143 F. Supp. 2d 304 (S.D.N.Y. 2001)........................33

<u>In re Regal Commc'ns Corp. Sec. Litig.</u>,
    No. 94-179, 1995 U.S. Dist. LEXIS 13492 (E.D. Pa. Sept. 12, 1995) ...................................37

<u>In re Safeguard Scientifics</u>, 216 F.R.D. 577 (E.D. Pa. 2003) ..................................36, 37

<u>In re Salomon Analyst Metromedia Litig.</u>, 544 F.3d 474 (2d Cir. 2008) ......................................18

<u>In re Schering Plough Corp. ERISA Litig.</u>, 589 F.3d 585 (3d Cir. 2009) .........................30, 31, 35

<u>Semerenko v. Cendant Corp.</u>, 223 F.3d 165 (3d Cir. 2000) ........................................17

<u>Smith v. Suprema Specialties, Inc.</u>, 206 F. Supp. 2d 627 (D.N.J. 2002)..........................31, 32, 33

<u>United States v. Schiff</u>, 602 F.3d 152 (3d Cir. 2010) ....................................29

<u>Zlotnick  v. Tie Commc'ns</u>, 836 F.2d 818 (3d Cir. 1988) ....................................16, 17

<u>S</u>TATUTES & <u>R</u>ULES

17 C.F.R. § 240.10b-5...............................................................................14

28 U.S.C. § 1292(b) ...............................................................................11

Fed. R. Civ. P. 12(c) ...............................................................................11

Fed. R. Civ. P. 23 ...............................................................................1, 18

Fed. R. Civ. P. 23(a) ...............................................................................4, 12

Fed. R. Civ. P. 23(b)(3)...............................................................................1, 12, 13, 14

<u>O</u>THER <u>A</u>UTHORITIES

Frederic C. Dunbar & Dana Heller, <u>Fraud on the Market Meets Behavioral Finance</u>,
    31 Del. J. Corp. L. 455 (2006) ...............................................................................36

Defendants Toll Brothers, Inc. ("Toll Brothers" or "the Company"), Bruce E. Toll, Robert I. Toll, Zvi Barzilay, Robert S. Blank, Joel H. Rassman, Richard Braemer, Paul E. Shapiro, Carl B. Marbach, and Joseph R. Sicree respectfully submit this memorandum of law in opposition to the motion by Plaintiffs City of Hialeah Employees' Retirement System ("Hialeah") and Laborers Pension Trust Fund for Northern California ("Laborers") for class certification pursuant to Federal Rule of Civil Procedure 23.

## PRELIMINARY STATEMENT

Plaintiffs' motion for class certification must be denied because Plaintiffs cannot establish that common issues predominate over individual issues, as they must under Federal Rule of Civil Procedure 23(b)(3). A necessary element of every securities action is reliance – proof that Plaintiffs <u>relied on</u> an alleged misstatement or omission in deciding to purchase a security. <u>Institutional Investors Group v. Avaya, Inc.</u>, 564 F.3d 242, 251 (3d Cir. 2009). Unless Plaintiffs can prove reliance on a class-wide basis, a court cannot certify a class of securities purchasers because individual issues of reliance would overwhelm any common issues. <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 242 (1988).

Plaintiffs here seek to clear that hurdle by invoking the "fraud-on-the-market" presumption: the rebuttable presumption that, in an efficient securities market, misleading statements will be presumed to affect the price of a security, thereby defrauding purchasers whether or not they themselves relied on the misleading statement in purchasing the security. (Memorandum of Law in Support of Lead Plaintiffs' Motion for Class Certification ("Pls.' Mem.") at 23-35.) It is, however, black letter law that the fraud-on-the-market presumption is not available when the alleged fraud did <u>not</u> affect the stock price. <u>Basic</u>, 485 U.S. at 248. Indeed, Plaintiffs themselves concede that the presumption – whether or not it is available here – is rebuttable. (<u>See, e.g.</u>, Pls.' Mem. at 3, 23.) And a long line of cases, starting with the

Supreme Court in <u>Basic</u>, hold that the presumption "can be vitiated by showing that the price

was unaffected by the fraud." <u>In re DVI Inc. Sec. Litig.</u>, 249 F.R.D. 196, 203 (E.D. Pa. 2008)

(internal quotation marks and citation omitted).  That is precisely what the unique record in this

case demonstrates: that the alleged fraud did not affect Toll Brothers' stock price.

   The core of Plaintiffs' claim is the allegation that – between December 9, 2004 and

November 8, 2005 (the "Alleged Class Period") – Defendants inflated Toll Brothers' stock price

by issuing allegedly false and misleading forecasts of the Company's future growth.  Plaintiffs

do not allege that Toll Brothers' forecasts for growth in its then-current fiscal year 2005

("FY2005")[1] were fraudulent.  Instead, Plaintiffs claim that Defendants somehow knew that their

forecasts of 20% year-over-year income growth for the <u>following</u> fiscal years – principally 2006

("FY2006") – lacked a reasonable basis when made.  Plaintiffs claim that investors who bought

stock during the Alleged Class Period at allegedly inflated prices were then injured when these

supposed misrepresentations were purportedly revealed on four "corrective disclosure" dates –

August 4, August 25, October 3, and November 8, 2005 – on which the Company's stock price

declined.

   Although the Third Circuit "requires a thorough examination of the factual and legal

allegations" on class certification, including consideration of competing expert testimony, <u>In re</u>

<u>Hydrogen Peroxide Antitrust Litig.</u>, 552 F.3d 305, 317 (3d Cir. 2008) (internal quotation marks

omitted), the record here is largely undisputed and the analysis remarkably straightforward.

Defendants' expert – Professor Michael R. Gibbons, the Deputy Dean and Professor of

Investment Banking at the Wharton School of the University of Pennsylvania – makes the

---

[1] Toll Brothers' fiscal year ends on October 31.

following basic economic observations, neither of which can be genuinely disputed by Plaintiffs'

retained economist:

- <u>First</u>, when converted from percentage terms to dollar terms – a simple step both experts agree the market would have taken – Toll Brothers' forecasts during the Alleged Class Period were at all times <u>below or within</u> the concededly non-fraudulent forecast the Company provided immediately after the Alleged Class Period ended.  Because the Company never reduced its FY2006 guidance during or immediately after the Alleged Class Period, the Company's forecasts could not – as a matter of basic economic logic – have caused the declines in Toll Brothers' stock price between August and November 2005 for which Plaintiffs seek to recover.

- <u>Second</u>, Toll Brothers' own forecasts during the Alleged Class Period were at all times <u>below</u> market expectations – often substantially below.  As Plaintiffs' own expert conceded, market expectations (and, in turn, the Company's stock price) would have been driven by the forecasts of independent securities analysts who studied the Company.  Consensus forecasts of Toll Brothers' FY2006 net income by those independent securities analysts were at all times higher than the Company's own forecasts.  As Plaintiffs' expert observed, it was only after the last alleged corrective disclosure that analysts' forecasts came to approximate the Company's, and even then analysts' predictions for FY2006 were higher than any the Company had ever given.  During the Alleged Class Period, therefore, the market was demonstrably ignoring the Company's lower guidance in favor of the independent analysts' much more aggressive forecasts.

In view of these two observations, Professor Gibbons concludes that Plaintiffs cannot

establish <u>either</u> that Toll Brothers' stock price was artificially inflated by the alleged

misrepresentations in the Amended Complaint <u>or</u> that the purported "corrective disclosures"

caused any declines in Toll Brothers' stock price.  Though Plaintiffs' expert had not, until his

deposition, performed either of the straightforward economic comparisons described above, he

did not dispute the validity of these conclusions.  And the analysis Plaintiffs' expert performed in

his report – which did <u>not</u> consider whether Toll Brothers' stock price was artificially inflated or

what factors caused the stock price declines at issue – was directed to a wholly different

question.

Therefore, under <u>Basic</u> and a host of cases in the Third Circuit, the record here conclusively rebuts the fraud-on-the-market presumption.  Although the same record may also prevent Plaintiffs from meeting their burden of proving loss causation (a separate required element of their case) on the merits (Pls.' Mem. at 33-35), the legal issue here is different.  In this case, the issue is whether Plaintiffs can prove reliance on a class-wide basis – precisely the sort of question that, under the Third Circuit's opinion in <u>Hydrogen Peroxide</u>, courts must consider rigorously on class certification, even if there is some overlap with the merits.  Because the record here conclusively establishes under well-settled law that the fraud-on-the-market presumption has been rebutted, reliance cannot be proved on a class-wide basis, and class certification must be denied.

Separately, Plaintiffs also fail to meet their burden on two of Rule 23(a)'s requirements – adequacy and typicality – because Plaintiffs are incapable of serving as adequate and typical representatives of the class.  The PSLRA bars them from serving together because they are not a "group" that can or will act as an agent for the class; indeed, since the Amended Complaint was filed, Plaintiffs have spoken together <u>once</u>, for a matter of minutes, and have otherwise ceded all control over this litigation to their lawyers.  Plaintiffs also cannot serve separately because each is subject to unique defenses that would be the focus of the litigation going forward.  In fact, one of their investment managers, who was responsible for purchasing Toll Brothers stock, expressly disavowed Plaintiffs' theory of loss causation, concluding that the decline in Toll Brothers' stock price during the Alleged Class Period was caused by market forces and not by anything attributable to Toll Brothers.  For those reasons too, Plaintiffs' motion for class certification must be denied.

# BACKGROUND

## A.      Factual Background

Toll Brothers is a home builder, founded in 1967 by Defendants Robert and Bruce Toll and headquartered in Horsham, Pennsylvania.  Historically, Toll Brothers had thrived in both strong and weak housing markets.  As it reported in its 2004 Annual Report, "[s]ince going public in 1986, we have averaged more than 20% compound annual growth in net income, revenues, contracts, backlog and shareholders' equity."  2004 Annual Report, at 5 (Ex. 1).[2]

### 1.      Toll Brothers' Forecasts for FY2005 and FY2006

The Company's fiscal year 2005, which ended on October 31, 2005, proved to be exceptionally strong.  And it got stronger and stronger as the fiscal year went on.

In August 2004, the Company predicted that its FY2005 net income would grow 30% over its net income for 2004.  Press Release, Aug. 25, 2004, at 1 (Ex. 2).  As additional information and actual results from 2004 became available, Toll Brothers revised its projection upward for FY2005 several times during the year, first to 40% year-over-year net income growth in December 2004, then to 60% in the following February, then to 70% in May, and finally to 80% in August 2005, three months before the end of the fiscal year.  Press Releases, Dec. 9, 2004, at 1 (Ex. 3); Feb. 23, 2005, at 1 (Ex. 4); May 26, 2005, at 1 (Ex. 5); Aug. 25, 2005, at 2 (Ex. 6).  Ultimately, Toll Brothers outperformed even its final estimate for 2005, achieving 97% net income growth over the previous year.  Press Release, Dec. 8, 2005, at 1 (Ex. 7).

During FY2005, as Toll Brothers was revising its forecasts for FY2005 upwards, the Company was also issuing forecasts of approximately 20% year-over-year net income growth for FY2006 – in other words, it was predicting that its net income for FY2006 would be 20% higher

---

[2] Exhibits cited in this memorandum are attached to the Declaration of Edmund Polubinski III in Support of Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification.

than its predicted net income for FY2005.  The following chart shows the Company's FY2005 and FY2006 forecasts in dollar terms:

| | | | | | |
|---|---|---|---|---|---|
| **Figure 1**<br>**Toll Brothers' 2005 and 2006 Net Income Guidance**<br>(*dollar figures in millions*) | | | | | |
| **Date** | **2005 Guidance** | **2006 Guidance** | **2004 Actual** | **2005 Estimate** | **2006 Estimate** |
| **Guidance Provided During Alleged Class Period** | | | | | |
| 12/9/04 | 40% growth from 2004 | At least 20% growth from 2005E | $409.1 | $572.8 | **$687.31** |
| 2/23/05 | 60% growth from 2004 | Approximately 20% growth from 2005E | $409.1 | $654.6 | **$785.49** |
| 5/26/05 | 70% growth from 2004 | Approximately 20% growth from 2005E | $409.1 | $695.5 | **$834.59** |
| 8/25/05 | 80% growth from 2004 | Approximately 20% growth from 2005E | $409.1 | $736.4 | **$883.68** |
| **Guidance Provided Immediately Following Close of Alleged Class Period** | | | | | |
| 12/8/05 | 97% actual growth | $810 - $890 | $409.1 | $806.1 (actual) | **$810 - $890** |

As Figure 1 illustrates, the increases in the Company's FY2005 forecasts had the effect of increasing the 20% FY2006 net income predictions in dollar terms correspondingly.  (Cf. Am. Compl. ¶¶ 20, 68(e), 92(e), 105, 129(g).)   Specifically, the Company's forecasts for FY2006 grew during the Alleged Class Period from $687.31 million on December 9, 2004 to $883.68 million on August 25, 2005.

At the end of the Alleged Class Period, on November 8, 2005 – in the face of a substantial and unexpected increase in FY2005 net income and increased economic uncertainty – the Company did not predict a further 20% increase for FY2006.  It deferred providing FY2006 net income guidance at that time, indicating that it would do so on December 8, 2005, when it released final results for FY2005.  On December 8, 2005, the Company announced in dollar

terms that it expected to achieve between $810 million and $890 million net income in 2006.[3]
Plaintiffs do not allege that this projection was false or misleading.  Press Release, Dec. 8, 2005,
at 1-2 (Ex. 7).

      **2.**      **The Gap Between Analysts' Expectations and the Company's Forecasts**

Throughout the Alleged Class Period, independent securities analysts always predicted
more net income for Toll Brothers in FY2006 than did the Company.  Securities analysts made
these aggressive predictions – well in excess of Toll Brothers' own forecasts – even after the
alleged "partial disclosures" in August 2005 about demand in some local markets and traffic.
Conf. Calls, Aug. 4, 2005, at 3 (Ex. 8); Aug. 25, 2005, at 15 (Ex. 9).  On these two alleged
"partial disclosure" dates – August 4 and August 25, 2005 – the Company in fact either reiterated
or increased its prior forecasts for FY2006.  Press Releases, Aug. 4, 2005, at 1 (Ex. 10); Aug. 25,
2005, at 1 (Ex. 6).  And insofar as there was a negative reaction to those announcements, it
reflected the disappointment of analysts and investors who considered the Company's 2006
projection to be too <u>conservative</u>.[4]  As shown in Figure 2, even after the two alleged partial
disclosures in August 2005, the average consensus analyst forecast for 2006 net income was
$983.90 million – approximately $100 million higher than the Company's own stated estimates
had ever been.

---

[3] In August 2005, the Company had also provided preliminary guidance for fiscal year 2007 ("FY2007").
In December 2005, the Company declined to provide guidance as to FY2007, noting that in view of the uncertain
economic environment, actual results for FY2007 "could prove better or worse" than 20% year-over-year growth.
Press Release, Dec. 8, 2005, at 2 (Ex. 7).

[4] Indeed, Dow Jones reported that "[i]nvestors appeared to react to this disappointment by selling off the
stock."  Janet Morrissey, <u>Update: Toll 3Q Net Doubles On Wider Margins</u>, Dow Jones Newswires, Aug. 25, 2005,
at 1 (attributing the price drop to the market's disappointment with Toll Brothers' refusal to increase its 2006
guidance) (Ex. 11).

| | Figure 2 | | |
|---|---|---|---|
| | **Toll Brothers' and Analysts' 2006 Net Income Estimates[5]** | | |
| | *(dollar figures in millions)* | | |
| **Date** | **Toll Brothers Estimates** | **Analyst Consensus Estimates** | **Difference Between Analyst and Company Estimates** |
| **During Alleged Class Period** | | | |
| 12/9/04 | $687.31 | $700.10 | $12.79 |
| 2/23/05 | $785.49 | $824.49 | $39.00 |
| 5/26/05 | $834.59 | $883.38 | $48.79 |
| 8/4/05 | $834.59 | $946.17 | $111.58 |
| 8/25/05 | $883.68 | $983.90 | $100.22 |
| 10/3/05 | $883.68 | $967.31 | $83.63 |
| **At Close of Alleged Class Period** | | | |
| 11/8/05 | | $897.15 | |

In an August 25, 2005 Wachovia report cited by Plaintiffs' expert, analysts pointedly observed that Toll Brothers' "conservatism" in its FY2006 guidance was "apparently unmatched by a number of other analysts based on their 2006 estimates."  Wachovia Securities, <u>TOL: Q3 EPS Of $1.27 Exceeds Our $1.18 Estimate</u>, Aug. 25, 2005, at 4 (Ex. 12).  Noting that the "2006 [analyst] EPS consensus is approximately 10% higher than our forecast of $5.15," the Wachovia analysts stated that, in choosing not to increase its forecasts further, "[p]erhaps TOL is also attempting to reset some more aggressive Street expectations."  <u>Id.</u>

### 3.      The Cooling in the Housing Market at the End of FY2005

The housing market began to cool off in the fall of 2005.  Robert Toll told *USA Today* that "I think we've got a general slowdown in most of the markets," resulting in a 10 percent decline in building activity.  Ron Insana, <u>Home Builder Optimistic in His Outlook for Market</u>,

---

[5] The numbers reported in Figure 2 are taken from Table 3 in the Gibbons Declaration.  (Gibbons Decl. ¶ 28.)

USA Today, Oct. 3, 2005, at 4B (Ex. 13).  He cautioned, however, that he was not suggesting it was unreasonable to expect continued growth; nevertheless, he said "it's not the overheated market you had maybe three months ago to a year and a half ago, but that you still have a very good market."  Id.  He reiterated that Toll Brothers expected 80% growth for 2005, and approximately 20% in 2006.  Id.

On November 8, 2005, the Company reported that it had shattered its latest expectations for FY2005; in particular, the Company reported that its revenues since its last forecast "were the highest for any quarter in our history."  Press Release, Nov. 8, 2005, at 1 (Ex. 14).  But the Company also noted that, in the face of these extraordinary results for FY2005 and increasingly uncertain markets in the months following Hurricane Katrina, it would not predict an additional 20% year-over-year growth for FY2006; it said it would provide further guidance for FY2006 the following month.  Id. at 1-2.  The Company noted a number of factors that accounted for its uncertainty about FY2006, including that some sales that were projected to close in 2006 had closed unexpectedly at the end of 2005, thus causing some of the projected growth of 2006 to occur in 2005 instead.  Id. at 1.

On December 8, 2005, Toll Brothers confirmed its extraordinary results for 2005:  its actual net income of $806 million represented 97% growth over 2004, compared with its most recent estimate of 80% year-over-year growth.  As noted above, the Company also provided its new guidance for 2006 net income of $810 million to $890 million in dollar terms.  Press Release, Dec. 8, 2005, at 1-2 (Ex. 7).  Though not mentioned in the Amended Complaint, the guidance Toll Brothers provided in December 2005 was thus substantially the same as the guidance the Company had provided in August 2005 (when 20% growth over the then-current

9

estimate for 2005 equated to net income in 2006 of $883.68 million) and substantially <u>higher</u> than its FY2006 guidance for most of the Alleged Class Period.  <u>See</u> <u>supra</u> Fig. 1.

In the wake of the November 8, 2005 announcement, the analysts and the market reacted swiftly by reducing their own inflated forecasts, which were far in excess of anything the Company had ever predicted.  The average analyst net income forecast for 2006 was reduced to $897.15 million.  <u>See</u> <u>supra</u> Fig. 2.  While still higher than the Company's projections were <u>at any point in time</u>, the analysts' new consensus estimate was significantly lower than their prior estimate of $967.31 million.  <u>Id.</u>  In other words, the analysts finally adjusted their expectations to more closely match the guidance the Company had been providing all along.  Significantly, none of the analysts or news organizations gave any indication that the Company had revealed anything other than its current assessment based on the information then available.

In total, consensus analyst estimates fell by 7.25% between October and November 2005.  This percentage drop was remarkably similar to the net 8.04% stock price drop – the negative abnormal return – that occurred on November 8, 2005, which Plaintiffs' expert concludes was unique to Toll Brothers.  (Finnerty Decl. at ¶ 10.)

Of course, the residential housing market did ultimately decline in 2006 and the years that followed, and Toll Brothers' stock price – like that of other home builders – declined as well.  But Plaintiffs have failed to link any corrective disclosure of any false statement or omission by Defendants with any decline in stock price for which they seek to recover.  Indeed, Michael Borgen of Navellier & Associates – the investment advisor who actually made the decision to purchase Toll Brothers stock for Hialeah – affirmatively testified that he believed that the loss in value of Toll Brothers stock over this time period was the result of market conditions, the popping of the housing bubble, and an unexpected slowdown of earnings and sales.  (Borgen

Dep. 104:14-108:14, Apr. 20, 2010 (Ex. 15).)  Mr. Borgen expressly testified that he does <u>not</u>

attribute his inability to predict these things to anything Defendants said or did.  (<u>Id.</u>)

**B.     Procedural History**

Defendants moved to dismiss the Amended Complaint on October 1, 2007.  The motion

was denied by Judge Giles in a memorandum and order dated September 2, 2008.

Defendants answered the complaint and simultaneously moved for judgment on the

pleadings under Rule 12(c) or, in the alternative, for reconsideration or certification of

interlocutory appeal under 28 U.S.C. § 1292(b).  The Court ultimately declined to grant the

motion but found "that [Judge Giles'] Order does implicate controlling questions of law about

which there may be grounds for a legitimate difference of opinion, so that consideration by the

Court of Appeals is appropriate."  (Order, Sept. 21, 2009, at 4)  The Court of Appeals, however,

declined to take the appeal.  (Order Den. Pet. for Permission to Appeal, Nov. 3, 2009.) [6]

On May 14, 2010, after several months of class certification discovery, Plaintiffs moved

for class certification.  The motion was accompanied by the declaration of Plaintiffs' retained

economist, John D. Finnerty.  Defendants deposed Professor Finnerty on May 27, 2010.  Among

other things, Professor Finnerty testified that he had not compared Toll Brothers' guidance

during the Alleged Class Period to its guidance immediately following the Alleged Class Period,

---

[6] The central basis for Defendants' motion for judgment on the pleadings was that Plaintiffs had not adequately pled the falsity of any statements by Toll Brothers: in particular, that the purported internal Toll Brothers documents – including so-called "traffic reports," "Sunday Night Reports," "Sales Reports," "Profitability Reports," and others, on which they based their claims (Am. Compl. ¶¶ 136-40) – were not described with sufficient specificity.  Plaintiffs opposed that motion by contending that they had described these documents with sufficient specificity to survive their heightened pleading burden under the Private Securities Litigation Reform Act.

Plaintiffs' counsel has since admitted that they had never possessed any of the purported internal Toll Brothers documents relied on in the Amended Complaint and described in their oppositions to Defendants' motion and petition to the Court of Appeals. (Letter from Jonathan D. Martin to Spencer A. Burkholz (Feb. 25, 2010) (Ex. 16).)  That fact surprised even the representative for Hialeah.  (Voorhees Dep. 145:11-17, Apr. 14, 2010 (Ex. 17).)

and that he had not considered what analysts were forecasting for FY2006 during the same period.  (Finnerty Dep. 175:2-6, 191:15-24, May 27, 2010 (Ex. 18).)

## STANDARDS FOR CLASS CERTIFICATION

Before a class can be certified, a plaintiff must establish the required elements of Federal Rule of Civil Procedure 23(a):  (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy").  Fed. R. Civ. P. 23(a).

Where – as here – the plaintiff seeks money damages under Rule 23(b)(3), the plaintiff must also establish that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Class certification is permissible only "'if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met.'"  In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 (3d Cir. 2008) (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982)).  In Hydrogen Peroxide, the Third Circuit clarified the standards a district court must apply when determining whether a class may be certified:

> First, the decision to certify a class calls for findings by the court, not merely a "threshold showing" by a party, that each requirement of Rule 23 is met.  Factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence.  Second, the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits – including disputes touching on elements of the cause of action.  Third, the court's obligation to consider all relevant evidence and arguments extends to expert testimony, whether offered by the party seeking class certification or by a party opposing it.

Id. at 307.

As Hydrogen Peroxide makes clear, expert testimony plays an important role at the class certification stage. Id. at 323-324. Such testimony, "like any matter relevant to a Rule 23 requirement, calls for rigorous analysis." Id. at 323. Indeed, "[w]eighing conflicting expert testimony at the certification stage is not only permissible; it may be integral to the rigorous analysis Rule 23 demands." Id. Moreover, resolving expert disputes "in order to determine whether a class certification requirement has been met is always a task for the court – no matter whether a dispute might appear to implicate the 'credibility' of one or more experts." Id. at 324.

Because predominance under Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," the standard is "'far more demanding' than the commonality requirement of Rule 23(a)." Id. at 310-11 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997)). "The predominance inquiry is especially dependent upon the merits of a plaintiff's claim, since 'the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual.'" In re Constar Int'l Inc. Sec. Litig., 585 F.3d 774, 780 (3d Cir. 2009) (quoting Hydrogen Peroxide, 552 F.3d at 310-11). Indeed, "a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." Hydrogen Peroxide, 552 F.3d at 311 (internal quotation marks omitted); see also Malack v. BDO Seidman, LLP, No. 08-0784, 2009 WL 2393933, at *4 (E.D. Pa. Aug. 3, 2009) ("Predominance . . . requires inquiry into the merits.").

# ARGUMENT

## POINT I.

### PLAINTIFFS CANNOT ESTABLISH PREDOMINANCE BECAUSE THEY CANNOT RELY ON THE FRAUD-ON-THE-MARKET PRESUMPTION

To satisfy the predominance requirement of Rule 23(b)(3), Plaintiffs must demonstrate by a preponderance of the evidence that each element of their cause of action "is capable of proof at trial through evidence that is common to the class rather than individual to its members." Hydrogen Peroxide, 552 F.3d at 311-12.  In a case brought under Rule 10b-5, 17 C.F.R. § 240.10b-5, plaintiffs must prove that "defendants made a misstatement or an omission of material fact with scienter in connection with the purchase or the sale of a security upon which plaintiffs reasonably relied and [plaintiffs'] reliance was the proximate cause of their injury." Institutional Investors Group v. Avaya, Inc., 564 F.3d 242, 251 (3d Cir. 2009) (emphasis added and internal quotation marks omitted).

Reliance is an essential element of a Rule 10b-5 claim because it "provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury."  Basic Inc. v. Levinson, 485 U.S. 224, 243 (1988).  If plaintiffs in a Rule 10b-5 case cannot establish the applicability of a class-wide presumption of reliance, they cannot "proceed[] with a class action, since individual issues then would . . . overwhelm[] the common ones."[7]  Basic, 485 U.S. at 242; see also Malack, 2009 WL 2393933, at *12 (denying motion for class certification because plaintiffs did not establish that a presumption of reliance was warranted and therefore failed to satisfy the predominance requirement by a preponderance of the evidence).

---

[7] Notwithstanding the Supreme Court's observation that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws," Amchem, 521 U.S. at 625, a district court may not "relax its certification analysis, or presume a requirement for certification is met, merely because a plaintiff's claims fall within one of those substantive categories."  Hydrogen Peroxide, 552 F.3d at 321-22.

Plaintiffs here seek to rely on the rebuttable "fraud-on-the-market" presumption to establish class-wide reliance.  As the Supreme Court has explained, "[t]he fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of the stock even if the purchasers do not directly rely on the misstatements."  Basic, 485 U.S. at 241-42 (alteration in original) (quoting Peil v. Speiser, 806 F.2d 1154, 1160-61 (3d Cir. 1986)).  If the fraud-on-the-market presumption applies, plaintiffs "need not show that they actually knew of the communication that contained the misrepresentation or omission" because the misrepresentation or omission is assumed to have "directly affect[ed] the stock prices at which the investor trade[d]."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1419 n.8 (3d Cir. 1997). Stated differently, the fraud is assumed to have been "transmitted through market price," and plaintiffs' reliance on the market price in purchasing stock serves as a proxy for their reliance on the allegedly fraudulent statements.  Basic, 485 U.S. at 248.  Central to the presumption is the concept that both the commission and disclosure of the alleged fraud have a direct impact on the market price of the security; where that is not the case, the presumption is inapplicable.  See id.

On this record, Plaintiffs cannot rely on the fraud-on-the-market presumption to prove reliance.  Whether or not Plaintiffs have met the showing necessary to avail themselves of the presumption in the first place – itself a doubtful proposition – the record conclusively establishes that the presumption has been rebutted under well-settled Supreme Court and Third Circuit law.

**A.      The Fraud-on-the-Market Presumption Is Not
Applicable Where the Alleged Fraud Did Not
Affect a Company's Stock Price**

It is well-established that the fraud-on-the-market presumption is not applicable where the alleged fraud did not affect a company's stock price.  To avail themselves of the

presumption, Plaintiffs must show that Defendants made a material misrepresentation that moved the market.  And in any event, there is no dispute that the presumption can be rebutted by a showing that severs the link between the alleged fraud and the stock price.

Courts in the Third Circuit "will presume reliance only where it is 'logical to do so.'" Zlotnick  v. Tie Commc'ns, 836 F.2d 818, 822 (3d Cir. 1988) (quoting Peil, 806 F.2d at 1161 n.11).  Contrary to Plaintiffs' suggestion that they need only show market efficiency to invoke the fraud-on-the-market presumption, Plaintiffs must also show by a preponderance of the evidence that either (1) Toll Brothers made material misrepresentations that inflated the Company's stock price in a statistically significant amount or (2) the alleged corrective disclosures caused a statistically significant decline in the Company's stock price.[8]  See Burlington, 114 F.3d at 1425; Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 175-76 (3d Cir. 2001) (relying on Burlington for the proposition that the fraud-on-the-market presumption is inapplicable unless plaintiffs establish "[1] an omission or misrepresentation that affected the value of a security [2] in an efficient market"); Alaska Elec. Pension Fund v. Pharmacia Corp., 554 F.3d 342, 352 (3d Cir. 2009) (ruling that materiality of alleged misrepresentation for purposes of class certification can be established by showing that either alleged misrepresentations or alleged corrective disclosures moved company's stock price).

---

[8] The requirement that plaintiffs show that alleged material misrepresentations (or corrective disclosures) actually moved the stock price flows directly from the Supreme Court's decision in Basic.  There, the Supreme Court explained that to "invoke the [fraud-on-the-market] presumption, a plaintiff must allege and prove:  (1) that the defendant made public misrepresentations; (2) that the misrepresentations were material; [and] (3) that the shares were traded on an efficient market," among other things.  Basic, 485 U.S. at 248 n.27 (emphasis added).  Under the Third Circuit's "special rule for measuring materiality in the context of an efficient securities market," Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2000), plaintiffs seeking to rely on the efficient market hypothesis (and the fraud-on-the-market presumption) must show that any alleged misrepresentations in fact moved the stock price. Burlington, 114 F.3d at 1425 (Whereas "[o]rdinarily, the law defines 'material' information as information that would be important to a reasonable investor in making his or her investment decision . . . [i]n the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock." ).

Plaintiffs must establish a link between the alleged fraud and stock price movements. Plaintiffs are, after all, seeking to benefit from a rebuttable presumption "(1) that the market price of the security actually incorporated the alleged misrepresentations, (2) that the plaintiff actually relied on the market price of the security as an indicator of its value, and (3) that the plaintiff acted reasonably in relying on the market price of the security."  Semerenko v. Cendant Corp., 223 F.3d 165, 178-79 (3d Cir. 2000).  If – as here – "plaintiffs' claims do not involve an omission or misrepresentation that affected the value of a security in an efficient market," then the fraud-on-the-market presumption is "inappropriate."  Newton, 259 F.3d at 175-76.

In any event, there is no dispute that the presumption is rebuttable.  In particular, Plaintiffs cannot dispute that the fraud-on-the-market presumption is rebutted by "[a]ny showing that severs the link" between the alleged misrepresentation and the price of the stock.  Basic, 485 U.S. at 248.

A host of cases in the Third Circuit and in this Court are in accord: The fraud-on-the-market theory "is a rebuttable presumption which can be vitiated by showing that the price was unaffected by the fraud."  In re DVI Inc. Sec. Litig., 249 F.R.D. 196, 203 (E.D. Pa. 2008). (internal quotation marks omitted); see also, e.g., Semerenko, 223 F.3d at 179 n.7 ("To rebut the presumption of reliance, a defendant may show that the misrepresentations were immaterial . . . or that the misrepresentations were otherwise not assimilated into the price of the security."); Zlotnick, 836 F.2d at 822 (fraud-on-the-market presumption can be rebutted "by showing that the market did not respond to the misrepresentation"); Peil, 806 F.2d at 1163 ("[R]eliance can be rebutted by showing that . . . the misrepresentations did not affect the market price of the stock . . . ."); In re Loewen Group Sec. Litig., 233 F.R.D. 154, 161 (E.D. Pa. 2005) ("The presumption of

reliance can be rebutted by showing that . . . the market did not respond to the alleged

misrepresentations . . . .").[9]

In the Third Circuit, evidence rebutting the fraud-on-the-market presumption must be

considered at the class certification stage.  This is not because Plaintiffs must conclusively prove

reliance at the class certification stage, but rather because they must establish then that reliance

"is capable of proof at trial through evidence that is common to the class rather than individual to

its members."  Hydrogen Peroxide, 552 F.3d at 311-12.  In other words, pursuant to Hydrogen

Peroxide, the Court must "consider carefully all relevant evidence and make a definitive

determination that the requirements of Rule 23 have been met," id. at 320 (emphasis added) – in

this case, a determination as to whether Plaintiffs may use the fraud-on-the-market presumption

of reliance.  In Hydrogen Peroxide, the Third Circuit held that district courts "must resolve all

factual or legal disputes relevant to class certification, even if they overlap with the merits –

including disputes touching on the elements of the cause of action."  Id. at 307.  The Third

Circuit cited approvingly a decision from the Second Circuit that remanded precisely to permit

the party opposing class certification to present evidence rebutting the fraud-on-the-market

presumption because Rule 23 requires a "definitive assessment" as to the predominance

requirement.  See Hydrogen Peroxide, 552 F.3d at 326-27 (citing In re Salomon Analyst

Metromedia Litig., 544 F.3d 474, 485-86 (2d Cir. 2008)).  Indeed, the Third Circuit expressly

emphasized that "actual, not presumed, conformance with the Rule 23 requirements is essential."

Id. at 326 (internal quotation marks omitted).

---

[9] Even Circuits that do not require affirmative proof by a plaintiff of a connection between an alleged fraud and stock price movements do recognize that the presumption is rebutted when the link between the alleged fraud and the stock price is severed.  See, e.g., In re Salomon Analyst Metromedia Litig., 544 F.3d 474, 483-84 (2d Cir. 2008).

Contrary to Plaintiffs' contention (Pls.' Mem. at 33), Defendants do not here suggest that the Court must definitively "resolve loss causation" at the class certification stage. Instead, the analysis here is distinct from the question of whether Plaintiffs can meet their burden of proving loss causation, i.e., the requirement that Plaintiffs prove that an actionable misstatement or omission caused them economic loss. Loss causation is, as Plaintiffs recognize, a distinct element of their claim, separate from reliance. (Pls.' Mem. at 34.) Although some of the same considerations apply – and although a conclusion that an alleged fraud did not affect a company's stock price would likely preclude a plaintiff from proving that the fraud caused it some economic loss – the question here is different.[10]  The question the Court must answer at the class certification stage is whether the record in this case supports a sufficient connection between the alleged fraud and Toll Brothers' stock price to permit Plaintiffs to proceed with the fraud-on-the-market presumption and thereby prove reliance on class-wide basis. Even if the Court concludes that Plaintiffs have, in fact, made a sufficient initial showing to avail themselves of the presumption, there is no dispute that <u>Basic</u> and <u>Salomon</u> instruct that the presumption can be rebutted if – as here – the record shows that the link between the alleged fraud and the stock price has been severed.

**B.      There Is No Link Between Toll Brothers' Stock
         Price and the Alleged Misrepresentations**

The misstatements alleged in the Amended Complaint did not inflate Toll Brothers' stock price; nor did the corrective disclosures alleged in the Amended Complaint cause the stock price

---

[10] For this reason, the Court need not adopt the Fifth Circuit's approach in <u>Oscar Private Equity Invs. v. Allegiance Telecom, Inc.</u>, 487 F.3d 261 (5th Cir. 2007), in which that court concluded that plaintiffs bear a burden of establishing loss causation at the class certification stage even to gain access to the rebuttable fraud-on-the-market presumption. <u>Id.</u> at 265.  Whether or not the affirmative showing necessary to avail oneself of the fraud-on-the-market presumption is co-extensive with a full-blown showing of loss causation, all the Court need do on this motion is apply the well-settled law from the Third Circuit and elsewhere addressing the requirements for <u>rebutting</u> the presumption.

to decline.  To the contrary, any alleged inflation in the Company's stock price is best explained by the fact that analyst forecasts of FY2006 net income consistently outstripped the Company's own net income projections, and the declines observed at the end of the Alleged Class Period are best explained by the convergence of analyst expectations with the Company's forecasts. Nothing in Professor Finnerty's expert report leads to a different conclusion.

Because the misrepresentations and corrective disclosures alleged in the Amended Complaint did not impact the price of Toll Brothers' stock, "the basis for finding that the fraud had been transmitted through market price [is] gone," and Plaintiffs cannot avail themselves of the fraud-on-the-market presumption.  Basic, 485 U.S. at 248.

      **1.**      **Because Toll Brothers' Forecasts During the Alleged Class Period Were Always Below or Within Its Concededly Non-Fraudulent Forecast After the Close of the Class Period, They Neither Artificially Inflated the Company's Stock Price Nor Caused Its Stock Price to Decline**

The record here conclusively demonstrates that Defendants' statements about FY2006 net income growth – the core of Plaintiffs' case[11] – neither artificially inflated Toll Brothers' stock price nor caused the stock price to decline.

As Professor Gibbons explains and as Professor Finnerty conceded, a simple mathematical calculation, which investors and analysts at the time would have performed, shows irrefutably that the allegedly fraudulent forecasts were at all times below or within the first forecast the Company issued after the close of the Alleged Class Period – a forecast which Plaintiffs do not allege to have been fraudulent.  (Gibbons Decl. ¶¶ 7(a), 10-20; accord Finnerty

---

[11] Plaintiffs also suggest that other generic statements about "demand" or information about various internal metrics, including "traffic" and "active selling communities," were allegedly fraudulent.  (See, e.g., Am. Compl. ¶¶ 26, 55, 68, 92, 129.)  But even assuming these statements were otherwise actionable, Plaintiffs' complaint itself concedes that these statements and metrics were relevant only insofar as they were "indicator[s]" of whether the Company's future net income guidance was achievable.  (Id.)

Dep. 183:21-184:6 (Ex. 18).)  In dollar terms, the net income predicted by Toll Brothers for

FY2006 was as follows:

| Figure 3 Toll Brothers' 2006 Net Income Guidance[12] (*dollar figures in millions*) | |
| --- | --- |
| **Immediately Following Close of Alleged Class Period** | |
| 12/8/05 | $810 - $890 |
| **During Alleged Class Period** | |
| 12/9/04 | $687.31 |
| 2/23/05 | $785.49 |
| 5/26/05 | $834.59 |
| 8/25/05 | $883.68 |

As Professor Gibbons explains, the Company's FY2006 projections could not, as an economic

matter, have artificially inflated the price of Toll Brothers stock because those forecasts were

never overstated when compared with the concededly non-fraudulent forecast issued after the

end of the Alleged Class Period.  (Gibbons Decl. ¶¶ 20, 25.)

When one considers the Company's forecasts for FY2005 and FY2006 together, the

observation that the Company's forecasts in the aggregate were never overstated is even

stronger.  Professor Gibbons compared the combined net income projections the Company

provided for FY2005 and FY2006 during the Alleged Class Period with the actual results (for

FY2005) and forecast (for FY2006) it provided on December 8, 2005.  (Gibbons Decl. ¶¶ 22-23.)

Toll Brothers' combined net income projections for FY2005 and FY2006 were always well

---

[12] The numbers reported in Figure 3 are taken from Table 1 in the Gibbons Declaration.  (Gibbons Decl. ¶ 13.)

below, or at the very bottom of, the guidance it issued following the end of the Alleged Class

Period.  (Id.)

| Figure 4 Toll Brothers' Combined 2005 and 2006 Net Income Guidance[13] (dollar figures in billions) | |
|---|---|
| **Immediately Following Close of Alleged Class Period** | |
| 12/8/05 | $1.616 - $1.696 |
| **During Alleged Class Period** | |
| 12/9/04 | $1.260 |
| 2/23/05 | $1.440 |
| 5/26/05 | $1.530 |
| 8/25/05 | $1.620 |

As Figures 3 and 4 demonstrate, the Company never revised its FY2006 guidance

downward during the relevant time period.  In other words, the "corrective disclosures" alleged

in the Amended Complaint did not actually "correct" anything.  (Gibbons Decl. ¶¶ 20, 23.)  To

the contrary, immediately following the end of the Alleged Class Period, Toll Brothers told the

market that its FY2006 net income would be greater than – or at least approximately as high as –

what the Company had forecasted in December 2004, February 2005, May 2005, and August

2005.

Given these unique facts, the allegedly fraudulent forecasts issued during the Alleged

Class Period could not have caused any artificial inflation in the price of Toll Brothers' stock,

and the supposed "corrective disclosure" of that alleged fraud could not have caused the stock

price drops that occurred at the end of the Alleged Class Period.

_____

[13] The numbers reported in Figure 4 are taken from Table 2 in the Gibbons Declaration.  (Gibbons Decl. ¶ 22.)

2.    **Movements in Toll Brothers' Stock Price During the Alleged Class Period Are Best Explained By the Divergence of Analyst Expectations From the Company's Own Forecasts**

The movements in Toll Brothers' stock price during the Alleged Class Period are best explained not by any actionable conduct by Defendants but rather by the fact that, throughout the Alleged Class Period, independent analyst forecasts were always greater than the Company's own forecasts, and often substantially so.  And Toll Brothers cannot be held liable for any inflation and subsequent decline of its stock price that was caused by third party analysts.

As Plaintiffs themselves concede, "the price of a company's security is often affected by analysts' reports of information underlined through their own investigation and analysis."  (Pls.' Mem. at 27 (emphasis added) (quoting DVI, 249 F.R.D. at 209).)  And as Plaintiffs' expert testified at his deposition, independent analyst forecasts of a company's future earnings drive the market's expectations for those earnings.  (Finnerty Dep. 144:14-145:15 (Ex 18).)

As Professor Gibbons explains and as Professor Finnerty conceded, during the Alleged Class Period, independent analyst consensus estimates for FY2006 net income were consistently higher than the Company's own projections.  (Gibbons Decl. ¶¶ 28-31; accord Finnerty Dep. 194:18-24 (Ex. 18).)  In December 2004, for example, the Company predicted FY2006 net income of $687.31 million while the mean analyst estimate was $700.10 million.  (Gibbons Decl. ¶ 30.)  This gap grew significantly over the next several months, and by June 2005, the mean analyst estimate for FY2006 net income was $883.38 million – nearly $50 million greater than the Company's projection of $834.59.  (Id. ¶ 28.)  By mid-August 2005, the difference had reached its peak: While the Company continued to project FY2006 net income of only $834.59 million, the mean analyst estimate was $946.17 million.  (Id. ¶ 31.)  In September 2005, the gap between the Company's FY2006 net income projection and analysts' FY2006 net income projection was still over $100 million.  (Id.)  Even Plaintiffs' own expert was surprised at the

size of this spread between the Company's and analysts' forecasts.  (Finnerty Dep. 191:15-21

(Ex. 18).)  After the Company announced on November 8, 2005 that it would defer issuing

further guidance until the following month, analysts responded by decreasing their FY2006 net

income projection to $897.15 million.  (Gibbons Decl. ¶ 33.)[14]  As Professor Finnerty noted at

his deposition, this figure turned out to be only slightly higher than the Company's August 25,

2005 forecast – in other words, "[p]retty close to the company's last guidance."  (Finnerty Dep.

194:4-17 (Ex. 18).)  This demonstrates that, after the date of the final alleged corrective

disclosure, analysts' expectations finally fell into line with what the Company had been

forecasting all along.[15]

---

[14] The mean and median analyst estimates are substantially the same for each of these dates.  (Gibbons Decl. ¶ 28 n.1.)

[15] Professor Gibbons demonstrates that the same holds true for the Company's preliminary estimates of FY2007 net income provided in August 2005.  (Gibbons Decl. ¶¶ 35-36.)  Those estimates, which built on assumed net income for FY2005 and FY2006, were also lower than the combined analyst consensus estimates for FY2005, FY2006, and FY2007 as of mid-November 2005, after the close of the Alleged Class Period.  (Id.)  Moreover, as Professor Gibbons concludes, the FY2007 guidance provided by Toll Brothers during the Alleged Class Period was consistent with the net income guidance it provided in December 2005 in that the Company always called for caution with respect to FY2007 in light of uncertain economic conditions, and in December 2005, the Company made clear that its FY2007 income could be either greater or less than 20% year-over-year growth.  (Id. ¶ 24.)

This pattern is illustrated by the following chart:

**Figure 5**
**Toll Brothers' and Analysts' 2006 Net Income Estimates[16]**



As is clear from Figure 5, during the Alleged Class Period – and particularly between August 2005 and October 2005 – the market affirmatively rejected the Company's more conservative earnings forecasts in favor of analysts' more aggressive forecasts.

In his report, Professor Finnerty illustrates the significance of analyst expectations in this case. For example, he attributes the decline in the price of Toll Brothers stock on August 25, 2005 – the second alleged corrective disclosure date – at least in part to comments by equity

---

[16] The numbers reported in Figure 5 are taken from Table 3 of the Gibbons Declaration (Gibbons Decl. ¶ 28), and from data obtained from the Institutional Brokers' Estimate System (I/B/E/S Estimates (Ex. 19)). The Institutional Brokers' Estimate System ("I/B/E/S") is a service that collects and disseminates information on analyst estimates. (Gibbons Decl. ¶ 27.) I/B/E/S data are frequently used in articles published in academic finance journals that study investor expectations in stock markets. (Id.) Plaintiffs' expert testified that he himself uses I/B/E/S data in his academic and consulting work. (Finnerty Dep. 185:18-21 (Ex. 18).) I/B/E/S updates its estimates once a month, around the middle of the month. (Gibbons Decl. ¶ 28 n.1.)

analysts.  (Finnerty Decl. ¶¶ 47-49, 87-89.)  Specifically, Professor Finnerty explains, analysts

reacted negatively because they believed Toll Brothers' guidance for FY2006 was too

"conservative":  analysts had been expecting earnings per share growth of 27% for FY2006, so

they were disappointed when the Company maintained its 20% net income growth forecast.  (Id.

¶ 89.)  Moreover, some analysts recognized that the Company's announcement reflected an

effort to encourage analysts to temper their overly-bullish expectations.  For example, a

Wachovia report dated August 25, 2005 stated that Toll Brothers' "conservatism" in its FY2006

guidance was "apparently unmatched by a number of other analysts based on their 2006

estimates" – which, as explained above, dwarfed the Company's own estimate – and that

"[p]erhaps TOL is also attempting to reset some more aggressive Street expectations."

Wachovia Securities, TOL: EPS Of $1.27 Exceeds Our $1.18 Estimate, Aug. 25, 2005, at 4 (Ex.

12).

It is well-established that Plaintiffs cannot bring a securities fraud claim against

Defendants for statements that analysts – and not Defendants – made, unless the Company

somehow endorsed those statements.  See Burlington, 114 F.3d at 1428.[17]  Here, Defendants did

the opposite: Rather than endorsing the independent analyst forecasts that were substantially

higher than their own, Toll Brothers remained conservative and sounded cautionary notes when

appropriate.  But the market simply chose not to listen until after the end of the Alleged Class

Period, when analyst forecasts returned to the levels the Company had been forecasting.

Given these unique facts, the allegedly fraudulent projections issued during the Alleged

Class Period could not have caused any inflation in the Company's stock price because the

---

[17] See also Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 158 (2d Cir. 2007) ("Plaintiffs have not alleged facts to show that Deloitte's misstatements, among others (made by Warnaco) that were much more consequential and numerous, were the proximate cause of plaintiffs' loss; nor have they alleged facts that would allow a factfinder to ascribe some rough proportion of the whole loss to Deloitte's misstatements.").

market actually disregarded those forecasts – as evidenced by consensus analyst forecasts that were far in excess of Company guidance.  (Gibbons Decl.¶ 8.)  And although the alleged partial disclosure dates in the Amended Complaint happen to coincide with declines in Toll Brothers' stock price, those declines are attributable not to any actionable conduct by Defendants, but rather to the convergence of consensus analyst expectations with the Company's own forecasts. (Id.)

### 3. Plaintiffs' Expert Cannot Establish a Link Between the Alleged Misstatements and Toll Brothers' Stock Price

Nothing in Professor Finnerty's declaration or testimony undercuts the simple economic facts set forth above.  In particular, in the face of these facts Professor Finnerty does not – and cannot – establish that the alleged fraud affected Toll Brothers' stock price.  (Gibbons Decl. ¶¶ 38-43.)

Until his deposition, Professor Finnerty had not considered the Company's FY2006 net income forecasts in dollar terms.  (Finnerty Dep. 175:2-6 (Ex. 18).)  When presented with these figures at his deposition, he conceded that the 20% guidance Toll Brothers provided during the Alleged Class Period was at all times below or within the range the Company provided on December 8, 2005 – a range which Plaintiffs do not allege to have been fraudulent.  (Id. 183:21-184:6.)

Nor did Professor Finnerty assess whether the stock price declines he observed were attributable to the fact that the Company did not meet analysts' inflated expectations.  (See, e.g., id. 191:15-24, 195:18-196:13.)  When shown the analyst consensus data at his deposition, Professor Finnerty agreed that during the Alleged Class Period, the Company's FY2006 forecasts were consistently lower than the corresponding consensus analyst estimates, and that even after the final alleged corrective disclosure on November 8, 2005, the consensus analyst

estimate still exceeded the last forecast the Company issued during the Alleged Class Period. (Id. 194:18-24.)

The limited analysis that Professor Finnerty did undertake suffers from at least two fundamental flaws.  (Gibbons Decl. ¶¶ 38-43.)  First, Professor Finnerty did not address, and testified that he was not asked to address, whether the so-called misrepresentations alleged in the Amended Complaint caused any artificial inflation in Toll Brothers' stock price.  (Finnerty Dep. 103:6-12 (Ex. 18); cf. Gibbons Decl. App. A.)  Second, he expressly testified that he did not – and likely cannot – determine what news on any given day caused the stock price declines at issue.  (See, e.g., Finnerty Dep. 169:5-170:7 (Ex. 18); cf. Gibbons Decl. App. B.)  For example, Professor Finnerty opines that the stock price decline on Plaintiffs' third purported corrective disclosure date, October 3, 2005, was caused in part by a *New York Times* article about "McMansions" going out of style.  (Finnerty Dep. 167:22-169:19 (Ex. 18); Finnerty Decl. ¶¶ 91-93.)  The article, however, reported contemporaneous developments in the housing market; it did not reveal any previously undisclosed information about Toll Brothers.  See Fred. A. Bernstein, Are McMansions Going Out of Style?, N.Y. Times, Oct. 2, 2005, at Sec. 11 Col. 3 (Ex. 20). Although Professor Finnerty testified that the October 3 decline "could be" caused by the *New York Times* article, he did not endeavor to "figure out what part of the impact that [he] observed is directly attributable" to the article.  (Finnerty Dep. 168:18-169:19 (Ex. 18).)  Asked whether he could perform such an analysis, Professor Finnerty testified that "it would be virtually impossible."  (Id. 169:20-170:7.)[18]

---

[18] There are fundamental flaws with Professor Finnerty's analysis of the other purported corrective disclosure dates as well.  (Gibbons Decl. ¶¶ 40-42, App. B.)  For example, Professor Finnerty concedes that the decline in Toll Brothers' stock price on August 4, 2005, the first purported corrective disclosure date, was not statistically significant.  (Finnerty Dep. 172:12-19 (Ex. 18).)  Jettisoning the date on which the alleged corrective disclosure was actually made, Professor Finnerty considered instead a different price decline on August 5.  (Id. 149:15-21.)  Confronted with this fact at his deposition, Professor Finnerty conceded that the Company's August 4 earnings announcement did not cause the stock price to drop on August 5.  (Id. 154:22-156:6.)  Instead, the decline

More crucially, Professor Finnerty expressly testified that he is not opining that the stock price declines on the four alleged partial disclosure dates were causally related to the alleged misrepresentations, or, indeed, to any particular misconduct by Defendants.  (Id. 120:18-123:2.) For that reason, he has not offered any opinion on the central question on which Professor Gibbons opines – whether the alleged fraud in this case affected Toll Brothers' stock price. Professor Gibbons' declaration on these points is effectively unrebutted.

And even if Professor Finnerty were offering an opinion purporting to connect the alleged fraud with Toll Brothers' stock price, his analysis would still fail.  As the Third Circuit expressly concluded in a very recent opinion, testimony like Professor Finnerty's fails unless it can disaggregate the effect on the stock price of the specific alleged corrective disclosures (as opposed to other negative information disclosed at the same time).  See United States v. Schiff, 602 F.3d 152, 171-77 (3d Cir. 2010).  In Schiff, a criminal case under Rule 10b-5,  the Third Circuit affirmed the district court's exclusion, on Daubert grounds, of an expert proffered by the government to show that the stock price drops on three alleged corrective disclosure dates were evidence of the materiality of the alleged misrepresentations.  See id. at 171.  As in this case, the expert looked at all of the news released on those dates and did not try to disaggregate the stock price impact caused by the specific alleged corrective disclosures.  See id. at 173.  The district court concluded that this testimony was not probative of the materiality of the alleged misrepresentations because, as here, the expert had not attempted to statistically disaggregate the effect of news that was negative, but not corrective, and had not made an effort to determine whether the alleged corrective disclosures in fact contained new information.  See id. at 173-75. The Third Circuit affirmed.  For precisely the same reasons, Professor Finnerty's declaration and

---

on that day "was the result of the interpretations of the earnings release" by analysts, (id. (emphasis supplied)), which are not actionable, Burlington, 114 F.3d at 1428.

testimony would be inadmissible even if he were attempting to conclude that the alleged

misrepresentations affected Toll Brothers' stock price.

## POINT II.

## PLAINTIFFS PROVIDE NO BASIS FOR THE COURT
## TO DETERMINE AN APPROPRIATE CLASS PERIOD

Any attempt to determine when an appropriate class period might start in this case

demonstrates conclusively that class certification is improper.  In a Rule 10b-5 case like this one,

the class period begins when an alleged misstatement first artificially inflates the company's

stock price and ends when the "truth" is revealed and the inflation is removed from the stock

price.  In re CIGNA Corp. Sec. Litig., 459 F. Supp. 2d 338, 339 n.1 (E.D. Pa. 2006).  On a

motion for class certification, the Court has a "duty to go behind the pleadings to determine the

appropriate class period," even if that means engaging "in preliminary factual inquiries on the

merits in order to resolve questions pertaining to the appropriate . . . date[s]."  In re Schering

Plough Corp. ERISA Litig., 589 F.3d 585, 602-03 (3d Cir. 2009) (remanding for district court to

reconsider class period).

The class period cannot conceivably begin on December 9, 2004, as currently alleged,

because Toll Brothers was then predicting FY2006 net income of only $687.31 million, which

was more than $120 million lower than the bottom of the range forecasted on December 8, 2005,

immediately after the end of the Alleged Class Period.

There is simply no viable date on which to begin a class period here.  On every day

during the Alleged Class Period, the Company's forecasts were below – and usually substantially

below – what independent securities analysts were forecasting, and they were also below or

within the guidance the Company issued after the end of the Alleged Class Period.  Plaintiffs

therefore never had any basis to allege that Toll Brothers even made a misrepresentation.

Accordingly, the Court cannot certify any class period in this case, let alone the class period alleged in the Amended Complaint.

## POINT III.

### PLAINTIFFS CANNOT SATISFY THE ADEQUACY AND TYPICALITY REQUIREMENTS OF RULE 23(a)

It is well established that "a class may be certified only if the court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." Schering Plough, 589 F.3d at 595-96 (internal quotation marks and alternations omitted) (quoting Beck v. Maximus, 457 F.3d 291, 297 (3d Cir. 2006)).[19]  This analysis reveals that Plaintiffs have failed to adequately protect the interests of the class and that they relied on atypical investment strategies which were unaffected by public statements and which refute the efficient market theory on which Plaintiffs' motion relies.  Because Plaintiffs are neither adequate nor typical, their motion to certify the class as its representatives must be denied.

### A.    Plaintiffs Are Not Adequate Because They Do Not Function as a "Group" Under the PSLRA

Plaintiffs are barred by statute from serving together as class representatives in this case. The Third Circuit has instructed that the PSLRA does not permit "co-Lead Plaintiffs."  See In re Cendant Corp. Litig., 264 F.3d 201, 223 n.3 (3d Cir. 2001).  Instead, there is "one lead plaintiff under the Reform Act:  an individual, an institution or a properly-constituted group."  Id. (internal quotation marks omitted).  A "properly-constituted group" of plaintiffs is one that will "function as an active agent for the class" and "fairly and adequately represent the interests of the class."  Id. at 266; see also Smith v. Suprema Specialties, Inc., 206 F. Supp. 2d 627, 636-37 (D.N.J. 2002).  "In cases where a group serves as lead plaintiff, it is for the group's members to

---

[19] The Court is not bound by its prima facie findings of adequacy and typicality made to approve Plaintiffs' uncontested motion to appoint lead plaintiffs.  In re Party City Sec. Litig., 189 F.R.D. 91, 106 (D.N.J. 1999).

decide how the group will make decisions, but it is the group – not its constituent members – that speaks for the class." Cendant, 264 F.3d at 223 n.3.

To determine whether multiple plaintiffs qualify as a "properly-constituted group," courts consider: "(i) whether the individuals in question had a pre-existing relationship, (ii) the extent of that relationship, (iii) whether the group was created by the efforts of lawyers for the purpose of obtaining lead plaintiff status, and (iv) whether the group is too large to adequately represent the Class." Suprema, 206 F. Supp. 2d at 636-37 (citing Cendant, 264 F.3d at 266-67).

The record here is clear that Plaintiffs have made no effort whatsoever to act as a singular "lead plaintiff."  In the three years since this action was first filed, Plaintiffs have spoken by telephone once – for ten to fifteen minutes, with Plaintiffs' counsel, to discuss their upcoming depositions in this case.  (Smith Dep. 75:24-76:9, Apr. 15, 2010 (Ex. 21); Voorhees Dep. 106:19-107:19, Apr. 14, 2010 (Ex. 17).)  Plaintiffs have had no discussions at all about the merits of the case, about litigation strategy, or about retaining Plaintiffs' counsel to represent the class.  (Smith Dep. 75:24-78:12 (Ex. 21); Voorhees Dep. 106:19-107:19 (Ex. 17).).  Plaintiffs have therefore never tried "to decide how the group will make decisions" so that they can "speak[] for the class." Cendant, 264 F.3d at 223 n.3.

Plaintiffs had no prior relationship when this case was filed.  On the contrary, each was approached separately by Plaintiffs' counsel and then paired together as part of the lead plaintiff process.  (Smith Dep. 39:20-42:21 (Ex. 21); Voorhees Dep. 67:4-69:3 (Ex. 17).)  Plaintiffs have been more the agents of their lawyers than the agents of any potential class; as such, they are wholly inadequate to serve as class representatives.  They do not even remotely approximate the "properly-constituted group" required by the PSLRA.  See Cendant, 264 F.3d at 267 (explaining that if lead plaintiff "group" "had been created by the efforts of lawyers hoping to ensure their

eventual appointment as lead counsel, [a court] could well conclude, based on this history, that

the members of that 'group' could not be counted on to monitor counsel in a sufficient manner");

<u>Suprema</u>, 206 F. Supp. 2d at 636 (finding lead plaintiffs inadequate where "it appears that these

unrelated individuals amalgamated together for the sole purpose of obtaining lead plaintiff

status").[20]

Indeed, one flagrant example of Plaintiffs' inadequacy is their failure to negotiate a fee

arrangement with Plaintiffs' counsel.  The Third Circuit has instructed that "one of the best ways

for a court to ensure that [a lead plaintiff] will fairly and adequately represent the interests of the

class is to inquire whether [the lead plaintiff] has demonstrated a willingness and ability to . . .

negotiate a reasonable retainer agreement with . . . counsel."  <u>Cendant</u>, 264 F.3d at 265.  Three

years ago, when Judge Giles granted Plaintiffs' motion to serve as lead plaintiff, he expressly

stated that he was "confident that [Plaintiffs] will endeavor to negotiate a reasonable fee

arrangement with counsel."  (Order, June 29, 2007, at 5-6.)  This confidence was abused by

Plaintiffs.  Neither Plaintiff has done anything in the last three years to negotiate a contingency

fee with Plaintiffs' counsel, (Smith Dep. 46:20-22, 55:17-57:7 (Ex. 21); Voorhees Dep. 77:10-

14, 86:1-87:3 (Ex. 17)), and they therefore cannot properly represent a class.  <u>Suprema</u>, 206 F.

Supp. 2d at 637 (finding plaintiff inadequate when it "has not demonstrated that it has negotiated

a retainer with its counsel on behalf of the Class").

The PSLRA was intended to eliminate "lawyer-driven" class action securities litigation.

To that end, Congress sought "to transfer control of securities class actions from the attorneys to

the class members . . . through a properly selected lead plaintiff."  <u>In re Cendant Corp.</u>, 260 F.3d

---

[20] <u>See also</u> <u>In re Razorfish, Inc. Sec. Litig.</u>, 143 F. Supp. 2d 304, 308 (S.D.N.Y. 2001) (refusing to appoint lead plaintiff group that, in the court's view, was "simply an artifice cobbled together by cooperating counsel for the obvious purpose of creating a large enough grouping of investors to qualify as 'lead plaintiff,' which can then select the equally artificial grouping of counsel as 'lead counsel'").

183, 197 (3d Cir. 2001); see In re Herley Indus. Inc. Sec. Litig., No. 06-2596, 2009 WL

3169888, at *10 (E.D. Pa. Sept. 30, 2009) ("The PSLRA's guidelines for appointing a lead

plaintiff were drafted to ensure the lead plaintiff – not the lead counsel – has the largest incentive

to vigorously litigate on behalf of the class."). That has not happened in this case. One apparent

reason is that Plaintiffs' counsel has mischaracterized to Plaintiffs the role Plaintiffs are

supposed to play:

> [Y]ou're going to be asked to do some things and we're going to try to make it,
> you know, as painless as possible for the Retirement System. Essentially, what
> you're going to be asked is to produce documents – we have those. You're going
> to be asked to give a deposition, so a representative of the Fund will have to give
> a deposition. That's probably the most time-consuming part of the whole class
> process; the most time-consuming part of the case for anyone at the Fund. We'll
> prepare you – that will take a half-a-day to a day, and then you'll give a
> deposition. You'll be well prepared for it; that can take a half-a-day to a day. So,
> we're looking for maximum of two days of someone's time for this, you know, to
> act as a possible representative.

(Tr. of Hialeah Bd. Mtg., Jan. 27, 2009 (Ex. 22) (emphasis added).) It is no surprise that

Plaintiffs have done nothing to monitor this meritless, lawyer-driven action. Indeed, everything

about Plaintiffs' conduct to date in this case suggests that they are mere figureheads who have

improperly ceded all control to Plaintiffs' counsel:

- Plaintiffs' sole involvement in the litigation has been to receive updates from counsel and participate in discovery. (Smith Dep. 15:21-16:16, 71:12-73:21 (Ex. 21);Voorhees Dep. 22:24-23:16, 40:15-42:7 (Ex. 17).)

- Plaintiffs did not even review the complaint before it was filed. (Smith Dep. 81:19-83:13 (Ex. 21);Voorhees Dep. 108:2-111:16 (Ex. 17).)

- During discovery, Plaintiffs demonstrated further inadequacy by failing to issue preservation notices or notify their investment advisors of the pending litigation. (Smith Dep. 174:7-176:22 (Ex. 21); Voorhees Dep. 184:21-185:2 (Ex. 17); see Borgen Dep. 22:20-23:1 (Ex. 15).)

- Plaintiffs then failed to search for and produce documents prior to their depositions. (Smith Dep. 37:19-38:15, 70:2-12, 121:5-122:18, 158:17-160:22, 167:18-169:4, 176:23-178:21 (Ex. 21); Voorhees Dep. 96:18-97:21, 179:2-7 (Ex. 17).) Such inadequate production subjects Plaintiffs to unique evidentiary and spoliation defenses.

**B.      Plaintiffs Are Atypical Because They
         Are Subject to Unique Defenses**

In addition, neither Plaintiff can serve as a class representative in this case because each

is subject to unique defenses that would at the very least become the focus of the litigation, and

likely make it impossible for either to prove the claims they assert.

The Third Circuit has ruled that "the proper consideration in assessing typicality . . .

include[s] three distinct, though related, concerns: (1) the claims of the class representative must

be generally the same as those of the class in terms of both (a) the legal theory advanced and (b)

the factual circumstances underlying that theory; (2) the class representative must not be subject

to a defense that is both inapplicable to many members of the class and likely to become a major

focus of the litigation; and (3) the interests and incentives of the representative must be

sufficiently aligned with those of the class."  Schering Plough, 589 F.3d at 599.  The typicality

requirement ensures "that the class representatives are sufficiently similar to the rest of the class

– in terms of their legal claims, factual circumstances, and stake in the litigation – so that

certifying those individuals to represent the class will be fair to the rest of the proposed class."

Id. at 597 (emphasis omitted).

Even if a class could proceed based on the fraud-on-the-market presumption – which it

cannot for the reasons demonstrated above – Laborers could not serve as an appropriate class

representative because it cannot itself rely on the presumption.  According to its own investment

manager, Laborers did not purchase Toll Brothers stock in reliance on the integrity of the stock

price, but instead pursuant to a "momentum" investment strategy.  (Fram Dep. 71:13-72:16, Apr.

28, 2010 (Ex. 23).)  That investment strategy is based on the behavioral finance hypothesis,

which the investment manager testified "basically refutes" the efficient market hypothesis.[21]  (Id.

53:2-5.)  A momentum investing strategy assumes, in simplified terms, that "stocks that have

been going up, tend to go up and stocks that have been going down, tend to go down."  (Id.

49:23-50:14.)  The efficient market hypothesis rejects such a notion, because, as Plaintiffs' own

expert states, in an efficient market stocks follow a "random walk" and "an investor cannot profit

on one day solely by knowing the return of the stock the previous day."  (Finnerty Decl. ¶¶ 75,

77, 101.)  By contrast, Laborers' investment manager purchased Toll Brothers stock in reliance

on the fact that investors "behave in strange ways," resulting in price movements that should not

happen in an efficient market.  (Fram Dep. 52:5-15 (Ex. 23).)  Laborers is therefore indisputably

incapable of adequately representing a class of investors relying on the fraud-on-the-market

theory.  See In re Safeguard Scientifics, 216 F.R.D. 577, 582 (E.D. Pa. 2003) (rejecting lead

plaintiff who was a day trader who relied on "technical price movements rather than price"

because he would be subject to unique defenses under the fraud-on-the-market theory).

In addition, Hialeah and Laborers both delegated their investment decisions to outside

investment managers – Navellier & Associates ("Navellier") and New York Life Investment

Management ("NYLIM"), respectively.  These advisors employed quantitative investment

strategies that, as they admit, did not consider the Company's statements or forecasts, but instead

relied on historical stock price movements and current period financials (which Plaintiffs do not

claim were misstated).  (Borgen Dep. 62:5-68:12, 78:8-17 (Ex. 15); Fram Dep. 37:16-38:9,

---

[21] Behavioral finance is an academic field that has "document[ed] violations of the efficient market
hypothesis" and "accumulated research on 'irrationality' of some investors."  Frederic C. Dunbar & Dana Heller,
Fraud on the Market Meets Behavioral Finance, 31 Del. J. Corp. L. 455, 471 (2006).  Commentators have noted that
"[a] lead plaintiff will rarely admit to trading for reasons other than integrity of the stock price because then they are
not trading in reliance on the alleged fraud.  Momentum traders and others base their trades on signals from prices
and other traders that may not be materially affected by any claimed fraud."  Id. at 521.  Here, however, Laborers'
investment manager readily admitted that it had purchased Toll Brothers stock based on price momentum – a
strategy that, the investment manager conceded, "basically refutes" the efficient market hypothesis.

71:13-72:16, 94:14-96:5 (Ex. 23).)  To the extent Navellier and NYLIM used forecasts in their

quantitative models, they relied exclusively on I/B/E/S consensus analyst data.  (Borgen Dep.

61:11-68:12 (Ex. 15); Fram Dep. 77:16-78:20 (Ex. 23).)  As discussed above, that data yielded

growth forecasts that always exceeded, and sometimes dwarfed, the forecasts issued by the

Company.  Because their investment managers have already conceded that they did not rely on

the Company's forecasts at all, Plaintiffs cannot establish the required elements of fraud and are

subject to the unique defense that they "would have made the purchase[s] regardless of the

misstatement."  Safeguard Scientifics, 216 F.R.D. at 582 (quoting In re Regal Commc'ns Corp.

Sec. Litig., No. 94-179, 1995 U.S. Dist. LEXIS 13492, at *13-14 (E.D. Pa. Sept. 14, 1995)).

This conclusion is bolstered by the fact that Laborers increased its holdings in Toll Brothers after

each of the alleged corrective disclosures, including just weeks after the end of the Alleged Class

Period.  (List of Laborers' Stock Trades (Ex. 24)); see Safeguard Scientifics, 216 F.R.D. at 582

(post-class period purchases suggested that plaintiff would have purchased regardless of alleged

fraud).

     Finally, Hialeah will face unique defenses because its own investment advisor – who

purchased Toll Brothers stock for it – specifically rejected Plaintiffs' theory of loss causation in

his deposition.  The advisor said that he did not blame Toll Brothers for Hialeah's losses.

(Borgen Dep. 107:13-108:14 ("I don't blame them at all.") (Ex. 15).)  Rather, he explained that

Hialeah lost money in Toll Brothers stock because Navellier did not predict "a slowdown in the

overall economy" and "a popping of the housing bubble."  The advisor did not attribute

Navellier's inability to predict the declining market to Toll Brothers at all.  (Id. 104:3-108:14.)

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court deny

Plaintiffs' motion for class certification.

Dated:    June 15, 2010

Respectfully submitted,


By:   /s/ Michael P. Carroll
         Michael P. Carroll

Michael P. Carroll (*admitted pro hac vice*)
Edmund Polubinski III (*admitted pro hac vice*)
Jonathan D. Martin (*admitted pro hac vice*)

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
Michael.Carroll@davispolk.com
Edmund.Polubinski@davispolk.com
Jonathan.Martin@davispolk.com

DECHERT LLP

   Robert C. Heim
   Michael Newman

Cira Center
2929 Arch Street
Philadelphia, Pennsylvania 19104
(215) 994-4000
(Robert.Heim@dechert.com)
(Michael.Newman@dechert.com)

*Attorneys for Defendants Toll Brothers, Inc.*
   *Bruce E. Toll, Robert I. Toll, Zvi Barzilay,*
   *Joel H. Rassman, and Joseph R. Sicree*

By:   /s/ Robert E. Zimet
      Robert E. Zimet

Robert E. Zimet (*admitted pro hac vice*)
Christopher P. Malloy (*admitted pro hac vice*)
William F. Clarke, Jr. (*admitted pro hac vice*)
Daniel M. Gonen (*admitted pro hac vice*)

SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
Four Times Square
New York, New York  10036
(212) 735-3000
Robert.Zimet@skadden.com
Christopher.Malloy@skadden.com
William.Clarke@skadden.com
Daniel.Gonen@skadden.com

SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP

    Anthony W. Clark
    Kimberly A. LaMaina

One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000
Anthony.Clark@skadden.com
Kimberly.LaMaina@skadden.com

*Attorneys for Defendants Robert S. Blank,
Richard Braemer, Paul E. Shapiro, and Carl
B. Marbach*

## <u>CERTIFICATE OF SERVICE</u>

I, Edmund Polubinski III, hereby certify that, on June 15, 2010, I caused to be filed electronically and served electronically on all counsel of record a true and correct copy of Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification, the Declaration of Edmund Polubinski III, and the Declaration of Professor Michael R. Gibbons. These documents are available for viewing and downloading from the ECF system.


/s/ Edmund Polubinski III
Edmund Polubinski III